# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PROTECT DEMOCRACY PROJECT,

                Plaintiff,

     v.

U.S. OFFICE OF MANAGEMENT & BUDGET et al.,

                Defendants.

Case No. 1:25-cv-01111

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR EXPEDITED SUMMARY JUDGMENT, OR IN THE ALTERNATIVE A PRELIMINARY INJUNCTION OR A WRIT OF MANDAMUS

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

   I.   Congress Establishes an Apportionment Process for Federal Agencies........................... 2

   II.  Congress Mandates Apportionment Transparency ............................................... 5

   III. Protect Democracy Launches OpenOMB .......................................................... 8

   IV. The President and Defendant Vought Indicate an Intent to Impound Funds .................... 10

   V.  OMB Ceases Following the Statutory Disclosure Requirements ..................................... 10

ARGUMENT ................................................................................................................... 12

   I.   The Court Should Grant Expedited Summary Judgment ................................................. 14

      A. Legal Standard for Summary Judgment........................................................................ 14

      B. Defendants' Actions Violate the APA ......................................................................... 15

          1. OMB's Actions Are Contrary to the Relevant Appropriations Acts ....................... 15

          2. OMB's Actions Violate the Constitution................................................................ 17

          3. OMB's Actions Are Arbitrary and Capricious ......................................................... 18

          4. OMB's Actions Represent Agency Action Unlawfully Withheld.......................... 20

      C. If Necessary, Defendants' Actions Should Equitably Enjoined as Unconstitutional and *Ultra Vires* ......................................................................................... 21

      D. Defendants Cannot Rely on Any Privilege or Sensitivities to Violate the Law........... 22

   II.  If the Court Concludes That Expedited Summary Judgment Cannot Be Granted, the Court Should Issue a Preliminary Injunction ........................................................... 26

      A. Legal Standard for a Preliminary Injunction................................................................ 26

      B. All Four Preliminary Injunction Factors Are Met Here ............................................ 27

   III. If the Court Cannot Require Restoration of the Required Website Through Plaintiff's Other Claims, the Court Should Issue a Writ of Mandamus.............................................. 30

      A. Legal Standard for a Writ of Mandamus....................................................................... 30

      B. Mandamus Is Warranted Here ..................................................................................... 30

CONCLUSION.................................................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014).................................................................. 27

*Anglers Conservation Network v. Pritzker*, 809 F.3d 664 (D.C. Cir. 2016)................................ 30

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). .................................................. 21

*Ashtari v. Pompeo*, 496 F. Supp. 3d 462 (D.D.C. 2020) ........................................................... 20

*Bennett v. Spear*, 520 U.S. 154, 178 (1997) ............................................................................. 22

*Berends v. Butz*, 357 F. Supp. 143 (D. Minn. 1973) .................................................................... 5

*Bias v. Advantage Int'l, Inc.*, 905 F.2d 1558 (D.C. Cir. 1990) ..................................................... 14

*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) ............................................ 18

*Ctr. for Pub. Integrity v. Dep't of Def.*, 486 F. Supp. 3d 317 (D.D.C. 2020) .............................. 24

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980).......................... 14

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) .................................... 17

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024)........................................... 17

*Elec. Priv. Info. Ctr.,* 416 F. Supp. 2d 30 (D.D.C. 2006) ....................................................... 27, 29

*Jacksonville Port Auth. v. Adams.,* 556 F.2d 52 (D.C. Cir.1977)................................................. 27

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).......................................................... 19

*Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756 (D.C. Cir. 2022) ........................... 21, 22

*Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012) .............................................................................. 18

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)................. 21

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)............................................................ 17, 30, 31

*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004) .................................... 30

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997)................................................................. 22, 25

*Jud. Watch, Inc. v. U.S. Dep't of Com.*, 736 F. Supp. 2d 24 (D.D.C. 2010) .............................. 31

*Jacksonville Port Auth. v. Adams.,* 556 F.2d 52 (D.C.Cir.1977)................................................. 29

*Kaufman v. Mukasey*, 524 F.3d 1334 (D.C. Cir. 2008) ............................................................... 20

*Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 257 (D.D.C. 2018)........................... 25, 30

*Landmark Hosp. of Salt Lake City v. Azar*, 442 F. Supp. 3d 327 (D.D.C. 2020) ........................ 15

*Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, 265 F. Supp. 3d 54 (D.D.C. 2017)......................................................... 27

*Lewis v. U.S. Parole Commission*, 743 F. Supp. 3d 181, 192 (D.D.C. 2024) ............................. 20

*Lines v. United States*, 371 U.S. 156, 168 (1962) ....................................................................... 16

*Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993) ........................... 15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . 18

*Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157 (2004) ............................................ 29

*Nat'l Ass'n for Home Care & Hospice v. Becerra*, 731 F. Supp. 3d 78 (D.D.C. 2024) .............. 15

*Neurelis, Inc. v. Califf*, No. 24-CV-1576, 2025 WL 1010222 (D.D.C. Mar. 19, 2025). ............. 26

*Nken v. Holder*, 556 U.S. 418 (2009). ...................................................................................... 26

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ................................................................ 22

*New York Times Co. v. Off. of Mgmt. & Budget*, 531 F. Supp. 3d 118 (D.D.C. 2021) ............... 14

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) .............................................................. 20

*Oestereich v. Selective Serv. Sys. Loc. Board No. 11*, 393 U.S. 233 (1968)). ............................ 21

*Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30 (D.D.C. 2006) .................................. 26

*Pub. Integrity v. U.S. Dep't of Def.*, 486 F. Supp. 3d 317 (D.D.C. 2020 ................................... 23

*Ramirez v. Blinken*, 594 F. Supp. 3d 76 (D.D.C. 2022) ............................................................. 30

*Sackett v. EPA*, 566 U.S. 120 (2012) ....................................................................................... 25

*Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Just.*,
    823 F.2d 574 (D.C. Cir. 1987 ........................................................................................ 23, 14

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006) ..................................................... 15

*United States v. Arthur Young & Co.*, 465 U.S. 805 (1984). ...................................................... 25

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261 (2021). ............................ 22, 23, 24

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). ................................................. 17

**Constitutional Provisions, Statutes, and Rules**

2 U.S.C. §§ 682-88 .................................................................................................................. 3

5 U.S.C.

    § 706(1) ........................................................................................................................ 15, 20

    § 706(2) ............................................................................................................................... 20

    § 706(2)(A) ..................................................................................................................... 16, 18

    § 706(2)(C) ........................................................................................................................... 16

    § 706(2)(A)-(C) ..................................................................................................................... 15

4 U.S.C

    § 3502 .................................................................................................................................... 7

    § 3502(20). ............................................................................................................................ 7

31 U.S.C.

§ 1341 ............................................................................................................. 3

§ 1349 ............................................................................................................. 3

§§ 1511-19. ..................................................................................................... 3

§ 1512 ............................................................................................................. 5

§ 1512(a). ....................................................................................................... 1

§ 1513(a) ....................................................................................................... 23

§ 1513(b) ............................................................................................... 16, 23

§ 1517(a)(1) ........................................................................................... 3, 23

§ 1517(b). ....................................................................................................... 3

§§ 1517-19 ..................................................................................................... 4

§§ 1518-19 ................................................................................................... 23

Fed. R. Civ. P. 56(a) ................................................................................... 14

Pub. L. No. 58-217, 33 Stat. 1214 (1905) ................................................... 6

