**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PROTECT DEMOCRACY PROJECT,

               Plaintiff,

     v.

U.S. OFFICE OF MANAGEMENT & BUDGET
et al.,

              Defendants.

Case No. 1:25-cv-01111

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR A PRELIMINARY INJUNCTION**
**OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

    I.   Congress Establishes an Apportionment Process for Federal Agencies............................. 2

    II.  Congress Mandates Apportionment Transparency ............................................ 4

    III. Protect Democracy Launches OpenOMB ...................................................... 7

    IV. The President and Defendant Vought Indicate an Intent to Impound Funds..................... 9

    V.  OMB Ceases Following the Statutory Disclosure Requirements ..................................... 10

LEGAL STANDARDS ........................................................................................................ 11

    I.   Preliminary Injunction ..................................................................................... 11

    II.  Summary Judgment ....................................................................................... 12

ARGUMENT ....................................................................................................................... 12

    I.   Plaintiff is Likely to Succeed on the Merits..................................................... 13

        A.   OMB's Actions Are Contrary to the Relevant Appropriations Acts......................... 13

        B.   Defendants Cannot Rely on Any Privilege or Sensitivities to Violate the Law........ 14

    II.  Plaintiff is Suffering Irreparable Harm .......................................................... 18

    III. The Balance of the Equities and Public Interest Weigh in Plaintiff's Favor ................... 20

    IV. The Court Should Alternatively Enter Partial Summary Judgment.................................. 21

CONCLUSION...................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)..................................................... 11

*Bennett v. Spear*, 520 U.S. 154, 178 (1997) ............................................................. 15

*Berends v. Butz*, 357 F. Supp. 143 (D. Minn. 1973) ................................................. 5

*Ctr. for Pub. Integrity v. Dep't of Def.*, 486 F. Supp. 3d 317 (D.D.C. 2020) ............................... 17

*Elec. Priv. Info. Ctr.,* 416 F. Supp. 2d 30 (D.D.C. 2006) ........................................ 19, 20

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997)........................................... 15, 17, 18

*Jacksonville Port Auth. v. Adams.*, 556 F.2d 52 (D.C.Cir.1977).................................. 20

*Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 257 (D.D.C. 2018)................................. 18

*Landmark Hosp. of Salt Lake City v. Azar*, 442 F. Supp. 3d 327 (D.D.C. 2020) ........................ 12

*Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, 265 F. Supp. 3d 54 (D.D.C. 2017). ........................................... 19

*Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993) ........................... 12

*McGehee v. U.S. Dep't of Just.*, 362 F. Supp. 3d 14 (D.D.C. 2019)........................................... 22

*Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157 (2004)................................ 20

*Nat'l Ass'n for Home Care & Hospice v. Becerra*, 731 F. Supp. 3d 78 (D.D.C. 2024)............... 12

*Neurelis, Inc. v. Califf*, No. 24-CV-1576, 2025 WL 1010222 (D.D.C. Mar. 19, 2025)............... 11

*Nken v. Holder*, 556 U.S. 418 (2009). ..................................................................... 11

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)................................................ 15

*Sackett v. EPA*, 566 U.S. 120 (2012) ..................................................................... 17

*Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Just.*, 823 F.2d 574 (D.C. Cir. 1987 ................................................................... 15, 17

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006) ........................................ 12

*United States v. Arthur Young & Co.*, 465 U.S. 805 (1984)............................................. 18

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261 (2021). ............................... 15, 17

**Constitutional Provisions, Statutes, and Rules**

2 U.S.C. §§ 682-88 ............................................................................................. 3

5 U.S.C. § 706(2)(A)........................................................................................... 14

4 U.S.C

  § 3502............................................................................................................ 6

  § 3502(20)...................................................................................................... 6

31 U.S.C.

§ 1341 .................................................................................................. 3

§ 1349 .................................................................................................. 3

§§ 1511-19 ........................................................................................... 3

§ 1512 .................................................................................................. 5

§ 1512(a) ............................................................................................. 3

§ 1513(a) ............................................................................................. 16

§ 1513(b) ........................................................................................ 3, 14, 16

§ 1517(a)(1) .................................................................................... 3, 16

§ 1517(b). ............................................................................................ 3

§§ 1517-19 ........................................................................................ 1, 3

§§ 1518-19 ......................................................................................... 16

Fed. R. Civ. P. 56(a) ............................................................................ 12

Fed. R. Civ. P. 65(a) ............................................................................ 22

Pub. L. No. 93-344, 88 Stat. 297 (1974) .............................................. 5

Pub. L. No. 117-103, 136 Stat. 49 (2022) ....................................... *passsim*

Pub. L. No. 117-328, 136 Stat. 4459 (2022) ................................... *passsim*

U.S. Const., art. I, § 9, cl. 7 ................................................................. 2

**Other Authorities**

90 Fed. Reg. 9737 (Feb. 18, 2025). ................................................... 4, 9

H.R. Rep. No. 115-411 (2017) ............................................................ 6

H.R. 1770, 115th Cong. (2017) ..................................................... 7, 20

OMB Circular No. A-11 (2024)

§ 120.1 ......................................................................................... 1, 4, 16

§ 120.10 ........................................................................................ 4, 16

§ 120.34 ........................................................................................ 4, 16

§ 120.37 ........................................................................................ 4, 16

## INTRODUCTION

Plaintiff Protect Democracy Project files this motion to enjoin Defendants' lawless conduct in refusing to publicly post apportionments of the Office of Management and Budget (OMB). A single undisputed fact resolves this case: federal law requires OMB "to post each document apportioning an appropriation . . . on a publicly accessible website,"[1] and OMB has decided not to do so.

