# Exhibit 10

# The Power of the Purse

## Princeton Initiative on Restoring the Constitutional Powers of Congress

Chaired by Nolan McCarty and Tim Penny[1]

Members: Laurel Harbridge-Yong, Kevin Kosar, Maya MacGuineas, Eloise Pasachoff, Erik Paulsen, Annelise Russell, Richard Swett, James Thurber, Craig Volden, James Wallner, Alan Wiseman

**Executive Summary**

Although the United States Constitution grants Congress the power of the purse, executive encroachment and congressional acquiescence require that Congress take action to reassert its power over government spending. With this aim, this report recommends a series of reforms focused on (1) improving transparency and accountability to Congress and (2) enabling expedited congressional review of executive spending.

- *Require increased transparency regarding apportionments* by developing a more user-friendly apportionment database and by mandating semi-annual reports by the Government Accountability Office (GAO) on apportionments.

- *Require increased transparency regarding expenditures made during government shutdowns* by mandating that agencies provide program-by-program information on expenditures made during a lapse in appropriations and that agencies report to Congress when GAO determines that they have violated the Antideficiency Act.

- *Require increased transparency regarding the transfer and reprogramming of federal funds* by mandating that agencies and departments make information on these actions publicly available.

- *Require the expiration of any presidential national emergency declaration after 30 days* unless an extension is affirmatively authorized by Congress.

- *Require increased transparency regarding the uses and sources of agency generated fees* by mandating greater disclosure and accounting of the use of agency fees, fines, and penalties.

- *Enact fast track congressional review of executive led spending decisions* by amending the Impoundment and Control Act to require that the President submit a message to Congress announcing plans to implement policy that rely in significant part on the obligation or expenditure of particular appropriations. A specified period in which Congress may act to overrule these executive actions is further recommended. The

---

[1] With thanks to Alina Dunlap and Annie Shuppy, for their work on this report. This report draws in part from Pasachoff, Eloise. "Modernizing the Power of the Purse Statutes." *Geo. Wash. L. Rev.*, vol. 92, 2024, forthcoming.

1

- application of such a mechanism of review to reprogramming actions is also recommended, subject to careful consideration of dollar amount thresholds that would trigger congressional review.

- *Increased training regarding the budget and appropriations process for both incoming and returning members of Congress*. Such training should emphasize Congress's constitutional role and authorities as well as the importance of executive accountability to Congress.

These proposals are best understood alongside behavioral reforms on the part of members of Congress and potential reforms to the budget process, both of which could serve to discourage future executive encroachment and undue congressional delegation of authority. A further elaboration of these proposals is accompanied by a brief history of Congress' power of the purse and by a discussion of potential behavioral and budgetary reforms.

**Introduction**

The Constitution unambiguously lodges the "power of the purse" in the Congress. These prerogatives encompass both the power to levy taxes (Article 1, Section 8, clause 1) and to appropriate funds (Article 1, Section 9, clause 7). While the Constitution vests these powers solely in Congress, it has granted limited discretion and flexibility to the executive branch and its agencies.

However, in recent decades, Presidents and agencies have asserted greater and greater authority over fiscal matters without explicit congressional authorization. Moreover, Congress has increasingly acquiesced by failing to challenge these assertions. Consider the following:

- When Congress failed to explicitly appropriate funds for physical barriers on the southern border, President Donald Trump decided to build his Wall with money reprogrammed from the military construction budget.
- President Trump delayed and threatened to withhold $400 million that Congress had appropriated to support the defense of Ukraine.
- President Joe Biden expanded a broad-based loan-forgiveness program through his statutory authority to administer the loan program. The Supreme Court struck down this action, and the Biden administration issued a new rule to alter the program to an estimated cost of $475 billion.

Beyond these headline-grabbing instances of executive encroachment, there are many mundane and routine instances, such as a lack of transparency and accountability in the Office of Management and Budget's instructions to agencies on how to spend money.

In this report, the subcommittee considers some of the reasons for the shrinking Congressional power over the purse and some feasible reforms that should be considered to slow, if not reverse, these trends.

2

There are certain relevant issues that the committee does not address due to our charge to focus on the separation of powers and the balance of power between the executive and legislative branches. First, we do not consider major reforms of the budgeting and appropriations process. While Congress's increasing failure to adhere to the timetables and procedures underlying the Congressional Budget and Impoundment Act is a source of declining congressional influence over fiscal matters, reform is a complex matter.[2] Many ideas on the budget reform agenda shift additional power away from Congress to the executive. The report however does contain an extended discussion of these issues and exhorts Congress to proceed carefully in ways that enhance fiscal governance while mainlining congressional authority.