Pub. L. No. 59-28, 34 Stat. 27 (1906) .......................................................... 6

Pub. L. No. 93-344, 88 Stat. 297 (1974) ...................................................... 5

Pub. L. No. 117-103, 136 Stat. 49 (2022) ............................... 1, 6, 15, 18

Pub. L. No. 117-328, 136 Stat. 4459 (2022) .............. 1, 6, 15, 30, 31

U.S. Const.,

art. I, § 1 ................................................................................................. 16

art. I, § 8, cl. 1 ....................................................................................... 17

art. I, § 8, cl. 18 ..................................................................................... 17

art. I, § 9, cl. 7 ................................................................................... 3, 17

art. II, § 3 ............................................................................................... 16

**Other Authorities**

90 Fed. Reg. 9737 (Feb. 18, 2025). ............................................................. 4

H.R. Rep. No. 115-411 (2017) ....................................................................... 7

H.R. 1770, 115th Cong. (2017) .................................................... 7, 29, 30

OMB Circular No. A-11 (2024)

§ 120.1 ............................................................................... 1, 4, 13, 23

§ 120.10 .................................................................................... 4, 13, 24

§ 120.34 ............................................................................................ 4, 24

§ 127 ................................................................................................. 4, 24

**INTRODUCTION**

Plaintiff Protect Democracy Project files this motion to bring a swift conclusion to Defendants' lawless conduct in refusing to publicly post apportionments of the Office of Management and Budget (OMB). A single undisputed fact resolves this case: federal law requires OMB "to post each document apportioning an appropriation . . . on a publicly accessible website,"[1] and OMB has decided not to do so.

There are multiple grounds on which this Court should vacate, set aside, or enjoin Defendants' refusal to comply with the law. Defendants' actions are, of course, contrary to the applicable statutes. They are also contrary to the constitutional separation of powers in contravening Congress's power to set the laws of this nation and to control the power of the purse. And Defendants' unreasoned decision, untethered to any factual predicate, is arbitrary and capricious in every way that an agency action can be arbitrary and capricious.

Defendants' main explanation for its violation of its statutory mandate has been a vague suggestion that apportionments are "predecisional" and "deliberative." *See* Jacobson Decl., Ex. 16. However, OMB's own guidance refutes any such notion. In its official guidance on apportionments, OMB Circular No A-11, OMB explains that "[a]pproved" apportionments are "legally binding" because they represent "legal limits that restrict how much an agency can obligate, when it can obligate, and what projects, programs, and activities it can obligate for." *See* Jacobson Decl., Ex. 4, OMB Circular No. A-11 § 120.1 (2024). OMB is correct: under the Antideficiency Act, an apportionment authorizes an agency to spend no more than the apportioned amount, and any official who violates that prohibition faces administrative discipline

---

[1] *See* Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022); Pub. L. No. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 256-57 (2022).

and even criminal liability. *See* 31 U.S.C. §§ 1517-19. By definition, a "legally binding" document that carries significant legal consequences cannot be "predecisional" or "deliberative."

Defendants' only other stated reason for violating the law—that apportionments may have "sensitive" information that "pose[s] a danger to national security and foreign policy"—also fails as a matter of law. The relevant statutes exempt the posting of information that may pose a danger to national security, *i.e.*, classified information. That apportionments may relate to foreign policy, or that the Executive Branch otherwise considers them "sensitive," is not a lawful basis to contravene Congress's explicit statutory directives.

Because the undisputed facts show Defendants have violated the law, summary judgment is warranted. However, if the Court disagrees, the Court should enter a preliminary injunction. As detailed below, the equities strongly favor an injunction. Protect Democracy is experiencing irreparable harm with each day that it cannot post and analyze apportionments through its custom website for which it has dedicated significant resources. And Congress, the press, and the public all rely on Protect Democracy's website to evaluate OMB's apportionments. Without this information, there will be no way to scrutinize whether OMB is misusing the apportionment process to impound or improperly restrict the use of appropriations. The public interest, and the rule of law, all necessitate immediate relief. To that end, if neither summary judgment nor a preliminary injunction is entered, Protect Democracy respectfully requests that the Court issue a writ of mandamus to compel Defendant Vought to comply with his mandatory legal duties.

## BACKGROUND

### I.    Congress Establishes an Apportionment Process for Federal Agencies

The Constitution grants the power of the purse to Congress, stating that "[n]o money shall be drawn from the Treasury, but in consequence of appropriations made by law." U.S.

Const. art. I, § 9, cl. 7. To protect and enforce this power, Congress has passed two related statutes: the Antideficiency Act and the Impoundment Control Act. The Impoundment Control Act provides that the Executive Branch must spend the funds that Congress appropriated for particular purposes, without delay, except in narrowly prescribed circumstances. 2 U.S.C. §§ 682-88. On the other side of the coin, the Antideficiency Act prohibits agencies from spending more funds than Congress has appropriated. 31 U.S.C. §§ 1341, 1349, 1511-19.

The Antideficiency Act ensures that agencies spend no more than Congress has appropriated by establishing an "administrative process" called "apportionment," that "requires that budget authority provided to federal agencies in appropriations acts be allocated in installments, rather than all at once." Cong. Rsch. Serv., R46240, *Introduction to the Federal Budget Process* 28 (2023), https://www.congress.gov/crs-product/R46240. The Act requires that funds appropriated for limited durations be apportioned to "prevent obligation or expenditure at a rate" that may require Congress to appropriate more money to the agency before the next appropriations cycle. 31 U.S.C. § 1512(a). Even for appropriations of indefinite durations, the Act requires apportionments "to achieve the most effective and economical use" of the funds. *Id.*

The Antideficiency Act assigns the task of apportioning funds to the President or his designee. *Id.* § 1513(b). The President or his designee "shall apportion in writing an appropriation available to an executive agency," and "shall notify" agency heads of the "action taken in apportioning" funds. *Id.* The Antideficiency Act prohibits agencies from making any obligation or expenditure "exceeding . . . an apportionment." *Id.* § 1517(a)(1); *see also id.* § 1517(b) (providing that, if an officer or employee makes an obligation or expenditure exceeding an apportionment, "the head of the executive agency . . . shall report immediately to the President and Congress all relevant facts and a statement of actions taken"). Congress viewed

compliance with the prohibition on agencies spending more than amounts apportioned so critical that it imposed administrative penalties and even *criminal* liability on officials who violate the prohibition. 31 U.S.C. §§ 1517-19.

The President has delegated the apportionment authority to the OMB Director. *See* 90 Fed. Reg. 9737 (Feb. 18, 2025). The OMB Director has, in turn, re-delegated the authority to other OMB officials. Historically, the OMB Director had delegated the authority to career officials. *See* Jacobson Decl., Ex. 5, Project 2025, Heritage Found., *Mandate for Leadership: The Conservative Promise* 45 (2023). The sole exceptions are during the first and current Trump Administrations, when the OMB Director delegated the authority to political appointees. *See id.*; 90 Fed. Reg. 9737.