The main explanation that Defendants OMB and Director Russell Vought have given for their clear statutory violations has been a vague suggestion that apportionments are "predecisional" and "deliberative." *See* Jacobson Decl., Ex. 16. However, OMB's own guidance refutes any such notion. In its official guidance on apportionments, OMB Circular No A-11, OMB explains that "[a]pproved" apportionments are "legally binding" because they represent "legal limits that restrict how much an agency can obligate, when it can obligate, and what projects, programs, and activities it can obligate for." *See* Jacobson Decl., Ex. 4, OMB Circular No. A-11 § 120.1 (2024). OMB is correct: under the Antideficiency Act, an apportionment authorizes an agency to spend no more than the apportioned amount, and any official who violates that prohibition faces administrative discipline and even criminal liability. *See* 31 U.S.C. §§ 1517-19. By definition, a "legally binding" document that carries significant legal consequences cannot be "predecisional" or "deliberative."

Defendants' only other stated reason for violating the law—that apportionments may have "sensitive" information that "pose[s] a danger to national security and foreign policy"—also fails. The statutes exempt posting information that may pose a danger to national security, *i.e.*, classified information. That apportionments may relate to foreign policy, or Defendants

---

[1] *See* Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022); Pub. L. No. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 256-57 (2022).

otherwise considers them "sensitive," is not a lawful basis to contravene Congress's explicit statutory directives.

Defendants' clear violations of law are causing Protect Democracy irreparable harm. With each passing day that Defendants refuse to post apportionments online, Protect Democracy is deprived of its ability to analyze and make apportionment data more accessible through a specially designed website—OpenOMB.org—that it set up precisely for that purpose. Protect Democracy has dedicated significant time and resources to developing that website, and its ongoing work has been suddenly and substantially interrupted. Indeed, Protect Democracy was on the precipice of launching a notification feature that would have allowed users to subscribe to daily or weekly email notifications when new apportionments were posted for a designated account or agency, but Protect Democracy now cannot launch that service. The ongoing harms are not only to Protect Democracy. Congress, the press, and other members of the public who monitor Defendants' publicly posted apportionments—and who rely on OpenOMB to do so more effectively—now have no way to scrutinize whether OMB is misusing the apportionment process to impound or improperly restrict the use of appropriations.

Thus, all four preliminary-injunction factors are met here. But because Protect Democracy's APA claim presents a purely legal question that requires no factual development or administrative record, the Court may go further and make the injunction permanent by entering summary judgment. Defendants' defiance of the law should not stand for a moment longer.

## BACKGROUND

## I.    Congress Establishes an Apportionment Process for Federal Agencies

The Constitution grants the power of the purse to Congress, stating that "[n]o money shall be drawn from the Treasury, but in consequence of appropriations made by law." U.S.

Const. art. I, § 9, cl. 7. To protect and enforce this power, Congress has passed two related statutes: the Antideficiency Act and the Impoundment Control Act. The Impoundment Control Act provides that the Executive Branch must spend the funds that Congress appropriated for particular purposes, without delay, except in narrowly prescribed circumstances. 2 U.S.C. §§ 682-88. On the other side of the coin, the Antideficiency Act prohibits agencies from spending more funds than Congress has appropriated. 31 U.S.C. §§ 1341, 1349, 1511-19.

The Antideficiency Act ensures that agencies spend no more than Congress has appropriated by establishing an "administrative process" called "apportionment," that "requires that budget authority provided to federal agencies in appropriations acts be allocated in installments, rather than all at once." Cong. Rsch. Serv., R46240, *Introduction to the Federal Budget Process* 28 (2023), https://www.congress.gov/crs-product/R46240. The Act requires that funds appropriated for limited durations be apportioned to "prevent obligation or expenditure at a rate" that may require Congress to appropriate more money to the agency before the next appropriations cycle. 31 U.S.C. § 1512(a). Even for appropriations of indefinite durations, the Act requires apportionments "to achieve the most effective and economical use" of the funds. *Id.*

The Antideficiency Act directs the President or his designee to apportion funds. *Id.* § 1513(b). The President or his designee "shall apportion in writing an appropriation available to an executive agency," and "shall notify" agency heads of the "action taken in apportioning" funds. *Id.* The Act prohibits agencies from making any obligation or expenditure "exceeding . . . an apportionment." *Id.* § 1517(a)(1); *see also id.* § 1517(b) (providing that, if an agency spends more than an apportionment, "the head of the executive agency . . . shall report immediately to the President and Congress all relevant facts and a statement of actions taken"). Congress viewed compliance with this prohibition so critical that it imposed administrative penalties and even *criminal* liability on officials who violate the prohibition. 31 U.S.C. §§ 1517-19.

The President has delegated the apportionment authority to the OMB Director. 90 Fed. Reg. 9737 (Feb. 18, 2025). The OMB Director has re-delegated the authority to other OMB officials. Historically, the OMB Director had delegated the authority to career officials. Jacobson Decl., Ex. 5, Project 2025, Heritage Found., *Mandate for Leadership: The Conservative Promise* 45 (2023). The sole exceptions are during the first and current Trump Administrations, when the OMB Director delegated the authority to political appointees. *See id.*; 90 Fed. Reg. 9737.