We set aside the issue of permanent appropriations and so-called entitlements. Congress chose to remove Social Security, Medicare, and the like from the standard annual appropriations process. In doing so however, they diminished both their authority over the purse for these programs and over an increasingly large portion of the annual budget.[3] However, evaluating the difficult policy choices and value tradeoffs associated with reforming these programs is beyond the scope of this sub-committee.

We also do not consider reforms to the debt limit. Clearly, Congress's constitutional prerequisites include a role in managing the federal debt. But the current system has become a tool for brinksmanship and a contributor to extreme fiscal uncertainty. We do recommend that Congress consider alternatives that maintain its role in managing debt, but without the negative consequences of the status quo.

**Part I. Background on the Power of the Purse**

In granting Congress the power of the purse, the Constitution vests the institution with a powerful tool with which to pursue its priorities and to maintain the separation of powers between branches of government. James Madison, for example, describes the purse as a "powerful instrument" for "reducing … all the overgrown prerogatives of the other branches" and as "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people."[4] Despite its constitutional basis, the ability of Congress to assert this power has required procedural innovation.

In response to developments in the executive and judicial branches, Congress has repeatedly reformed statutory procedures in order to assert its power of the purse. The 1849 Miscellaneous Receipts Statute, for example, required that federal receipts be deposited into the Treasury.[5] In doing so, Congress ensured that these funds would be subject to appropriations, limiting the ability of the executive branch to create special accounts beyond congressional control. The 1870 Antideficiency Act was passed to address "coercive deficiencies," the rapid spending down of

---

[2] See McCarty, Nolan. "The Decline of Regular Order in Appropriations: Does It Matter?" *Congress and Policy Making in the 21st Century*, edited by Jeffery A. Jenkins and Eric M. Patashnik, Cambridge University Press, Cambridge, 2016, pp. 162–186; McCarty, Nolan, et al. "The Budget and Appropriations Process" *Congressional Reform Task Force Report,* American Political Science Association, 2019, pp. 23-30.
[3] Lawrence, Matthew B. "Congress's Domain: Appropriations, Time, and Chevron." *Duke L.J.,* vol. 70, 2020, p. 1077; Feld, Alan L. "The Shrunken Power of the Purse." *B.U. L. Rev.,* vol. 89, 2009, p. 494.
[4] Federalist 58.
[5] Ch. 110, § 1, 9 Stat. 398, 398-99 (1849).

allocations in order to pressure Congress to cover existing obligations through additional sums. The Act, for example, made it illegal for agencies to spend more than had been appropriated for the given fiscal year.[6]

The 1974 Budget Act[7] was passed in response to growing presidential influence over the budget process and abuses by the Nixon administration. The Act created the Congressional Budget Office and the process of budget resolutions for appropriations. These procedural reforms were intended to bolster the technical capacity of Congress against that of the Office of Management and Budget (OMB) and to counter the influence of the president's budget proposal. In addition, Title X of the 1974 Budget Act, known as the Impoundment Control Act, circumscribed the president's ability to rescind or defer appropriated funds.[8] [9]

More recently, Congress passed several provisions to increase transparency and accountability regarding apportionment. Apportionment involves the distribution by OMB of congressional appropriations to executive agencies over the course of the fiscal year. This process is legally binding and provides an essential tool in the execution of the federal budget, ensuring that agencies do not mismanage the funds allocated to them. Prior to recent reforms, apportionments were not generally disclosed to the public, hindering congressional oversight of the execution of congressional appropriations. The Consolidated Appropriations Act of 2022 required OMB to provide the House and Senate Appropriations and Budget Committees with documentation of apportionments. Furthermore, the Act required the development of a public-facing website to disclose apportionments and provide written explanation for any associated conditions on the use of funds.[10] This website is now active[11] and these reforms were made permanent in the Consolidated Appropriations Act of 2023.[12] Originally included in the Congressional Power of the Purse Act,[13] these reforms were advocated for by a broad, bipartisan coalition.[14]

Congress has repeatedly sought to reassert its power of the purse in response to changing inter-branch dynamics. The reforms proposed below, then, are not anomalous, but rather follow a recurring need to bolster the existing powers of the legislative branch.