OMB has made clear that its apportionments are final, legally operative actions. OMB's definitive guidance on apportionments, OMB Circular No. A-11, states without qualification that "[a]n apportionment is legally binding." Ex. 4 § 120.1. "[A]pportioned amounts," OMB explains, "are legal limits that restrict how much an agency can obligate, when it can obligate, and what projects, programs, and activities it can obligate for." *Id.* § 120.10. OMB notes that the footnotes it includes in apportionments also "have [the] legal effect" of placing conditions and restrictions on spending the apportioned funds. *Id.* § 120.34. And removing any doubt that apportionments are final decisions, OMB describes that "[w]hen OMB approves an apportionment through the apportionment system, [agencies] will receive an e-mail with the approved Excel file . . . and the subject line will include the words 'Approved Apportionment.'" *Id.* § 120.37. Put simply, apportionments reflect final, legal operative actions that specify the amount of appropriated funds an agency may spend, when the agency may spend them, and any conditions on spending

those amounts. *See also* Jacobson Decl., Ex. 2, Declaration of Joseph Carlile ("Carlile Decl.") ¶¶ 6; Jacobson Decl., Ex. 3, Declaration of Samuel Bagenstos ("Bagenstos Decl.") ¶ 11.

## II.    Congress Mandates Apportionment Transparency

Throughout history, administrations of both parties have been criticized for abusing the apportionment process. President Roosevelt used apportionments during World War II to halt funding for programs that Congress had enacted into law that the President deemed non-essential to the war effort. That decision drew objections from Congress and the public alike.[2] President Nixon used apportionments, among other tools, to impound funds for an array of domestic programs. *See, e.g.*, Letter from OMB Director Roy Ash to Sen. Spiro Agnew, President of the Senate (Feb. 5, 1973), in 119 Cong. Rec. S3282-86, https://perma.cc/8KPW-LZ9X. Those actions led to extensive litigation and the passage of the Impoundment Control Act.[3]

More recently, in 2019, President Trump used the apportionment process to withhold military aid to Ukraine. Jacobson Decl., Ex. 6, GAO, B-331564, *Office of Management and Budget—Withholding of Ukraine Security Assistance*, at 3-4 (Jan. 16, 2020). The Government Accountability Office (GAO) determined that this withholding of funds violated the Impoundment Control Act. *See id.* at 6-9.

---

[2] *See, e.g.*, J.D. Williams, *The Impounding of Funds by the Bureau of the Budget* (1955) (Inter-University Case Program, Case Series No. 28), in *Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. 378-94 (1971), https://tinyurl.com/5vyd9h8b.

[3] *See, e.g.*, *Berends v. Butz*, 357 F. Supp. 143 (D. Minn. 1973) (noting OMB apportionment's cap on funds available to the Department of Agriculture); Congressional Budget & Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, § 1002, 88 Stat. 297, 332 (1974) (amending the Antideficiency Act to narrow when apportionments may be used to hold appropriated funds in reserve, and requiring reporting of reserves to Congress); *see also* 31 U.S.C. § 1512.

With this history in mind, in March 2022, Congress enacted new legislation to bring transparency and accountability to the apportionment process.[4] *See* Pub. L. No. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 256-57 (2022) (codified at 31 U.S.C. § 1513 note) (hereinafter "2022 Appropriations Act"). In a division-by-division summary of the 2022 Appropriations Act, Representative Rosa DeLauro (then-Chairwoman of the House Appropriations Committee) described the legislation as among other "Important Policy Changes" that would "[s]trengthen[] our democracy" by "mak[ing] apportionments of appropriations publicly available in a timely manner." Jacobson Decl., Ex. 7, Chair Rosa DeLauro, H.R. 2471, *Funding for the People: Division-by-Division Summary of Appropriations Provisions* 18.

The 2022 Appropriations Act directed OMB to implement an "automated system to post each document apportioning an appropriation, . . . including any associated footnotes." 136 Stat. at 257. The apportionments must be posted "on a publicly accessible website" "not later than 2 business days after the date of approval" of the apportionment. *Id.* Each document "shall also include a written explanation by the [approving] official . . . stating the rationale for any footnotes for apportioned amounts." *Id*. Any "classified documentation referenced in any

---

[4] This was not the first time Congress had mandated a form of apportionment transparency. When Congress created the apportionment process in the Antideficiency Acts of 1905 and 1906, it included a provision requiring that, "in case said apportionments are waived or modified as herein provided, the same shall be waived or modified in writing by the head of such Executive Department or other Government establishment having control of the expenditure, and the reasons therefor shall be fully set forth in each particular case and communicated to Congress in connection with estimates for any additional appropriations required on account thereof." Pub. L. No. 59-28, ch. 510, § 3, 34 Stat. 27, 48-49 (1906), https://tinyurl.com/yc7p93w4; see Pub. L. No. 58-217, ch. 1484, § 4, 33 Stat. 1214, 1257-58 (1905), https://tinyurl.com/yc3fmej7 (similar, requiring that "all such waivers or modifications, together with the reasons therefor, shall be communicated to Congress in connection with estimates for any additional appropriations required on account thereof").

apportionment" need not be disclosed publicly but shall be made available to Congress at its request. *Id.*

Moreover, each apportionment document must be posted "in a format that qualifies [it] as an Open Government Data Asset (as defined in [4 U.S.C. § 3502])." *Id.* An Open Government Data Asset is defined as "a public data asset that is [] (A) machine-readable; (B) available (or could be made available) in an open format; (C) not encumbered by restrictions . . . that would impede the use or reuse of such asset; and (D) based on an underlying open standard that is maintained by a standards organization." 44 U.S.C. § 3502(20). When Congress adopted this definition in 2017, Congress underscored its goal of "establish[ing] a default of openness," explaining that "government data should be available to use and usable by the public to the greatest extent possible." H.R. Rep. No. 115-411, at 12 (2017), https://perma.cc/52FT-QNH5. Recognizing that "Federal Government data is a valuable national resource," Congress intended that it be made "open, available, discoverable and usable to the general public, businesses, journalists, academics, and advocates" alike. H.R. 1770, 115th Cong. § 2(a)(1) (2017), https://perma.cc/W222-D65A. Congress had these very goals in mind in requiring that apportionments information be posted as an Open Government Data Asset.

In December of 2022, Congress made the 2022 Appropriations Act's apportionment transparency requirements permanent. *See* Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022) (codified at 31 U.S.C. § 1513 note) (hereinafter "2023 Appropriations Act"). In the 2023 Appropriations Act, Congress provided that "[i]n fiscal year 2023 and each fiscal year thereafter," OMB "shall operate and maintain the automated system required to be implemented by" the 2022 Appropriations Act. *Id.* Further, OMB "shall continue to post each

document apportioning an appropriation," including "any associated footnotes," in the format and subject to the requirements specified in the 2022 Appropriations Act. *Id.*

In July 2022, in compliance with the law, OMB began making apportionments public at https://apportionment-public.max.gov. *See* Jacobson Decl., Ex. 8, Press Release, Protect Democracy, *OMB Implements Apportionment Transparency Program, a Key Pro-Democracy Reform* (July 13, 2022); *see also* Carlile Decl. ¶ 8.

### III.    Protect Democracy Launches OpenOMB

Protect Democracy is a nonpartisan, nonprofit organization dedicated to preventing American democracy from declining into a more authoritarian form of government. Jacobson Decl., Ex. 1, Declaration of William Ford ¶ 2 ("Ford Decl."). A critical way Protect Democracy carries out that work is by educating the public about democratic norms and conducting research, analysis, and technology developments to promote fact-based debate. *Id.* ¶ 3. Protect Democracy's work covers efforts to support Congress's power of the purse, including by publishing an extensive report on the history of presidential impoundments. *Id.*

After OMB created its public apportionment website, Protect Democracy organized and led a virtual training for congressional staff in October 2022 on how to read apportionments, navigate and use OMB's website, and find the apportionments associated with a particular appropriation or Treasury account. *Id.* ¶ 5; *see* Protect Democracy, *Experts Explain How to Read Apportionments and Navigate OMB's New Apportionment Website*, YouTube (Oct. 17, 2022), https://perma.cc/6PMA-QGAL. Protect Democracy made a recording of the training and other resources for Congress available online. Ford Decl. ¶ 6; *see* Jacobson Decl., Ex. 9, *Using OMB's Apportionment Website: Resources for Congress*, Protect Democracy (Nov. 3, 2022).