OMB has made clear that its apportionments are final, legally operative actions. OMB's definitive guidance on apportionments, OMB Circular No. A-11, states without qualification that "[a]n apportionment is legally binding." Ex. 4 § 120.1. "[A]pportioned amounts," OMB explains, "are legal limits that restrict how much an agency can obligate, when it can obligate, and what projects, programs, and activities it can obligate for." *Id.* § 120.10. OMB notes that the footnotes for apportionment amounts (or "A" footnotes) that it includes in apportionments also "have [the] legal effect" of placing conditions and restrictions on spending the apportioned funds. *Id.* § 120.34. And removing any doubt that apportionments are final decisions, OMB describes that "[w]hen OMB approves an apportionment through the apportionment system, [agencies] will receive an e-mail with the approved Excel file . . . and the subject line will include the words 'Approved Apportionment.'" *Id.* § 120.37. Put simply, apportionments reflect final, legally operative actions that specify the amount of appropriated funds an agency may spend, when the agency may spend them, and any conditions on spending those amounts. *See also* Jacobson Decl., Ex. 2, Declaration of Joseph Carlile ("Carlile Decl.") ¶¶ 6; Jacobson Decl., Ex. 3, Declaration of Samuel Bagenstos ("Bagenstos Decl.") ¶ 11.

## II.    Congress Mandates Apportionment Transparency

Throughout history, administrations of both parties have been criticized for abusing the apportionment process. President Roosevelt used apportionments during World War II to halt

funding for programs that Congress had enacted into law that the President deemed non-essential to the war effort. That decision drew objections from Congress and the public alike.[2] President Nixon used apportionments, among other tools, to impound funds for an array of domestic programs. *See, e.g.*, Letter from OMB Director Roy Ash to Sen. Spiro Agnew, President of the Senate (Feb. 5, 1973), in 119 Cong. Rec. S3282-86, https://perma.cc/8KPW-LZ9X. Those actions led to extensive litigation and the passage of the Impoundment Control Act.[3]

More recently, in 2019, President Trump used the apportionment process to withhold military aid to Ukraine. Jacobson Decl., Ex. 6, GAO, B-331564, *Office of Management and Budget—Withholding of Ukraine Security Assistance*, at 3-4 (Jan. 16, 2020). The Government Accountability Office (GAO) determined that this withholding of funds violated the Impoundment Control Act. *See id.* at 6-9.

With this history in mind, in March 2022, Congress enacted new legislation to bring transparency and accountability to the apportionment process. *See* Pub. L. No. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 256-57 (2022) (codified at 31 U.S.C. § 1513 note) (hereinafter "2022 Appropriations Act"). In a division-by-division summary of the 2022 Appropriations Act, Representative Rosa DeLauro (then-Chairwoman of the House Appropriations Committee) described the legislation as among other "Important Policy Changes" that would "[s]trengthen[] our democracy" by "mak[ing] apportionments of appropriations publicly available in a timely

---

[2] *See, e.g.*, J.D. Williams, *The Impounding of Funds by the Bureau of the Budget* (1955) (Inter-University Case Program, Case Series No. 28), in *Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. 378-94 (1971), https://tinyurl.com/5vyd9h8b.

[3] *See, e.g.*, *Berends v. Butz*, 357 F. Supp. 143 (D. Minn. 1973) (noting OMB apportionment's cap on funds available to the Department of Agriculture); Congressional Budget & Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, § 1002, 88 Stat. 297, 332 (1974) (amending the Antideficiency Act to narrow when apportionments may be used to hold appropriated funds in reserve, and requiring reporting of reserves to Congress); *see also* 31 U.S.C. § 1512.

manner." Jacobson Decl., Ex. 7, Chair Rosa DeLauro, H.R. 2471, *Funding for the People: Division-by-Division Summary of Appropriations Provisions* 18.

The 2022 Appropriations Act directed OMB to implement an "automated system to post each document apportioning an appropriation, . . . including any associated footnotes." 136 Stat. at 257. The apportionments must be posted "on a publicly accessible website" "not later than 2 business days after the date of approval" of the apportionment. *Id.* Each document "shall also include a written explanation by the [approving] official . . . stating the rationale for any footnotes for apportioned amounts." *Id*. Any "classified documentation referenced in any apportionment" need not be disclosed publicly but shall be made available to Congress at its request. *Id.*

Moreover, each apportionment document must be posted "in a format that qualifies [it] as an Open Government Data Asset (as defined in [4 U.S.C. § 3502])." *Id.* An Open Government Data Asset is defined as "a public data asset that is [] (A) machine-readable; (B) available (or could be made available) in an open format; (C) not encumbered by restrictions . . . that would impede the use or reuse of such asset; and (D) based on an underlying open standard that is maintained by a standards organization." 44 U.S.C. § 3502(20). When Congress adopted this definition in 2017, Congress underscored its goal of "establish[ing] a default of openness," explaining that "government data should be available to use and usable by the public to the greatest extent possible." H.R. Rep. No. 115-411, at 12 (2017), https://perma.cc/52FT-QNH5. Recognizing that "Federal Government data is a valuable national resource," Congress intended that it be made "open, available, discoverable and usable to the general public, businesses, journalists, academics, and advocates" alike. H.R. 1770, 115th Cong. § 2(a)(1) (2017), https://perma.cc/W222-D65A. Congress had these very goals in mind in requiring that apportionments information be posted as an Open Government Data Asset.