**Part II. Proposed Reforms**

---

[6] Ch. 251, § 7, 16 Stat. 230, 251 (1870).
[7] Budget Act, Pub. L. No. 93-344, 88 Stat. 297 (1974).
[8] See Chafetz, Josh. *Congress's Constitution: Legislative Authority and the Separation of Powers,* Yale University Press, 2017, pp. 45-77; Pasachoff, "Modernizing the Power of the Purse Statutes."
[9] Conversely, congressional purse authority was weakened by the 1983 Supreme Court decision that found Congress's use of a "legislative veto" unconstitutional. INS v. Chadha, 462 U.S. 919 (1983).
[10] Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 4459, Div. E, § 204.
[11] The public-facing apportionment website made permanent in the Consolidated Appropriations Act of 2023 can be found here, https://apportionment-public.max.gov/.
[12] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, Div. E., § 204; Pasachoff, "Modernizing the Power of the Purse Statutes."
[13] Congressional Power of the Purse Act, H.R. 6628, 116th Cong. (2020).
[14] See, e.g., Hedtler-Gaudette, Dylan. "Power of the Purse Coalition Applauds House Budget Committee Hearing, Urges Follow-Up Action." *Project on Government Oversight*. 28 April 2021. https://www.pogo.org/letter/2021/04/power-of-the-purse-coalition-applauds-house-budget-committee-hearing-urges-follow-up-action.

1. Improving Transparency and Accountability to Congress

    a) Require increased apportionments transparency through the development of an improved apportionment database and through mandated semi-annual reports by the Government Accountability Office (GAO) on OMB's apportionments.

Congress has delegated substantial authority over the power of the purse to the executive branch through the apportionment process. Beyond the discrete disbursement of funds discussed above, the apportionment process may also be used to condition the use of funds. Footnotes attached to apportionments, for example, may bar agency officials from taking certain actions. As such, apportionments allow for the efficient use of public resources but also provide an opportunity for executive aggrandizement and control over the budget process.[15] [16]

This delegation of authority by Congress to the executive branch has been exacerbated by the lack of transparency in OMB's apportionments. We strongly support the reforms included in the Consolidated Appropriations Acts of 2022 and 2023 requiring OMB to provide the House and Senate Appropriations and Budget Committees with documentation of apportionments and creating a public-facing website disclosing apportionments. However, we believe that further efforts are needed to improve apportionment transparency. These reforms directly affect the ability of Congress to oversee the process by which appropriations are translated into agency expenditures and the ability of the public to hold the executive branch accountable for its spending.

First, Congress should require that the existing apportionment database be made more user friendly. At present the website is unnecessarily difficult to navigate. The website, for example, provides links to apportionments by agency and by Treasury Appropriation Fund Symbol (TAFS), which may not be easily recognized as programs of interest by members of Congress, staff members, or members of the public. Reviewing information from the website also requires downloading discrete data files rather than allowing users to interact with the information directly online. The inclusion of:
    (1) titles that reflect program names,
    (2) clearly identified apportionment footnotes,
    (3) clearly identified changes between apportionments from the same program or activity over the course of the fiscal year,
    (4) and direct links to appropriation language, the President's own budget request, and supporting materials for each program,
would substantially improve the ability of Congress and the public to put disclosures in context. Furthermore, these changes would allow for a systematic assessment of the extent to which apportionment footnotes are used as a source of executive branch policy direction. These

---

[15] See Pasachoff, "Modernizing the Power of the Purse Statutes," pp. 7-8; Office of Management and Budget, Executive Office of the President, OMB Circular No. A-11, 2016.
[16] For example, apportionment footnotes provided the basis for the hold placed on funds to Ukraine. Office of Management and Budget, Executive Office of the President, B-331564, Withholding of Ukraine Security Assistance, 2020, https://www.gao.gov/products/b-331564.

recommendations are in line with other disclosure requirements that Congress has already undertaken.[17]

Second, Congress should require GAO provide semi-annual public reports on apportionments. GAO is well situated to evaluate apportionment disclosures and to make this information about OMB's actions comprehensible to members of Congress, staff, and civil society organizations. A semi-annual disclosure would allow Congress to have relevant information as it is developing appropriations bills for the subsequent fiscal year. These reports could be provided as an additional resource on the existing apportionment website to improve the transparency of the available information.

The ability of GAO to provide such information to Congress and the public would be enhanced if GAO were added to the list of entities to whom agencies must disclose issues with OMB's delayed or conditioned apportionments. In this way, agency-level concerns about the use of apportionments would be elevated to the GAO, rather than obscured within sub-links on the apportionment website. This reform would also mirror existing disclosure requirements to GAO of Antideficiency Act and Impoundment Control Act violations.[18]

   b) Require that agencies provide program-by-program information on expenditures made during a lapse in appropriations and that agencies report to Congress when GAO has determined that they have violated the Antideficiency Act.