OMB's website, however, had shortcomings. *See* Jacobson Decl., Ex. 10, Princeton Initiative, *The Power of the Purse* 5 (May 2024) (identifying areas for improvement that would make OMB's apportionments website easier to navigate and more usable to Congress and members of the public). And so, in service of its mission, Protect Democracy decided to itself make the apportionments information more accessible and understandable.

In October 2024—after ten months of development work—Protect Democracy launched OpenOMB.org ("OpenOMB"). Ford Decl. ¶¶ 7-8; Jacobson Decl., Ex. 11 (OpenOMB.org). OpenOMB aims to make oversight of OMB's apportionments easier for Congress, the press, and the public by providing easier access to apportionment files. *Id.* To that end, each day, OpenOMB pulls the primary source data from OMB's site and stores the files in a database in a manner that allows them to be searched, filtered, and indexed. *Id.* ¶ 10. OpenOMB's search function, moreover, allows users to search for information in and across apportionments. *Id.* The site is a user-friendly interface that provides access to primary source data that is updated daily and contains searchable and well-organized files. *Id.*; *see also* Jacobson Decl., Ex. 12, William Ford, et al., *Is the president following the law when it comes to spending?*, If You Can Keep It (Oct. 2, 2024); Carlile Decl. ¶ 15 ("OpenOMB.org took the open government data assets available on the apportionment website and improved the user experience and made the data more accessible for a broader audience.").

OpenOMB is widely used by Congress, litigants, journalists, public policy organizations, academics, libraries, budget experts, and the Wikipedia community. Ford Decl. ¶ 11. For instance, congressional appropriators have stated in press releases that they monitor OpenOMB to identify apportionment abuses, *id.*, journalists have used OpenOMB as a source in their news reporting, *id.*, and libraries have shared OpenOMB as a resource to help the communities they

serve understand developments in government, *id.*; *see also* Carlile Decl. ¶ 15 (discussing estimated "weekly" use of OpenOMB).

## IV.    The President and Defendant Vought Indicate an Intent to Impound Funds

During the 2024 presidential campaign, then-candidate Trump openly stated that he intended to impound appropriated funds if elected, claiming incorrectly that the President's power to impound funds is "undisputed." Jacobson Decl., Ex. 13, Donald J. Trump, *Using Impoundment to Cut Waste, Stop Inflation, and Crush the Deep State*, Agenda47 (June 20, 2023). He promised that, if elected, he would wield the so-called "Impoundment Power." *Id.* 37.

After the election, Defendant Vought strongly suggested that the incoming Administration would follow through on the President's promise. At his confirmation hearing, when asked to disclaim any intention to violate the Impoundment Control Act, Vought responded that "the President has run on that issue" and "believes [the Impoundment Control Act is] unconstitutional." Jacobson Decl., Ex. 14, Transcr. of Russell Vought Confirmation Hearing. Vought has since taken steps that make the impoundment of funds more likely, including by giving the apportionment authority to political appointees rather than career officials. 90 Fed. Reg. 9737 (Feb. 18, 2025). Vought has previously expressed a commitment to being an OMB Director who would "restore apportionment decision-making to the [political appointees'] personal review," so that OMB can be "aggressive in wielding the tool on behalf of the President's agenda." *Mandate for Leadership*, *supra*, at 45.

## V.    OMB Ceases Following the Statutory Disclosure Requirements

On March 24, 2025, OMB abruptly ceased following the statutory requirements to make apportionments public. On that day, without explanation, OMB's website began showing a

"Page not found" error. *See* Jacobson Decl., Ex. 15, Paul Krawzak, *White House scraps public spending database*, Roll Call (Mar. 24, 2025).

Several days later, on March 29, Defendant Vought sent a letter to the House and Senate Appropriations Committees' Ranking Member and Vice Chair, Representative Rosa DeLauro and Senator Patty Murray, stating that OMB "will no longer operate and maintain" the website mandated by law. Jacobson Decl., Ex. 16, Letter from Russell T. Vought to The Hon. Patty Murray (March 29, 2025). Vought claimed that complying with the law "requires the disclosure of sensitive, predecisional, and deliberative information," and that disclosing the required information "may pose a danger to national security and foreign policy." *Id.* Vought did not cite any specific examples where OMB's compliance with the law has required disclosure of privileged information or posed a danger to national security or foreign policy.

After OMB took its website down, Protect Democracy posted the following header on OpenOMB: "The OMB website that provides the underlying data used by OpenOMB is offline. There will be no new apportionments posted on OpenOMB until that site is back online." Ford Decl. ¶ 14; *see also* Ex. 11.

As a result of OMB's failure to follow the law, Protect Democracy can no longer provide updated information about apportionments to the public through OpenOMB. Ford Decl. ¶¶ 14, 19. Nor can it monitor the apportionments, footnotes, and written explanations for potential violations of the law. *Id.* Meanwhile, Defendants' ability to impound appropriated funds, or to attach unlawful restrictions on the use of funds, without the public or Congress knowing is significantly stronger without required apportionment disclosures. Without access to OMB's apportionments, the public cannot know if OMB is using its apportionment authority in ways that potentially unlawfully affect the delivery of federal government services, employment of

federal workers, or delivery of federal funding for certain grantees. *Id.* ¶ 20. For example, apportionments provide the only source of publicly available information about the available amounts and specified purposes of funds apportioned for certain U.S. Department of Housing and Urban Development ("HUD") homeless assistance grant programs that are funded through procedures other than annual appropriations. Carlile Decl. ¶¶ 10-11. Having data on apportionments is thus crucial to ensuring transparency in how taxpayer dollars are allocated and spent. *Id.* ¶ 14; *see also* Bagenstos Decl. ¶ 8.

## ARGUMENT

Expedited summary judgment is appropriate in this case, which raises purely legal issues that can be resolved without difficulty or factual disputes. Two laws enacted by Congress, the 2022 and 2023 Appropriations Acts, require Defendants to post OMB's apportionments online in particular formats and timeframes. Defendants openly admit that they have made a final decision not to comply with these statutory requirements. Defendants' actions violate the APA in multiple ways and give rise to equitable claims to enjoin their unlawful actions.

Under the APA, Defendants' actions are "not in accordance with law" and are "in excess of statutory authority," because they violate the plain text of the 2022 and 2023 Appropriations Acts. Defendants' refusal to execute the laws enacted by Congress, on matters related to Congress's power of the purse, is also contrary to the constitutional separation of powers. Further, Defendants' taking down of the required apportionments website is textbook arbitrary-and-capricious agency action, as Defendants provided no reasoned explanation for their decision, did not provide any facts supporting their decision, and entirely failed to consider reliance interests. Thus, for three independent reasons, Defendants' actions should be vacated and set

aside under 5 U.S.C. § 706(2). In addition, Defendants have unlawfully withheld agency action required by law, making relief available under 5 U.S.C. § 706(1) as well.