In December of 2022, Congress made the 2022 Appropriations Act's apportionment transparency requirements permanent. *See* Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022) (codified at 31 U.S.C. § 1513 note) (hereinafter "2023 Appropriations Act"). In the 2023 Appropriations Act, Congress provided that "[i]n fiscal year 2023 and each fiscal year thereafter," OMB "shall operate and maintain the automated system required to be implemented by" the 2022 Appropriations Act. *Id.* Further, OMB "shall continue to post each document apportioning an appropriation," including "any associated footnotes," in the format and subject to the requirements specified in the 2022 Appropriations Act. *Id.*

In July 2022, in compliance with the law, OMB began making apportionments public at https://apportionment-public.max.gov. *See* Jacobson Decl., Ex. 8, Press Release, Protect Democracy, *OMB Implements Apportionment Transparency Program, a Key Pro-Democracy Reform* (July 13, 2022); *see also* Carlile Decl. ¶ 8.

## III.    Protect Democracy Launches OpenOMB

Protect Democracy is a nonpartisan, nonprofit organization dedicated to preventing American democracy from declining into a more authoritarian form of government. Jacobson Decl., Ex. 1, Declaration of William Ford ¶ 2 ("Ford Decl."). A critical way Protect Democracy carries out that work is by educating the public about democratic norms and conducting research, analysis, and technology developments to promote fact-based debate. *Id.* ¶ 3. Protect Democracy's work covers efforts to support Congress's power of the purse, including by publishing an extensive report on the history of presidential impoundments. *Id.*

After OMB created its public apportionment website, Protect Democracy organized and led a virtual training for congressional staff in October 2022 on how to read apportionments, navigate and use OMB's website, and find the apportionments associated with a particular

appropriation or Treasury account. *Id.* ¶ 5; *see* Protect Democracy, *Experts Explain How to Read Apportionments and Navigate OMB's New Apportionment Website*, YouTube (Oct. 17, 2022), https://perma.cc/6PMA-QGAL. Protect Democracy made a recording of the training and other resources for Congress available online. Ford Decl. ¶ 6; *see* Jacobson Decl., Ex. 9, *Using OMB's Apportionment Website: Resources for Congress*, Protect Democracy (Nov. 3, 2022).

OMB's website, however, had shortcomings. *See* Jacobson Decl., Ex. 10, Princeton Initiative, *The Power of the Purse* 5 (May 2024) (identifying areas for improvement that would make OMB's apportionments website easier to navigate and more usable to Congress and members of the public). And so, in service of its mission, Protect Democracy decided to itself make the apportionments information more accessible and understandable.

In October 2024—after ten months of development work—Protect Democracy launched OpenOMB.org ("OpenOMB"). Ford Decl. ¶¶ 7-8; Jacobson Decl., Ex. 11 (OpenOMB.org). OpenOMB aims to make oversight of OMB's apportionments easier for Congress, the press, and the public by providing easier access to apportionment files. *Id.* To that end, each day, OpenOMB pulls the primary source data from OMB's site and stores the files in a database in a manner that allows them to be searched, filtered, and indexed. *Id.* ¶ 10. OpenOMB's search function, moreover, allows users to search for information in and across apportionments. *Id.* The site is a user-friendly interface that provides access to primary source data that is updated daily and contains searchable and well-organized files. *Id.*; *see also* Jacobson Decl., Ex. 12, William Ford, et al., *Is the president following the law when it comes to spending?*, If You Can Keep It (Oct. 2, 2024); Carlile Decl. ¶ 15 ("OpenOMB.org took the open government data assets available on the apportionment website and improved the user experience and made the data more accessible for a broader audience.").

OpenOMB is widely used by Congress, litigants, journalists, public policy organizations, academics, libraries, budget experts, and the Wikipedia community. Ford Decl. ¶ 11. For instance, congressional appropriators have stated in press releases that they monitor OpenOMB to identify apportionment abuses, *id.*, journalists have used OpenOMB as a source in their news reporting, *id.*, and libraries have shared OpenOMB as a resource to help the communities they serve understand developments in government, *id.*; *see also* Carlile Decl. ¶ 15 (discussing estimated "weekly" use of OpenOMB).

## IV.    The President and Defendant Vought Indicate an Intent to Impound Fund

During the 2024 presidential campaign, then-candidate Trump openly stated that he intended to impound appropriated funds if elected, claiming incorrectly that the President's power to impound funds is "undisputed." Jacobson Decl., Ex. 13, Donald J. Trump, *Using Impoundment to Cut Waste, Stop Inflation, and Crush the Deep State*, Agenda47 (June 20, 2023). He promised that, if elected, he would wield the so-called "Impoundment Power." *Id.* After the election, Defendant Vought strongly suggested that the incoming Administration would follow through on the President's promise. At his confirmation hearing, when asked to disclaim any intention to violate the Impoundment Control Act, Vought responded that "the President has run on that issue" and "believes [the Impoundment Control Act is] unconstitutional." Jacobson Decl., Ex. 14, Transcr. of Russell Vought Confirmation Hearing. Vought has since taken steps that make the impoundment of funds more likely, including by giving the apportionment authority to political appointees rather than career officials. 90 Fed. Reg. 9737 (Feb. 18, 2025). Vought has previously expressed a commitment to being an OMB Director who would "restore apportionment decision-making to the [political appointees']

personal review," so that OMB can be "aggressive in wielding the tool on behalf of the

President's agenda." *Mandate for Leadership*, *supra*, at 45.