As government shutdowns and associated opportunities for control of federal spending by the executive branch become more frequent, increased transparency is needed to ensure that Congress can adequately oversee the power of the purse. Two exceptions to the Antideficiency Act prohibition on agencies operating in the absence of appropriations are provided for: when the activity is otherwise "authorized by law" and in the case of "emergencies involving the safety of human life or the protection of property".[19] In practice, these exceptions have created opportunities for the manipulation of federal spending by the executive branch, with OMB instructing agencies on the creation of shutdown plans and making determinations about which agency employees and activities should continue during a shutdown.

Congress lacks sufficient information to effectively oversee spending during a government shutdown. Although OMB requires agencies to submit shutdown plans, these plans often lack the level of detail needed to allow for meaningful oversight. Furthermore, formal legal decisions made by the Office of Legal Counsel (OLC) on the permissibility of agency actions are not always made public. To address this informational deficit, Congress should require that agencies provide program-by-program information about any expenditures or obligations made during a lapse in appropriations, including any analysis of the legal authority for such spending. [20]

---

[17] For example, OMB already provides information about the President's Budget Request on its website, and it indicates changes between requests over time. Apportionment documents could be clearly situated among these documents with cross-references.
[18] See, Pasachoff, "Modernizing the Power of the Purse Statutes," pp. 29-32.
[19] 31 U.S.C. §§ 1341(a)(1)(b), 1342.
[20] Pasachoff, Eloise. "The President's Budget as a Source of Agency Policy Control." *Yale L.J.,* vol. 125, 2016, pp. 2232-2235.

In providing oversight of executive branch spending during government shutdowns, Congress often relies on GAO to investigate whether an agency's choices complied with emergency exceptions to the Antideficiency Act. Whether agencies report and explain their actions to Congress when GAO determines that they have violated the Act importantly depends on OMB policy. These reports provide valuable information to Congress, explaining agencies' rationale for why the GAO's determination may be wrong. OMB reporting requirements have changed across recent administrations, leading to variation in the information available to Congress.

Congress should require agencies to report to Congress when GAO determines they have violated the Antideficiency Act. At a minimum, whether Congress has access to valuable information in overseeing executive branch spending should not depend on the determinations of the executive branch.

c) Require agencies and departments make information on transfer and reprogramming actions publicly available.

The transfer and reprogramming of funds provide agencies and departments with flexibility in the use of available budgetary resources. This shifting of funds may be necessary for enabling agencies to effectively respond to existing needs and unforeseen circumstances. These actions may also, however, allow agencies to spend money in ways contrary to congressional intent and, again, with limited congressional oversight.

Changes in the application of funds by agencies and departments primarily occur through transfers and reprogramming. Transfers involve the movement of funds within an agency from one appropriations account to another or the movement of funds between agencies. For an agency to engage in this form of budget adjustment, authorization must be provided for in authorizing statutes or appropriations acts. Reprogramming involves the movement of funds within appropriations accounts from one program activity to another. This shifting of funds is generally permitted unless otherwise restricted by statute or unless such an action would violate existing law. Notification of these changes in the application of funds generally only extends to the relevant House and Senate Appropriations Committees and some authorizing committees.[21] [22]

To increase access to information on, and opportunities for, oversight of transfer and reprogramming actions, Congress should require agencies make information on these actions publicly available. Information regarding agency and departmental changes in the application of funds is not readily accessible to members of Congress who are not serving on relevant committees and civil society groups engaged in the oversight of government. Some departments, such as the Department of Defense, already make reports of transfers and reprogramming actions

---

[21] Congressional Research Service, Transfer and Reprogramming of Appropriations: An Overview of Authorities, Limitations, and Procedures, No. R43098, June 6, 2013, https://crsreports.congress.gov/product/pdf/R/R43098; U.S. Government Accountability Office, *Principles of Federal Appropriations Law,* Fourth Edition, Chapter 2, 2016, GAO-16-463SP, https://www.gao.gov/assets/2019-11/675709.pdf.
[22] Reynolds, Molly E., and Philip A. Wallach. "Does the Executive Branch Control the Power of the Purse?" *American Enterprise Institute,* 2020, pp. 1-11.

7

readily accessible to the public.[23] Most, however, do not, impeding congressional and public opportunities for oversight.

Although this reform would involve an increase in the reporting requirements faced by agencies, it would not substantively alter thresholds for notification of reprogramming actions or expand the set of committees to which notification is required. These types of recommendations have raised concerns in the past of further burdening the oversight capacity of Congress.[24] Requiring that agencies and departments post documentation of transfer and reprogramming actions on pre-existing websites would make crucial information about the use of federal funds more transparent while limiting the potential burden of additional reporting.

   d) Require the expiration of any presidential national emergency declaration after 30 days unless an extension is affirmatively authorized by Congress.