If the Court does not grant summary judgment on Plaintiff's APA claim, it should grant summary judgment on Plaintiff's nonstatutory claims to enjoin Defendant Vought's continuing violations of law. The Court has inherent equitable authority to enjoin Vought's ongoing violation of the separation of powers. And Vought's statutory violation is so blatantly lawless that it may be enjoined as *ultra vires* as well.

It appears that Defendants' only defense in this case will be some theory that publicly posting OMB's apportionments requires disclosing "predecisional" and "deliberative" information, meaning complying with the law would supposedly infringe upon the deliberative process privilege. But OMB's own statements refute any such claim. OMB states in its Circular No. A-11 that an apportionment is sent to an agency only after it is "approved," and that once approved, the apportionment is "legally binding" because "apportioned amounts are legal limits that restrict how much an agency can obligate, when it can obligate, and what projects, programs, and activities it can obligate for." Ex. 4 §§ 120.1, 120.10. That is correct as a matter of law. Under the Antideficiency Act, apportionments are legally operative in authorizing agencies to spend the apportioned amounts, and no more than those amounts. Legal consequences also flow to agency officials, who face administrative discipline or criminal liability if they authorize spending greater than an apportioned amount. Simply put, an apportionment does not precede the relevant decision, it *is* the decision regarding how much agencies can spend. Defendants' other purported reason for violating the law—that disclosing apportionments could risk "national security"—can be dismissed out of hand because the law exempts from disclosure any classified information referenced in an apportionment.

While summary judgment therefore would be proper because there are no genuinely disputed material facts bearing on the unlawful nature of Defendants' actions, if the Court disagrees, Protect Democracy respectfully requests that the Court issue a preliminary injunction. The merits overwhelmingly favor an injunction for the reasons already explained, and the equities do as well. Protect Democracy is suffering irreparable harm each day that it is unable to use its custom website to analyze apportionments and inform Congress and the public whether the Executive Branch might be defying Congress's will by preventing agencies from spending funds. The equities and the public interest similarly counsel strongly in favor of an injunction to ensure that the Executive Branch complies with the law on disclosing apportionments, including to shine light on whether the Executive Branch is violating other laws by impounding funds.

I.    **The Court Should Grant Expedited Summary Judgment**

A.  **Legal Standard for Summary Judgment**

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to withstand a summary judgment motion once the moving party has made a prima facie showing to support its claims, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Bias v. Advantage Int'l, Inc.*, 905 F.2d 1558, 1561 (D.C. Cir. 1990). "[S]ummary judgment is appropriate, no matter which party is the moving party, where a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 1560. Where the federal government seeks to withhold information on the basis of executive privilege, it bears the burden of proof in establishing that the privilege applies to the information. *Coastal States Gas Corp. v. Dep't of*

14

*Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980); *New York Times Co. v. Off. of Mgmt. & Budget*, 531 F. Supp. 3d 118, 129 (D.D.C. 2021).

With respect to Plaintiff's APA claims, "the 'APA standards of review' apply in place of 'Rule 56's standards.'" *Nat'l Ass'n for Home Care & Hospice v. Becerra*, 731 F. Supp. 3d 78, 86 (D.D.C. 2024) (quoting *Landmark Hosp. of Salt Lake City v. Azar*, 442 F. Supp. 3d 327, 331 (D.D.C. 2020)). For APA claims, "summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Landmark Hosp.*, 442 F. Supp. 3d at 331 (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). "The entire case on review is a question of law, and only a question of law." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

## B. Defendants' Actions Violate the APA

The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A)-(C). The APA also requires reviewing courts to "compel agency action unlawfully withheld." *Id.* § 706(1). Summary judgment is appropriate here on all of these grounds.

### 1. OMB's Actions Are Contrary to the Relevant Appropriations Acts

The 2022 and 2023 Appropriations Acts confer on OMB a non-discretionary duty to publicly post apportionments in a specific manner and on a specific timeline. Congress has directed that OMB "*shall* operate and maintain the automated system" required by the 2022 Appropriations Act." 136 Stat. at 4667 (emphasis added). OMB must "post each document

apportioning an appropriation," "including any associated footnotes," "on a publicly accessible website" within "2 business days after the date of approval of such apportionment." 136 Stat. at 257. The apportionment documents must take the format of an "Open Government Data Asset" as defined by 31 U.S.C. § 1513(b). *Id.* And the documents "*shall* also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts." *Id.* (emphasis added).

On March 24, without explanation, Defendants ceased complying with these unambiguous congressional mandates. On that day, OMB's apportionments website went dark, showing only "page not found." *See* Ex. 15. In a March 29 letter to Congress, OMB Director Vought went public with the agency's decision made at least five days prior. Vought stated that "the Office of Management and Budget will no longer operate and maintain the publicly available automated system to which apportionments are posted envisioned in section 204 of division E of the Consolidated Appropriations Act, 2023." Ex. 16. Vought left no doubt that this decision is final: "OMB has determined," Vought said, "that it can no longer operate and maintain this system." *Id.*

Thus, by Vought's own admission, OMB has made a final decision not to operate the apportionments website that Congress "envisioned" in the 2022 and 2023 Appropriations Acts. Congress did not merely envision this website; it affirmatively mandated that OMB operate this website in specific ways. As a matter of law, therefore, OMB's actions are not in accordance with law and in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C). The Court should grant summary judgment and vacate and set aside OMB's unlawful actions.

### 2. OMB's Actions Violate the Constitution

Defendants' actions also violate the separation of powers. The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id*. art. II, § 3. Congress's powers to set the nation's policies are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Congress has sole authority to authorize federal spending through its appropriations power, U.S. Const. art. I, § 9, cl. 7, and Congress has the power to control the conditions under which those appropriations are spent, *id.*, art. I, § 8, cl. 1; *see also CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024) ("Our Constitution gives Congress control over the public fisc."). Congress further has the authority "[t]o make all Laws which shall be necessary and proper for carrying into Execution" these powers. U.S. Const. art. I, § 8, cl. 18.

Here, as an exercise of its lawmaking power and its power of the purse specifically, Congress has required that OMB disclose information regarding the Executive Branch's handling and distribution of funds that Congress appropriates. Congress imposed this requirement, among other reasons, to ensure that the Executive Branch spends appropriations in the amounts and under the terms that Congress mandated. The Executive Branch lacks any authority to ignore Congress's legislative directions, especially on appropriations matters so squarely within Congress's domain.[5]

---

[5] Indeed, because Congress has enacted legislation directly requiring the Executive Branch to post apportionments information, the President's power to refuse to do so is at its "lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring). The President must show that the Constitution affords him "conclusive and preclusive" authority in this field, which he cannot possibly show given that the Constitution affords Congress the power of the purse. *San Francisco*, 897 F.3d at 1234 (quotation omitted).

This case thus "has serious implications for our constitutional structure." *In re Aiken Cnty.*, 725 F.3d 255, 266-67 (D.C. Cir. 2013). "It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if . . . executive . . . agencies [were allowed] to disregard federal law in the manner" done by Defendants here. *Id.* The undisputed facts show that Defendants have violated the APA by violating the Constitution.

### 3. OMB's Actions Are Arbitrary and Capricious

Defendants' actions also are the epitome of an arbitrary-and-capricious agency action. When OMB abruptly shut down its apportionments website on March 24, 2025, it offered no explanation for its decision. Only after-the-fact, five days later, did Defendant Vought attempt to provide an explanation in a letter to Congress. For multiple reasons, the decision as reflected in Vought's letter was not "the product of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012). Thus, even if the statute granted Defendants any discretion to stop publicly posting apportionments—and it clearly does not—Defendants' decision here must also be set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A).