## V.    OMB Ceases Following the Statutory Disclosure Requirements

On March 24, 2025, OMB abruptly ceased following the statutory requirements to make

apportionments public. On that day, without explanation, OMB's website began showing a

"Page not found" error. *See* Jacobson Decl., Ex. 15, Paul Krawzak, *White House scraps public*

*spending database*, Roll Call (Mar. 24, 2025).

Several days later, on March 29, Defendant Vought sent a letter to the House and Senate

Appropriations Committees' Ranking Member and Vice Chair, Representative Rosa DeLauro

and Senator Patty Murray, stating that OMB "will no longer operate and maintain" the website

mandated by law. Jacobson Decl., Ex. 16, Letter from Russell T. Vought to The Hon. Patty

Murray (March 29, 2025). Vought claimed that complying with the law "requires the disclosure

of sensitive, predecisional, and deliberative information," and that disclosing the required

information "may pose a danger to national security and foreign policy." *Id.* Vought did not cite

any specific examples where OMB's compliance with the law has required disclosure of

privileged information or posed a danger to national security or foreign policy.

After OMB took its website down, Protect Democracy posted the following header on

OpenOMB: "The OMB website that provides the underlying data used by OpenOMB is offline.

There will be no new apportionments posted on OpenOMB until that site is back online." Ford

Decl. ¶ 14; *see also* Ex. 11.

As a result of OMB's failure to follow the law, Protect Democracy can no longer provide

updated information about apportionments to the public through OpenOMB. Ford Decl. ¶¶ 14,

19. Nor can it monitor the apportionments, footnotes, and written explanations for potential

violations of the law. *Id.* Meanwhile, Defendants' ability to impound appropriated funds, or to attach unlawful restrictions on the use of funds, without the public or Congress knowing is significantly stronger without required apportionment disclosures. Without access to OMB's apportionments, the public cannot know if OMB is using its apportionment authority in ways that potentially unlawfully affect the delivery of federal government services, employment of federal workers, or delivery of federal funding for certain grantees. *Id.* ¶ 20. For example, apportionments provide the only source of publicly available information about the available amounts and specified purposes of funds apportioned for certain U.S. Department of Housing and Urban Development ("HUD") homeless assistance grant programs that are funded through procedures other than annual appropriations. Carlile Decl. ¶¶ 10-11. Having data on apportionments is thus crucial to ensuring transparency in how taxpayer dollars are allocated and spent. *Id.* ¶ 14; *see also* Bagenstos Decl. ¶ 8.

## LEGAL STANDARDS

### I.    Preliminary Injunction

A preliminary injunction is warranted where the plaintiff is likely to succeed on the merits, the plaintiff is likely to suffer irreparable harm absent an injunction, the balance of equities weighs in the plaintiff's favor, and the public interest would be served by an injunction. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The final two factors merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009).[4]

---

[4] The Court may consider these factors independently or employ a "sliding scale" framework under which a strong showing on one factor may overcome a weaker showing on another. *See, e.g.*, *Neurelis, Inc. v. Califf*, No. 24-CV-1576, 2025 WL 1010222, at *2 (D.D.C. Mar. 19, 2025).

II.    **Summary Judgment**

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But for APA claims, "the 'APA standards of review' apply in place of 'Rule 56's standards.'" *Nat'l Ass'n for Home Care & Hospice v. Becerra*, 731 F. Supp. 3d 78, 86 (D.D.C. 2024) (quoting *Landmark Hosp. of Salt Lake City v. Azar*, 442 F. Supp. 3d 327, 331 (D.D.C. 2020)). For APA claims, "summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Landmark Hosp.*, 442 F. Supp. 3d at 331 (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). "The entire case on review is a question of law, and only a question of law." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

## ARGUMENT

Each of the relevant factors point in one direction: toward an injunction. On the merits, the straightforward, purely legal question before the Court is easily resolved in Plaintiff's favor. Two laws enacted by Congress, the 2022 and 2023 Appropriations Acts, require Defendants to post OMB's apportionments online in particular formats and timeframes. Defendants openly admit that they have made a final decision not to comply with these statutory requirements. Defendants' actions violate the plain text of the 2022 and 2023 Appropriations Acts and thus are "not in accordance with law" within the meaning of the APA.

It appears that Defendants' only defense in this case will be some theory that publicly posting OMB's apportionments requires disclosing "predecisional" and "deliberative" information, meaning complying with the law would supposedly infringe upon the deliberative

process privilege. But the plain text of the Antideficiency Act, and OMB's own statements that an "approved" apportionment is "legally binding," refute any such claim. Ex. 4 §§ 120.1, 120.10. Simply put, an apportionment does not precede the relevant decision, it is the decision regarding how much agencies can spend, and that decision has immediate legal consequences. Defendants' other purported reason for violating the law—that disclosing apportionments could risk "national security"—can be dismissed out of hand because the law exempts from disclosure any classified information referenced in an apportionment.