Congress has delegated substantial emergency powers to the president with only weak checks on their exercise. The Constitution does not grant explicit emergency powers to the president. Instead, these enhanced authorities are derived from Congress and, most notably, the 1976 National Emergencies Act. Since the Supreme Court ended the use of legislative vetoes, congressional termination of an emergency declaration has required passage of a law signed by the president or a veto-proof supermajority in the legislature. This high threshold limits the ability of Congress to respond to potential abuses of emergency powers.

As demonstrated by the controversial manner in which the Trump administration funded the construction of the southern border wall or President Biden extended temporary student debt relief during COVID, these emergency declarations provide opportunities for the president to transfer federal funds in ways potentially opposed by majorities in Congress. Congress should seek to reestablish meaningful checks on presidential emergency powers and to limit opportunities for associated appropriation by the executive branch of Congress's power of the purse by amending the statutes governing national emergencies. Specifically, Congress should require the expiration of presidentially declared national emergencies after 30 days unless an extension is affirmatively authorized by Congress within said period and on a yearly basis thereafter. [25] [26]

---

[23] Documentation of all transfer and reprogramming actions by the Department of Defense from the 1999 fiscal year through the present are available here: https://comptroller.defense.gov/Budget-Execution/ReprogrammingFY2023/.
[24] See, e.g., U.S. Governmental Accountability Office, Ways to Reduce the Reprogramming Notification Burden and Improve Congressional Oversight, NSIAD-89-202, September 21, 1989, p. 11, http://gao.gov/assets/220/211646.pdf.
[25] Reynolds and Wallach, "Does the Executive Branch Control the Power of the Purse?"; Goitein, Elizabeth. "Good Governance Paper No. 18L Reforming Emergency Powers." *Just Security,* 2020, https://www.justsecurity.org/73196/good-governance-paper-no-18-emergency-powers/.
[26] This reform has received bipartisan support. See, e.g., United States, Congress, Senate, Assuring that Robust, Thorough, and Informed Congressional Leadership is Exercised Over National Emergencies Act or the ARTICLE ONE Act. *Congress.gov,* 2019. S.764, 116th Congress, https://www.congress.gov/bill/116th-congress/senate-bill/764; United States, Congress, House of Representatives, Protecting Our Democracy Act. *Congress.gov,* 2021. H.R.5314, 117th Congress, https://www.congress.gov/bill/117th-congress/house-bill/5314.

e) Require greater disclosure and accounting of the uses and sources of agency generated fees.

Many executive agencies self-fund using revenues generated by license fees, royalties, proceeds from public lands, the sale of ordinary goods and services, and legal fines and settlements. Although government agencies, as a rule, may not spend funds that have not been appropriated by Congress, non-tax revenues can provide exceptions to this requirement.

These self-funding enterprises include government corporations (e.g., Export-Import Bank) and other congressionally chartered entities (e.g., the Federal Reserve).[27] These enterprises are managed by federal employees and treated as government entities for most legal purposes. In some cases, user fees charged by regular federal agencies are remitted to the Treasury. In others, however, fees are retained by the agencies and may or may not be subject to appropriations. In the latter case, agencies are allowed to create a "revolving fund" that continuously collects user fees and spends them on specified purposes. Revolving funds are increasingly used to permit regulatory and enforcement agencies to use fines and settlements to operate their own spending programs.[28]

The use revolving funds and other mechanisms such as the Consumer Financial Protection Bureau's guaranteed funding through Federal Reserve revenues complicate the ability of Congress to exercise its power of the purse.[29] Neither the Office of Management and Budget, the Department of the Treasury, the enforcement agencies, nor Congress publishes systematic accounts of agency revenue-raising and the uses made of these funds.[30] The lack of transparency is such that Congress has been caught unaware of the self-funding status of government agencies and its inability to defund relevant programs in the past.[31] Furthermore, "non-prosecution agreements" with confidential fines and settlements provide enforcement agencies with non-transparent sources of funding outside of Congress's purview. Congress has acquiesced in the expansion of agency self-funding, in part, because doing so involves generating revenues without increasing broad based taxes.

Although government agencies that rely on self-funding are not necessarily immune from congressional direction,[32] greater transparency and reporting would facilitate oversight both by

---

[27] Kevin R. Kosar, Federal Government Corporations: An Overview, Congressional Research Service, report RL3365, June 8, 2011, https://sgp.fas.org/crs/misc/RL30365.pdf; Kevin R. Kosar, Congressional or Federal Charters: Overview and Enduring Issues, Congressional Research Service, report RS2223, April 19, 2013, https://sgp.fas.org/crs/misc/RS22230.pdf.