To start, Defendants' decision does not reflect a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Vought's letter cited no actual facts supporting the notion that complying with the statutes risks "sensitive," "predecisional," "deliberative" or "national security" information. As explained further *infra*, Defendants' professed concerns over the disclosure of predecisional and deliberative or sensitive information *contradict* the evidence. Posting final, legally operative apportionments necessarily does not disclose "predecisional" and "deliberative" information. *Infra*. And "there have never been national security concerns associated with" the requirement to

publicly disclose apportionments. Jacobson Decl., Ex. 17, DeLauro & Murray, Press Release, *What are They Hiding?* (March 24, 2025). Indeed, Vought did not explain why complying with the statutes raises national security concerns given that the statutes exempt from disclosure any "classified documentation referenced in any apportionment." 136 Stat. at 257; *see also infra*.

Defendants' sudden concealment of its apportionments also inexplicably departs from years of contrary practice. It is undisputed that, from July 2022 to March 2025—nearly three years—OMB posted apportionments in the manner and on the timeline required. *See generally* OpenOMB.org; Bagenstos Decl. ¶ 7; Carlile Decl. ¶ 8. Vought's letter did not even acknowledge OMB was changing its long-time policy of complying with the statute, a clear case of arbitrary-and-capricious action. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). In fact, OMB Circular A-11, which has not been revised since its most recent revisions in 2024, *still* says that OMB posts apportionments on the website. Ex. 4 § 120.4.

Defendants also cannot factually dispute that Vought failed to address the reliance interests OMB was disturbing. Protect Democracy, for example, invested significant time and resources in building and managing its OpenOMB website. Ford Decl. ¶¶ 7-9. And Congress and the public have relied on the publicly posted apportionments to better understand the government's budgetary decisions. Congressional appropriators have stated that they monitor Protect Democracy's OpenOMB website in particular as a tool of accountability. *Id.* ¶ 11. Journalists, public organizations, academics, and libraries—among other institutions—likewise have utilized the apportionment information posted by OMB and incorporated into OpenOMB. *Id.*; *see also* Carlile Decl. ¶¶ 1, 15. Defendants' abrupt removal of the apportionments website, contrary to statutory requirements, fails to address the serious reliance interests of Congress, members of the public, and organizations like Protect Democracy.

Thus, for multiple reasons, OMB's decision to cease following statutory commands is arbitrary and capricious action as a matter of law and must be set aside.

### 4. OMB's Actions Represent Agency Action Unlawfully Withheld

Alternatively, Protect Democracy is entitled to summary judgment on its APA claim requesting this Court to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). By refusing to make apportionment data public, Defendants are failing to take "discrete agency action that [they are] required to take." *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (quoting *Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008) (emphasis removed)); *see also Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 192 (D.D.C. 2024) (explaining that a plaintiff can challenge agency inaction under § 706(1) or § 706(2) when an agency is "under an unequivocal statutory duty to act").

Here, the law leaves OMB no discretion about whether, when, and how to publicly post apportionment data. This is therefore not a case in which the court lacks power to "specify *what* . . . action" the agency must take. *See Kaufman*, 524 F.3d at 1338 (emphasis added) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004)). Congress made plain what the agency must do: (1) post apportionment documents (including any accompanying footnotes) online, (2) in a format that qualifies as an Open Government Data Asset, (3) with a written explanation by the approving official for any footnotes, (4) within 2 days of the apportionment. 136 Stat. at 4667; 136 Stat. at 256-57; *see* Bagenstos ¶ 7 (describing "compliance with the apportionment transparency law" as "straightforward"); Carlile Decl. ¶ 5 (describing "approval of apportionments" as "largely ministerial in nature and aimed at faithfully and responsibly executing the aims of the appropriation").

The APA authorizes the Court to compel Defendants to take these specific, statutorily mandated actions. The Court should do so here.

### C.  If Necessary, Defendants' Actions Should Equitably Enjoined as Unconstitutional and *Ultra Vires*

If for any reason the Court concludes that it cannot grant complete relief on Protect Democracy's APA claims, the Court should grant summary judgment based on Protect Democracy's nonstatutory claims.

With respect to Protect Democracy's constitutional nonstatutory claim, the Supreme Court has held that plaintiffs may bring nonstatutory claims to enjoin unconstitutional actions by federal officials, including violations of the separation of powers. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). The Court has explained that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Here, Defendant Vought's actions plainly violate the separation of powers for the reasons already explained, *see supra*, and he should be enjoined to cease his unconstitutional actions.

 This is also one of the rare cases where a federal official's statutory violation is so brazen that it may be enjoined as *ultra vires*. The D.C. Circuit has held that a federal official's statutory violation may be enjoined as *ultra vires* where an agency's action or inaction "amount[s] to a 'clear departure . . . from [a] statutory mandate' or [is] 'blatantly lawless.'" *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (quoting *Oestereich v. Selective Serv. Sys. Loc. Board No. 11*, 393 U.S. 233, 238 (1968)). "The agency overstep must be 'plain on the record and on the face of the [statute.]'" *Id.* at 765 (quoting *Oestereich*, 393 U.S. at 238 n.7).

As explained, *supra*, the 2022 and 2023 Appropriations Acts impose an unambiguous duty on Defendants to publicly post OMB's apportionments. The 2022 and 2023 Appropriations Acts also clearly specify when, what, and how OMB must post the apportionments. Defendants' actions are a "clear departure" from a statutory mandate and are "blatantly lawless." *Fed. Express Corp.*, 39 F.4th at 764. They must be enjoined.

### D.  Defendants Cannot Rely on Any Privilege or Sensitivities to Violate the Law

It appears that Defendants will not deny in this case that their actions violate the 2022 and 2023 Appropriations Acts. Rather, Defendants' sole defense seemingly will be that Congress somehow lacks the authority to compel Defendants to post apportionments information online. Although Defendant Vought in his letter hints at the notion that the statutes are unconstitutional, he does not state that outright. Instead, he vaguely gestures to the possible "disclosure of sensitive, predecisional, and deliberative information." Ex. 16.

Vought's repeated use of the terms "predecisional" and "deliberative" seems to be referencing the deliberative process privilege. The deliberative process privilege is "primarily a common law privilege." *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997). To fall under the privilege, "the material must be predecisional and it must be deliberative." *Id.* at 737. "The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual." *Id.*

"Documents are 'predecisional' if they were generated before the agency's final decision on the matter." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021). Agency action is "final" where it "mark[s] the consummation of the agency's decisionmaking process," and "rights or obligations have been determined" by the action or "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted). A decision thus is final

where, legally, it "has real operative effect." *Sierra Club*, 592 U.S. at 271 (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 159 n.25 (1975)). In contrast, a decision is predecisional where a court can "pinpoint an agency decision or policy to which the document contributed." *Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Just.*, 823 F.2d 574, 585 (D.C. Cir. 1987).

Closely related, documents are "deliberative" if they "were prepared to help the agency formulate its position." *Sierra Club, Inc.*, 592 U.S. at 268. Deliberative information "must . . . be a part of the agency give-and-take by which the decision itself is made." *Senate of the Com. of Puerto Rico*, 823 F.2d at 585 (quotations and alteration omitted).