The equities likewise compel the entry of immediate relief. Protect Democracy is suffering irreparable harm each day that it is unable to use its custom website to analyze apportionments and inform Congress and the public whether the Executive Branch might be defying Congress's will by preventing agencies from spending funds. The equities and the public interest similarly counsel strongly in favor of an injunction to ensure that the Executive Branch complies with the law on disclosing apportionments, including to shine light on whether the Executive Branch is violating other laws by impounding funds.

Finally, because the issue before the Court is purely legal and requires no administrative record or factual development, the Court may alternatively enter summary judgment and thus make the injunction permanent.

## I.    Plaintiff is Likely to Succeed on the Merits

### A.  OMB's Actions Are Contrary to the Relevant Appropriations Acts

The 2022 and 2023 Appropriations Acts confer on OMB a non-discretionary duty to publicly post apportionments in a specific manner and on a specific timeline. Congress has directed that OMB "*shall* operate and maintain the automated system" required by the 2022 Appropriations Act." 136 Stat. at 4667 (emphasis added). OMB must "post each document apportioning an appropriation," "including any associated footnotes," "on a publicly accessible

website" within "2 business days after the date of approval of such apportionment." 136 Stat. at

257. The apportionment documents must take the format of an "Open Government Data Asset"

as defined by 31 U.S.C. § 1513(b). *Id.* And the documents "*shall* also include a written

explanation by the official approving each such apportionment stating the rationale for any

footnotes for apportioned amounts." *Id.* (emphasis added).

On March 24, without explanation, Defendants ceased complying with these

unambiguous congressional mandates. On that day, OMB's apportionments website went dark,

showing only "Page not found." *See* Ex. 15. In a March 29 letter to Congress, OMB Director

Vought went public with the agency's decision made at least five days prior. Vought stated that

"the Office of Management and Budget will no longer operate and maintain the publicly

available automated system to which apportionments are posted envisioned in section 204 of

division E of the Consolidated Appropriations Act, 2023." Ex. 16. Vought left no doubt that this

decision is final: "OMB has determined," Vought said, "that it can no longer operate and

maintain this system." *Id.*

Thus, by Vought's own admission, OMB has made a final decision not to operate the

apportionments website that Congress "envisioned" in the 2022 and 2023 Appropriations Acts.

Congress did not merely envision this website; it affirmatively mandated that OMB operate this

website in specific ways. OMB's actions thus are not in accordance with law. 5 U.S.C. §

706(2)(A).

### B. Defendants Cannot Rely on Any Privilege or Sensitivities to Violate the Law

It appears that Defendants will not deny in this case that their actions violate the 2022 and

2023 Appropriations Acts. Rather, Defendants' sole defense seemingly will be that Congress

somehow lacks the authority to compel Defendants to post apportionments information online.

Although Defendant Vought in his letter hints at the notion that the statutes are unconstitutional,

he does not state that outright. Instead, he vaguely gestures to the possible "disclosure of sensitive, predecisional, and deliberative information." Ex. 16.

Vought's repeated use of the terms "predecisional" and "deliberative" seems to be referencing the deliberative process privilege. The deliberative process privilege is "primarily a common law privilege." *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997). To fall under the privilege, "the material must be predecisional and it must be deliberative." *Id.* at 737. "The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual." *Id.*

"Documents are 'predecisional' if they were generated before the agency's final decision on the matter." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021). Agency action is "final" where it "mark[s] the consummation of the agency's decisionmaking process," and "rights or obligations have been determined" by the action or "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted). A decision thus is final where, legally, it "has real operative effect." *Sierra Club*, 592 U.S. at 271 (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 159 n.25 (1975)). In contrast, a decision is predecisional where a court can "pinpoint an agency decision or policy to which the document contributed." *Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Just.*, 823 F.2d 574, 585 (D.C. Cir. 1987).

Closely related, documents are "deliberative" if they "were prepared to help the agency formulate its position." *Sierra Club, Inc.*, 592 U.S. at 268. Deliberative information "must . . . be a part of the agency give-and-take by which the decision itself is made." *Senate of the Com. of Puerto Rico*, 823 F.2d at 585 (quotations and alteration omitted).

OMB's apportionments are not predecisional or deliberative. Under the Antideficiency Act, an apportionment is a final decision regarding the funds an agency may spend, and it has

15

immediate legal consequences. The Act requires the President or his designee to "apportion [an]
appropriation in writing" and "notify the head of the executive agency of the action taken." 31
U.S.C. § 1513(a), (b). Legal consequences flow directly from that action. Agencies may obligate
funds after, but only after, they receive an apportionment, and agencies are prohibited from
"exceeding . . . an apportionment" in the amounts they spend. *Id.* § 1517(a)(1). The legal
consequences are very real for federal employees, who face administrative discipline or criminal
liability if they authorize obligations or expenditures greater than an apportionment. *Id.* §§ 1518-
19. The 2022 Appropriations Act also confirms that OMB need not disclose any predecisional
information; OMB must only disclose apportionments that an OMB official has "approv[ed],"
136 Stat. at 257, not apportionments an official is "considering" or "deliberating over."