[28] DeMuth, Christopher C., and Michael S. Greve. "Agency Finance in the Age of Executive Government." *Geo. Mason L. Rev.,* vol. 24, 2017, pp. 555-594; DeMuth, Christopher C. "Agency Taxation." *Engage*, vol. 16, no. 2, 2015. http://www.fed-soc.org/publications/detail/agency-taxation.

[29] Other examples include the FCCs Universal Access program and the PCAOB's "accounting support fee".

[30] U.S. Government Accountability Office, Fees, Fines, and Penalties: Better Reporting of Government-wide Data Would Increase Transparency and Facilitate Oversight, GAO-19-221, March 2019, p. 27, https://www.gao.gov/assets/700/697345.pdf.

[31] Shabad, Rebecca. "House GOP Panel: Defunding Immigration Order 'Impossible'." *The Hill,* 20 Nov. 2014. https://thehill.com/policy/finance/224837-appropriations-panel-defunding-immigration-order-impossible/.

[32] Kosar, Kevin. "Fees, Fines and Penalties: Has Congress Lost Control of the Purse?" *Center for the Study of the Administrative State Working Paper 21-26.* https://administrativestate.gmu.edu/wp-content/uploads/2022/08/Kosar-Fees-Fines-and-Penalties.pdf.

Congress and by civil society groups. Congress should require greater disclosure and accounting of the use of agency fees, fines, and penalties. Congress should also consider new procedures to increase congressional supervision of confidential sources such as non-prosecution agreements.[33]

2. Enact fast-track congressional review of executive led spending decisions.

Whereas the Impoundment Control Act was a response by Congress to aggressive executive branch influence over the budget in the form of *non-spending*, recent cases of executive aggrandizement involve presidential *spending* and are inadequately addressed by the statute. Consider, for example, the Obama administration's use of tax credits in the Affordable Care Act,[34] the transfer of funds by the Trump administration for the construction of a wall on the southern border,[35] and the Biden administration's reading of the post-9/11 HEROES Act to provide student debt relief.[36]

Congressional reliance on the legal system to push back against these types of executive actions may also prove insufficient. Judicial review over spending decisions may encounter issues of justiciability (e.g., standing, cause-of-action, and reviewability) and can take years.[37] Moreover, the involvement of the courts on executive spending decisions has not negated an independent role for Congress. Although the courts weighed in on Nixon-era impoundments, Congress still saw a need to develop procedures to respond to presidential non-spending through the Impoundment Control Act. Congress should develop comparable procedures to respond to presidential spending.

We recommend amending the Impoundment Control Act to include "fast-track" authority for Congress to consider potentially improper executive spending. Such a procedure would define a "Release" as a presidential or agency plan or announcement of a plan to develop or implement a policy choice that relies in significant part on the obligation or expenditure of a particular appropriations account or set of accounts. Under our proposal, the President would be required to submit a special message to Congress describing Releases that involve sums exceeding a

---

[33] See Wallner, James. "Testimony on Examining 'Backdoor' Spending by Federal Agencies before the House Oversight and Government Affairs Committee, Subcommittee on Intergovernmental Affairs." (Date: 12/11/2018). https://oversight.house.gov/wp-content/uploads/2018/12/Wallner-RStreet-Statement-Backdoor-Spending-12-11.pdf. Exceptions were included for funds to be paid to a whistle-blower, loan guarantee programs, or insurance programs and the requirements did not apply to the U.S. Postal Service or the U.S. Patent and Trademark Office (PTO). The Department of Commerce and the PTO must report annually to Congress on funds collected by the PTO from a settlement. Offsetting receipts and collections are funds collected by agencies from other government accounts or from the public in businesslike or market-oriented transactions. Under current law, the collections are treated as negative budget authority and outlays rather than revenue and may be used to offset spending for budget enforcement purposes. Similar legislation was introduced in the 118th Congress. See United States, Congress, House, Agency Accountability Act of 2023. *Congress.gov,* 2023. H.R.2368, 118th Congress, https://www.congress.gov/bill/118th-congress/house-bill/2368.

[34] Sohoni, Mila. "On Dollars and Deference: Agencies, Spending, and Economic Rights." *Duke L.J.,* vol. 66, 2017, pp. 1688-94.

[35] Metzger, Gillian E. "Taking Appropriations Seriously." *Colum. L. Rev.,* vol. 121, 2021, pp. 1096-1097.