OMB's apportionments are not predecisional or deliberative. Under the Antideficiency Act, an apportionment is a final decision regarding the funds that an agency may spend, and it has immediate legal consequences. The Act requires the President or his designee to "apportion [an] appropriation in writing" and then "notify the head of the executive agency of *the action taken*." 31 U.S.C. § 1513(a), (b) (emphasis added). Legal consequences flow directly from that action. Agencies may obligate funds after, but only after, they receive an apportionment, and agencies are prohibited from "exceeding . . . an apportionment" in the amounts they spend. *Id.* § 1517(a)(1). The legal consequences are very real for federal employees, who face administrative discipline or even criminal liability if they authorize obligations or expenditures greater than an apportionment. *Id.* §§ 1518-19. The 2022 Appropriations Act also confirms that OMB need not disclose any information that is predecisional; OMB must only disclose apportionments that an OMB official has "approv[ed]," 136 Stat. at 257, not is "considering" or "deliberating over."

This Court need not take Plaintiff's word for it that apportionments are neither predecisional nor deliberative—OMB itself says so. In its definitive guidance on apportionments,

Circular No. A-11, OMB states that "[a]n apportionment is legally binding." Ex. 4 § 120.1. That is in part because "apportioned amounts are legal limits that restrict how much an agency can obligate, when it can obligate, and what projects, programs, and activities it can obligate for." *Id.* § 120.10. OMB notes that its apportionment footnotes for apportioned amounts likewise "have legal effect" by placing binding conditions and restrictions on how agencies spend apportioned funds. *Id.* § 120.34. And OMB leaves no doubt that it considers an apportionment to be the consummation of its decisionmaking process; the email that OMB sends to agencies containing an apportionment must contain the subject line "Approved Apportionment." *Id.* § 120.37.

There is more. In Freedom of Information Act (FOIA) litigation, OMB effectively conceded that final apportionments are not covered by the deliberative process privilege. In response to a FOIA request for documents related to OMB's apportionments for assistance to Ukraine, OMB appears to have willingly produced the entirety of its final apportionments. *See Ctr. for Public Integrity v. Dep't of Def.*, No. 1:19-cv-03265-CKK, ECF No. 23-2 (D.D.C. Feb. 14, 2020). OMB withheld on deliberative process privilege grounds the "draft language" and discussions leading up to an apportionment, but not the "final language of the apportionment footnotes" that reflected the "agency's final position." *See Ctr. for Pub. Integrity v. Dep't of Def.*, 486 F. Supp. 3d 317, 337-38 (D.D.C. 2020).

GAO, the nonpartisan arm of Congress that reviews appropriations issues, has also found that final apportionments are not subject to the deliberative process privilege. GAO has explained that, because"apportionments are legally binding decisions on agencies under the Antideficiency Act," they "by definition, cannot be predecisional or deliberative." Jacobson Decl., Ex. 18, GAO, *Letter to OMB on Apportionments* (Apr. 8, 2025).

OMB's and GAO's statements confirm the obvious. Something cannot be "predecisional" where it is "legally binding." Ex. 4 § 120.1. OMB's apportionment are not "prepared to help [OMB] formulate its position," *Sierra Club, Inc.*, 592 U.S. at 268, and are not "part of the agency give-and-take by which the decision itself is made," *Senate of the Com. of Puerto Rico*, 823 F.2d at 585 (quotations and alteration omitted). Apportionments *are* the decision regarding how much agencies may spend from an appropriation at any point in time. *See* Bagenstos Decl. ¶ 11. The information regarding apportionments that OMB must disclose "simply state or explain a decision the government has already made," and "is purely factual." *In re Sealed Case*, 121 F.3d at 737. Apportionments are the opposite of predecisional or deliberative.

Vought's letter nonetheless casts apportionments as "interim" decisions because OMB can revisit them as "circumstances" change. Ex. 16. But "[t]he mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal. *Sackett v. EPA*, 566 U.S. 120, 127 (2012). By Vought's logic, virtually every government decision would be considered interim, because government decisions are always subject to change. An agency regulation, for example, is not rendered "interim," "predecisional," or "deliberative" simply because changing circumstances may lead the agency to change the regulation. Neither are Defendants' apportionment decisions rendered interim simply because they may be "changed as . . . circumstances change." Ex. 16.[6] *See* Bagenstos Decl. ¶¶ 14-15.

---

[6] Even if apportionments did somehow fall under the deliberative process privilege, Congress has more than a sufficient need to require disclosure to overcome the qualified privilege. *See In re Sealed Case*, 121 F.3d at 737-38. The statutes here reflect "a congressional policy choice *in favor of disclosure* of all information." *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984).

Vought's other ground for refusing to comply with the statute—that OMB may have to disclose "sensitive" information that "may pose a danger to national security and foreign policy"—can be dispensed with even more quickly. There is no "it's sensitive" exception to the Executive Branch's duty to comply with the law. And merely invoking the words "national security" does not give Defendants "carte blanche authority to act in contravention of . . . applicable statutes." *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 266-67 (D.D.C. 2018). That is particularly so here, where the statute expressly provides for the protection of any "classified documentation referenced in any apportionment" by exempting it from public disclosure. 136 Stat. at 257; *see also* Bagenstos Decl. ¶ 16. OMB has been posting apportionments online for three years without any reported incident or danger to national security, and there is no reason that would suddenly change now.

## II.    If the Court Concludes That Expedited Summary Judgment Cannot Be Granted, the Court Should Issue a Preliminary Injunction

Summary judgment is appropriate because there is no dispute of material fact about Defendants' failures to follow the law. Because the issues presented here are purely legal, Plaintiff respectfully submits that the most efficient resolution of the case is to rule on Plaintiff's motion for summary judgment now.

However, in the event the Court concludes that there are any material disputed facts that preclude immediate entry of summary judgment, or that resolving Plaintiff's request for summary judgment would take an extended time, Plaintiff respectfully requests that the Court enter a preliminary junction.

### A.  Legal Standard for a Preliminary Injunction

A preliminary injunction is warranted where the plaintiff is likely to succeed on the merits, the plaintiff is likely to suffer irreparable harm absent an injunction, the balance of

equities weighs in the plaintiff's favor, and the public interest would be served by an injunction. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The final two factors merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009).[7]

## B.  All Four Preliminary Injunction Factors Are Met Here

Protect Democracy satisfies each of the elements for a preliminary injunction. First, for the reasons already explained, Protect Democracy is likely to succeed on the merits of APA and nonstatutory claims.

Second, Protect Democracy is suffering significant irreparable harm. Because of Defendants' actions, Protect Democracy and those who rely on Protect Democracy's OpenOMB database have been "denied access to information that is highly relevant to an ongoing public debate" about how the Executive Branch is, or is not, spending appropriated funds. *Lawyers' Comm. for C.R. Under L. v. Presidential Advisory Comm'n on Election Integrity*, 265 F. Supp. 3d 54, 70 (D.D.C. 2017); *see also Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006) (finding plaintiff irreparably harmed by a failure to "obtain[] in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program").

Every day that Defendants refuse to comply with the law, Protect Democracy is deprived of the ability to fulfill its mission by monitoring and reporting on the Executive Branch's compliance with Congress's directives and making that information more accessible to the public. *See* Carlile Decl. ¶ 15. Protect Democracy is also experiencing acute harm in receiving far fewer visitors to its website since OMB took its site down. According to Google Analytics,

---

[7] The Court may consider these factors independently or employ a "sliding scale" framework under which a strong showing on one factor may overcome a weaker showing on another. *See, e.g.*, *Neurelis, Inc. v. Califf*, No. 24-CV-1576, 2025 WL 1010222, at *2 (D.D.C. Mar. 19, 2025).