This Court need not take Plaintiff's word for it that apportionments are neither
predecisional nor deliberative—OMB itself says so. In its definitive guidance on apportionments,
Circular No. A-11, OMB states that "[a]n apportionment is legally binding." Ex. 4 § 120.1. That
is in part because "apportioned amounts are legal limits that restrict how much an agency can
obligate, when it can obligate, and what projects, programs, and activities it can obligate for." *Id.*
§ 120.10. OMB notes that its footnotes for apportioned amounts likewise "have legal effect" by
placing binding conditions and restrictions on how agencies spend apportioned funds. *Id.* §
120.34. And OMB leaves no doubt that it considers an apportionment to be the consummation of
its decisionmaking process; the email that OMB sends to agencies containing an apportionment
must contain the subject line "Approved Apportionment." *Id.* § 120.37.

There is more. In Freedom of Information Act (FOIA) litigation, OMB effectively
conceded that final apportionments are not covered by the deliberative process privilege. In
response to a FOIA request for documents related to OMB's apportionments for assistance to
Ukraine, OMB appears to have willingly produced the entirety of its final apportionments. *See*

16

*Ctr. for Public Integrity v. Dep't of Def.*, No. 1:19-cv-03265, ECF No. 23-2 (D.D.C. Feb. 14, 2020). OMB withheld on deliberative process privilege grounds the "draft language" and discussions leading up to an apportionment, but not the "final language of the apportionment footnotes" that reflected the "agency's final position." *See Ctr. for Pub. Integrity v. Dep't of Def.*, 486 F. Supp. 3d 317, 337-38 (D.D.C. 2020).

GAO, the nonpartisan arm of Congress that reviews appropriations issues, has also found that final apportionments are not subject to the deliberative process privilege. GAO has explained that, because "apportionments are legally binding decisions on agencies under the Antideficiency Act," they "by definition, cannot be predecisional or deliberative." Jacobson Decl., Ex. 18, GAO, *Letter to OMB on Apportionments* (Apr. 8, 2025).

OMB's and GAO's statements confirm the obvious. Something cannot be "predecisional" where it is "legally binding." Ex. 4 § 120.1. OMB's apportionments are not "prepared to help [OMB] formulate its position," *Sierra Club, Inc.*, 592 U.S. at 268, and are not "part of the agency give-and-take by which the decision itself is made," *Senate of the Com. of Puerto Rico*, 823 F.2d at 585 (quotations and alteration omitted). Apportionments *are* the decision regarding how much agencies may spend from an appropriation at any point in time. *See* Bagenstos Decl. ¶ 11. The information regarding apportionments that OMB must disclose "simply state or explain a decision the government has already made," and "is purely factual." *In re Sealed Case*, 121 F.3d at 737. Apportionments are the opposite of predecisional or deliberative.

Vought's letter nonetheless casts apportionments as "interim" decisions because OMB can revisit them as "circumstances" change. Ex. 16. But "[t]he mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). By Vought's logic, virtually every government decision

17

would be considered interim, because government decisions are always subject to change. An agency regulation, for example, is not rendered "interim," "predecisional," or "deliberative" simply because changing circumstances may lead the agency to change the regulation. Neither are Defendants' apportionment decisions rendered interim simply because they may be "changed as . . . circumstances change." Ex. 16; *see* Bagenstos Decl. ¶¶ 14-15.[5]

Vought's other ground for refusing to comply with the statute—that OMB may have to disclose "sensitive" information that "may pose a danger to national security and foreign policy"—can be dispensed with even more quickly. There is no "it's sensitive" exception to the Executive Branch's duty to comply with the law. And merely invoking the words "national security" does not give Defendants "carte blanche authority to act in contravention of . . . applicable statutes." *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 266-67 (D.D.C. 2018). That is particularly so here, where the statute expressly provides for the protection of any "classified documentation referenced in any apportionment" by exempting it from public disclosure. 136 Stat. at 257; *see also* Bagenstos Decl. ¶ 16. OMB has been posting apportionments online for three years without any reported incident or danger to national security, and there is no reason that would suddenly change now.

## II.    Plaintiff is Suffering Irreparable Harm

A preliminary injunction is necessary to remedy Plaintiff's ongoing, irreparable harm stemming from Defendants' unlawful conduct. Because of Defendants' actions, Protect Democracy and those who rely on Protect Democracy's OpenOMB database have been "denied

---

[5] Even if apportionments did somehow fall under the deliberative process privilege, Congress has more than a sufficient need to require disclosure to overcome the qualified privilege. *See In re Sealed Case*, 121 F.3d at 737-38. The statutes here reflect "a congressional policy choice *in favor of disclosure* of all information." *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984).

access to information that is highly relevant to an ongoing public debate" about how the

Executive Branch is, or is not, spending appropriated funds. *Lawyers' Comm. for C.R. Under L.*

*v. Presidential Advisory Comm'n on Election Integrity*, 265 F. Supp. 3d 54, 70 (D.D.C. 2017);

*see also Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006)

(finding plaintiff irreparably harmed by a failure to "obtain[] in a timely fashion information vital

to the current and ongoing debate surrounding the legality of the Administration's warrantless

surveillance program").