[36] See, e.g., "Student Debt Cancellation Resources Page." *Committee for a Responsible Federal Budget,* 4 Jan. 2022. https://www.crfb.org/blogs/student-debt-cancellation-resources-page.

[37] Pasachoff, Eloise. "The President's Budget Powers in the Trump Era." *Executive Policymaking: The Role of the OMB in the Presidency,* edited by Meena Bose and Andrew Rudalevige, Brookings Institution Press, 2020, pp. 69–98.

specified dollar amount. Upon receipt of the Release message, Congress would have a specified window (such as 25 calendar days)[38] to overrule such action subject to the Constitution's presentment clause. This procedure would treat presidential funding releases similar to the way rules are subject to congressional override under the Congressional Review Act (CRA).

Use of the CRA model provides a useful balance between requiring affirmative approval of Releases and allowing only expressions of disapproval. Of course, bicameralism and presentment would be formidable hurdles to congressional rejection of Presidential spending releases just as it has been for agency rules under the CRA. Yet, the use of the procedure we propose would greatly enhance Congress's opportunities to weigh in on presidential spending decisions.

We also recommend a similar model for fast-track congressional review of reprogramming actions. As discussed above, the reprogramming of funds can provide agencies and departments with the necessary flexibility to respond to changing circumstances. Where reprogramming actions exceed those warranted by the regular needs of effective governance, however, a mechanism for increased congressional oversight, such as the proposal outlined above, may be appropriate. The dollar threshold at which congressional review of reprogramming actions is triggered requires careful consideration such as to allow for necessarily flexibility in the allocation of budgetary resources.

**Part III. Reforming the Budget and Appropriations Process**

Although reforms discussed in Part II make up the primary focus of this report, such tools for reasserting the power of the purse would likely be less effective if Congress does not first seek to improve internal dysfunction. Gridlock over appropriations and the broader budget process is an impediment to Congress fulfilling its responsibilities over fiscal issues. If the Legislative Branch appears feckless, especially when it comes to the most basic of its constitutionally mandated duties, it can embolden the Executive Branch to take unilateral action.

Congress does not prioritize the appropriations process, frequently relying on omnibus bills and continuing resolutions, essentially relinquishing much of its own power of the purse. The Congressional Budget Act of 1974, part of the broader Congressional Budget and Impoundment Control Act discussed in other parts of this report, established a timeline for the annual budget process that culminates with the beginning of the new fiscal year on October 1. Congress is supposed to adopt a budget resolution by April 15 and pass 12 individual appropriations bills over the subsequent months, but it typically fails to meet these deadlines.

Lawmakers have not passed all appropriations bills individually and before October 1 in more than a quarter century, leading to government funding through lengthy, opaque omnibus laws or series of inefficient continuing resolutions for each year after FY 1995. The budget process was designed such that appropriators and lawmakers give each of the 12 appropriations bills necessary scrutiny and evaluate which discretionary spending programs truly deserve spending

---

[38] This length of time reflects existing language in the Impoundment Control Act.

increases or cuts.  But it has devolved into a vote on a large legislative package negotiated by the president and party leaders– often just days before Congress adjourns for the winter holidays.[39]

Finalizing at least part of the discretionary budget before the beginning of the fiscal year would be better than nothing at all, but Congress tends to also fall short by this standard. Lawmakers have not passed any appropriations bills before October 1 in more than five years, as five appropriations bills were signed into law by the beginning of FY 2019. There were only two fiscal years out of the last 10 years which began with any completed appropriations bills.

Failure to collectively complete appropriations results in the use of continuing resolutions, temporary bills which provide funding for programs based on the previous funding levels, for at least part of the year. While continuing resolutions do not typically provide for large discretionary spending increases and may even keep spending flat, they do not account for changing needs within departments or agencies and can actually waste money.

In addition to neglecting discretionary spending, Congress exercises limited control over mandatory spending and frequently declines to adopt budget resolutions, leading to a failure to confront longer-term budget challenges. Formal budget resolutions are supposed to include estimates for spending, revenues, deficits, and debts over the following decade under the policies that Congress wishes to pursue, as well as providing instructions for the use of budget reconciliation. The last true budget resolution Congress adopted was for FY 2016, although lawmakers have since used the budget resolution process to trigger powerful reconciliation procedures – resulting in so-called "skinny budgets" that served as a vehicle for the majority party to advance favored policy goals.

To prevent Executive Branch encroachment on its power of the purse, Congress should demonstrate its ability to serve as a functional legislative body and best use its authority over spending. Lawmakers should consider budget process reforms that both compel Congress to complete annual appropriations in a timely manner and encourage Congress to reassert its role in shaping the longer-term budget trajectory. Suggestions included below are not exhaustive, and other proposals for budget process reforms could be considered.