OpenOMB received approximately 41,000 page views between October 2, 2024 and March 24, 2025 alone. Ford Decl. ¶ 12. After OMB stopped operating its public apportionment website, OpenOMB's page views significantly decreased: the site has received only 3,400 views so far in April, compared to 6,800 page views in March. *Id.* ¶ 15.

Protect Democracy has also had to halt ongoing work to make OMB's apportionments more accessible. For instance, before OMB shut down its website, Protect Democracy was completing a "notification" feature that it has spent months developing, which would have allowed OpenOMB users to sign up for daily or weekly alerts with tailored information relating to new apportionments. *Id.* ¶¶ 16-17. Protect Democracy has attempted to obtain new apportionments information in other ways, such as through a Freedom of Information Act (FOIA) request. *Id.* ¶ 22. But FOIA responses need not be provided in a format that is considered an Open Government Data Asset, and unless Protect Democracy were to receive information in that format, Protect Democracy likely would be unable to add the information into OpenOMB for public dissemination and use without significant manual effort. *Id.*

The loss of legally required, real-time information on apportionments overwhelmingly tips the equities and public interest in favor of an injunction. Without access to this information, Congress, members of the public, and organizations like Protect Democracy have little way of knowing if OMB is using apportionments to improperly restrict how appropriated funds may be used (including through footnotes), or if OMB is holding back apportionments to impound funds by making it impossible for agencies to spend their appropriations before they expire at the end of the fiscal year. Ford Decl. ¶¶ 19-21; Carlile Decl. ¶¶ 12-14. The risk that such action is occurring is very real. The President and Defendant Vought have loudly stated their intent to impound funds, *supra*, and the Administration has taken steps to prevent whole agencies like the

U.S. Agency for International Development (USAID) from spending funds that Congress appropriated to the agency, as part of the Administration's efforts to shutter those agencies.

The need for disclosure of apportionment information is also urgent given that the Administration will be imminently proposing a rescissions package to Congress requesting that Congress rescind more than $9 billion previously appropriated to USAID, the Corporation for Public Broadcasting, and potentially other agencies. Jennifer Scholtes & Megan Messerly, *White House to send Congress a formal request to nix $9.3B for PBS, State Department*, POLITICO, Apr. 14, 2025, https://perma.cc/A878-XRML. Apportionment information would show whether OMB has unlawfully refused to apportion these funds to the agencies prior to proposing a rescission, whether OMB has otherwise unlawfully restricted when or how the agencies may spend these funds prior to any rescission, and whether there are other funds currently not being made available to the agencies even if the proposed rescission is enacted. *See* Ford Decl. ¶ 21.

A preliminary injunction would bring sunshine on any misuses of the apportionment process that is occurring. If the Court were to require OMB to immediately place apportionments back online, Protect Democracy would update OpenOMB and display the newly posted apportionment files. Ford Decl. ¶ 23.

Ensuring that the Executive Branch complies with the rule of law also serves the public interest. "[T]here is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d at 42 (quoting *Jacksonville Port Auth. v. Adams.,* 556 F.2d 52, 59 (D.C.Cir.1977)). And where, as here, the statutory mandate exists to shed light on government actions, the public's interest is even greater: "public awareness of the government's actions is 'a structural necessity in a real democracy.'" *Id.* at 40 (quoting *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157 (2004)). Indeed,

Congress has recognized that "Federal Government data is a valuable national resource" that should be "open, available, discoverable and usable to the general public, businesses, journalists, academics, and advocates" alike. H.R. 1770, 115th Cong. § 2(a)(1) (2017). Ensuring that apportionment data, like all government data, is open and usable to the public "promotes efficiency and effectiveness in Government . . . and most importantly, strengthens our democracy." *Id.*

### III.    If the Court Cannot Require Restoration of the Required Website Through Plaintiff's Other Claims, the Court Should Issue a Writ of Mandamus

Should the Court determine that it cannot grant summary judgment or a preliminary injunction to compel Defendants to comply with their statutory mandates, Protect Democracy respectfully requests that the Court issue a writ of mandamus.

### A.  Legal Standard for a Writ of Mandamus

"The standards for challenging agency inaction under the APA and the Mandamus Act are the same." *Ramirez v. Blinken*, 594 F. Supp. 3d 76, 90 (D.D.C. 2022). The writ may be granted "to correct transparent violations of a clear duty to act." *Aiken Cnty.*, 725 F.3d at 258 (quoting *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004)). Thus, a mandamus is appropriate to compel a federal official to take a "ministerial or non-discretionary' duty amounting to 'a specific, unequivocal command.'" *Kirwa*, 285 F. supp. 3d at 267 (quoting *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016)).

### B.  Mandamus Is Warranted Here

If ever there were a case where mandamus were warranted, it is this one. OMB's duties under the 2022 and 2023 Appropriations Acts are mandatory. The Acts provide, for example, that "[OMB] *shall* operate and maintain the automated system required to be implemented by [the 2022 Appropriations Act]," 136 Stat. at 4667 (emphasis added); "[OMB] *shall* complete

implementation of an automated system to post each document apportioning an appropriation, . . . including any associated footnotes, in a format that qualifies each such document as an Open Government Data Asset . . . not later than 2 business days after the date of approval of such apportionment," 136 Stat. at 257 (emphasis added); and "[e]ach document apportioning an appropriation . . . that is posted on a publicly accessible website . . . *shall* also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amount," *id.* (emphasis added).

This language "leaves no room for discretion." *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010) (finding that "shall" duties in the Federal Advisory Committees Act were non-discretionary). These are "discrete, non-discretionary duties [that] qualify as relief in the nature of mandamus." *Id.* (citation omitted).

Then-Judge Kavanaugh's opinion in *Aiken County* is highly instructive. There, the D.C. Circuit entered a writ of mandamus where the Nuclear Regulatory Commission failed to comply with statutory requirements that it "'shall consider' the Department of Energy's license application to store nuclear waste at Yucca Mountain and 'shall issue a final decision approving or disapproving' the application within three years of its submission." 725 F.3d at 257 (citation omitted). The court had "no good choice but to grant the petition for a writ of mandamus" given the Commission's failure to abide by its legal duties. *Id.* at 266. Mandamus was needed "to correct transparent violations of a clear duty to act." *Id.* at 258 (citation omitted).

Mandamus is warranted here for the same reason. Issuing the writ would vindicate "the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress." *Id.* at 267.

**CONCLUSION**

For the foregoing reasons, the Court should grant expedited summary judgment. In the alternative, if the Court concludes that summary judgment is unwarranted at this stage of the proceedings, the Court should issue a preliminary injunction until it can render a decision on the merits of Plaintiff's claims. If the Court concludes that it may not provide complete relief through summary judgment or a preliminary injunction, the Court should issue a writ of mandamus compelling Defendants to comply with their legal duties.

Dated: April 22, 2025

/s/ Daniel F. Jacobson
Daniel F. Jacobson (D.C. Bar # 1016621)
Kyla M. Snow*
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington DC, 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

* Not admitted in the District of Columbia.
Practiced limited to matters before U.S. courts.
(admitted *pro hac vice*)

*Counsel for Plaintiff*