     Every day that Defendants refuse to comply with the law, Protect Democracy is deprived

of the ability to fulfill its mission by monitoring and reporting on the Executive Branch's

compliance with Congress's directives and making that information more accessible to the

public. *See* Carlile Decl. ¶ 15. Protect Democracy is also experiencing acute harm in receiving

far fewer visitors to its website since OMB took its site down. According to Google Analytics,

OpenOMB received approximately 41,000 page views between October 2, 2024 and March 24,

2025 alone. Ford Decl. ¶ 12. After OMB stopped operating its public apportionment website,

OpenOMB's page views significantly decreased: as of April 22, the site had received only 3,400

views so far in April, compared to 6,800 page views in March. *Id.* ¶ 15.

     Protect Democracy has also had to halt ongoing work to make OMB's apportionments

more accessible. For instance, before OMB shut down its website, Protect Democracy was

completing a "notification" feature that it has spent months developing, which would have

allowed OpenOMB users to sign up for daily or weekly alerts with tailored information relating

to new apportionments. *Id.* ¶¶ 16-17. Protect Democracy has attempted to obtain new

apportionments information in other ways, such as through a Freedom of Information Act

(FOIA) request. *Id.* ¶ 22. But FOIA responses need not be provided in a format that is considered

an Open Government Data Asset, and unless Protect Democracy were to receive information in

that format, Protect Democracy likely would be unable to add the information into OpenOMB for public dissemination and use without significant manual effort. *Id.* If the Court were to require OMB to immediately place apportionments back online, however, Protect Democracy would update OpenOMB and display the newly posted apportionment files. Ford Decl. ¶ 23.

### III.    The Balance of the Equities and Public Interest Weigh in Plaintiff's Favor

In general, there is always a public interest in ensuring that the Executive Branch complies with the law. "[T]here is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d at 42 (quoting *Jacksonville Port Auth. v. Adams.,* 556 F.2d 52, 59 (D.C.Cir.1977)). And where, as here, the statutory mandate exists to shed light on government actions, the public's interest is even greater: "public awareness of the government's actions is 'a structural necessity in a real democracy.'" *Id.* at 40 (quoting *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157 (2004)). Indeed, Congress has recognized that "Federal Government data is a valuable national resource" that should be "open, available, discoverable and usable to the general public, businesses, journalists, academics, and advocates" alike. H.R. 1770, 115th Cong. § 2(a)(1) (2017). Ensuring that apportionment data, like all government data, is open and usable to the public "promotes efficiency and effectiveness in Government . . . and most importantly, strengthens our democracy." *Id.*

Here, the loss of legally required, real-time information on apportionments overwhelmingly tips the equities and public interest in favor of an injunction. Without access to this information, Congress, members of the public, and organizations like Protect Democracy have little way of knowing if OMB is using apportionments to improperly restrict how appropriated funds may be used (including through footnotes), or if OMB is holding back apportionments to impound funds by making it impossible for agencies to spend their

appropriations before they expire at the end of the fiscal year. Ford Decl. ¶¶ 19-21; Carlile Decl.

¶¶ 12-14. The risk that such action is occurring is very real. The President and Defendant Vought

have loudly stated their intent to impound funds, *supra*, and the Administration has taken steps to

prevent whole agencies like the U.S. Agency for International Development (USAID) from

spending funds that Congress appropriated to the agency, as part of the Administration's efforts

to shutter those agencies.

The need for disclosure of apportionment information is also urgent given that the

Administration will be imminently proposing a rescissions package to Congress requesting that

Congress rescind more than $9 billion previously appropriated to USAID, the Corporation for

Public Broadcasting, and potentially other agencies. Jennifer Scholtes & Megan Messerly, *White

House to send Congress a formal request to nix $9.3B for PBS, State Department*, POLITICO,

Apr. 14, 2025, https://perma.cc/A878-XRML. Apportionment information would show whether

OMB has unlawfully refused to apportion these funds to the agencies prior to proposing a

rescission, whether OMB has otherwise unlawfully restricted when or how the agencies may

spend these funds prior to any rescission, and whether there are other funds currently not being

made available to the agencies even if the proposed rescission is enacted. *See* Ford Decl. ¶ 21. A

preliminary injunction would bring sunshine on any misuses of the apportionment process that is

occurring.

## IV. The Court Should Alternatively Enter Partial Summary Judgment

A preliminary injunction is warranted to remedy Plaintiff's irreparable harm and protect

public interests. But the Court should go further and enter summary judgment on Plaintiff's

purely legal claim that Defendants' actions are contrary to the 2022 and 2023 Appropriations

Acts. Because no administrative record or discovery is necessary to resolve this claim on the

merits, the Court may resolve this claim swiftly through expedited summary judgment. *See also*

Fed. R. Civ. P. 65(a)(2) (authorizing courts to consolidate proceedings on a preliminary injunction motion with proceedings on the merits); *see also McGehee v. U.S. Dep't of Just.*, 362 F. Supp. 3d 14, 18 (D.D.C. 2019) ("[d]istrict courts enjoy broad discretion" in the management of their dockets). And doing so would be in the best interest of the parties, Congress, and the public, who would benefit from this Court's definitive resolution of the lawfulness of Defendants actions withholding important apportionment information required by law.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's motion for a preliminary injunction or in the alternative partial summary judgment.

Dated: April 27, 2025

*/s/ Daniel F. Jacobson*
 Daniel F. Jacobson (D.C. Bar # 1016621)
Kyla M. Snow*
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington DC, 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

* Not admitted in the District of Columbia. Practice limited to matters before U.S. courts. (admitted *pro hac vice*)

*Counsel for Plaintiff*

22