Certain bipartisan process proposals discussed by both internal congressional panels and outside groups in the past, such as biennial budgeting and automatic continuing resolutions designed to prevent government shutdowns, may not appeal to true member incentives or must be designed carefully with sanctions for both parties. Understanding the motivation behind behaviors and acknowledging the challenges of political polarization are both key to crafting meaningful budget process reforms.

Congress could implement restrictions to member pay, travel, or August recess adjournment unless the appropriations process meets certain targets, to borrow an idea from recently proposed automatic continuing resolution legislation. Points of order in the Senate for consideration of

---

[39] We do not feel that there is anything magic about 12 appropriations bills.  A case could be made for a smaller number which might facilitate efficient tradeoffs across spending areas.  But we do believe that maintaining the congressional power requires establishing a more orderly and committee-centered process.

non-appropriations legislation during certain months – perhaps June or July – could force lawmakers to stay on schedule.

The budget resolution is one of the few procedures forcing members of Congress to acknowledge trajectory of mandatory spending. On the other hand, it is often hard to find tangible consequences of not passing a budget on time. In years in which Congress produces a budget, they typically are no better at passing appropriations bills on time.

A more serious budget process, though, could engage more legislators in the process of fiscal management and create more individual incentives to push back when those prerogatives are violated by the Executive Branch. Congress could require committee chairs to testify in front of the Budget Committee and the Budget Committee to formally present their views and estimates, convincing members of Congress to take the process more seriously and producing a new culture, or implement binding 302(b) allocations for the 12 appropriations bills. Perhaps a process for Congress to formally respond annually or biannually to Congressional Budget Office budget outlooks would force more serious discussions of the long-term fiscal trajectory.

The ongoing debt limit debate still has potential to serve as a vehicle for budget process reforms, as more than a dozen past debt ceiling increases have been accompanied by deficit reduction plans like the Budget Control Act or procedural reforms. Proposed procedural changes have included withholding congressional pay temporarily, reinstatement of statutory pay-as-you-go rules, and certain Presidential line-item veto powers. It is possible that steps could be added in the reconciliation process or debt ceiling process that would strengthen the hand of Congress and go directly to the mission of reclaiming the power of the purse.

The budget process followed by Congress at present makes it unnecessarily difficult for its members to discharge their constitutional duties effectively. Its complexity obscures the real nature of today's dysfunction and inhibits efforts to fix it. Moreover, the closed-door nature of budgeting makes it harder for rank-and-file members of Congress, and the people they represent, to evaluate budgetary decisions as they are made. Reforms aiming to improve the efficiency of federal budgeting without tackling this deeper dysfunction are unlikely to fix the broken process. To be effective, reform efforts should be grounded in a clear understanding of what the act of budgeting entails.

Although this report does not make specific recommendations regarding reform of the budget and appropriations process, we do recommend that member and staff trainings concerning these processes be developed for all incoming and returning members of Congress. For Congress to effectively assert its power of the purse, not only its staff but also its members must be aware of the relevant tools at their disposal. Although written materials and lectures on the budget and appropriations process are available through the CRS, GAO, and civil society groups,[40] these resources could be better targeted to the needs of members themselves.  But most importantly, this training should emphasize Congress's constitutional role and authorities as well as the importance of executive accountability to Congress.

---

[40] See, e.g., GAO Appropriations Law Training, https://www.gao.gov/legal/appropriations-law/appropriations-law-training.

**Conclusion**

We do not place much faith in the idea that the President and executive will ever actively promote congressional fiscal authority or that the courts will be an effective or reliable congressional ally.[41] But we do believe that Congress can reclaim much of the ground it has lost by reasserting its authority over appropriations and using that power to police the executive and punish its encroachments.[42] All that stands in the way is the rebuilding of a commitment to the institution that has eroded over decades of increased polarization and partisanship.[43]

---

[41] But see Metzger (2021) arguing that courts should take appropriations "seriously" by developing interpretative doctrines that reinforces congressional power of the purse.

[42] See Chafetz, Josh. *Congress's Constitution: Legislative Authority and the Separation of Powers,* Yale University Press, 2017.

[43] Levinson, Daryl J., and Richard H. Pildes. "Separation of Parties, Not Powers." *Harv. L. Rev.*, vol. 119, 2006, pp. 2311-2386; McCarty, Nolan. "Polarization and the Changing American Constitutional System." *Can America Govern Itself?*, edited by Frances E. Lee and Nolan McCarty, Cambridge University Press, Cambridge, 2019, pp. 301–328.