**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| PROTECT DEMOCRACY PROJECT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-01111-EGS |
| | ) | |
| OFFICE OF MANAGEMENT AND | ) | |
| BUDGET, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

<u>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY**</u>
<u>**INJUNCTION OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................... ii

TABLE OF AUTHORITIES .................................................................................................... iii

INDEX OF EXHIBITS ............................................................................................................ viii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

    I.   Statutory Background ................................................................................................. 2

    II.  Factual Background ................................................................................................... 3

        A. The Apportionment Process ................................................................................. 3

        B. The Apportionment Documents and their Contents ............................................ 5

        C. The Apportionment Reporting Requirements ...................................................... 6

    III.    Procedural History ................................................................................................. 7

LEGAL STANDARD ................................................................................................................ 8

        A. Preliminary Injunction Standard .......................................................................... 8

        B. Summary Judgment Standard ............................................................................... 9

ARGUMENT ............................................................................................................................. 9

    I.   Protect Democracy Cannot Establish Likelihood of Success on the Merits ............... 9

        A. Protect Democracy Lacks Standing Under Article III. ........................................ 9

        B. Protect Democracy's Claim That Defendants' Conduct Violated the 2022 and 2023 Acts is Unlikely to Succeed Because the Statute Unconstitutionally Infringes Upon Executive Power. .................................................................................................... 15

    II.  Protect Democracy Has Failed to Demonstrate that It Will Suffer Irreparable Harm Unless the Court Grants the Requested Relief. ........................................................ 22

    III.  The Balance of the Equities and the Public Interest Support Rejection of Protect Democracy's Motion. ............................................................................................... 25

    IV.  Protect Democracy Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief .................................................................................... 25

    V.  Protect Democracy's Partial Motion for Summary Judgment Fails .............................. 25

CONCLUSION .......................................................................................................................... 26

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) ............................................................................. 8

*Advoc. Christ Med. Ctr. v. Becerra*,
No. 17-cv-1519, 2022 WL 2064830 (D.D.C. June 8, 2022) .......................................... 9

*Alcresta Therapeutics, Inc. v. Azar*,
318 F. Supp. 3d 321 (D.D.C. 2018) ......................................................................... 22

*Army Times Publ'g Co. v. Department of the Air Force*,
998 F.2d 1067 (D.C. Cir. 1993) ............................................................................. 18

*Bowsher v. Synar*,
478 U.S. 714 (1986) ................................................................................... 16, 20

*Brennan Ctr. for Justice at NYU Sch. of Law v. Dep't of Commerce*,
498 F. Supp. 3d 87 (D.D.C. 2020) ......................................................................... 24

*Church v. Biden*,
573 F. Supp. 3d 118 (D.D.C. 2021) ........................................................................ 23

*Citizens for Responsibility & Ethics in Washington v. U.S. DOGE Serv.*,
No. 25-CV-511 (CRC), 2025 WL 752367 (D.D.C. Mar. 10, 2025) .................................. 24

*Clinton v. Jones*,
520 U.S. 681 (1997) .......................................................................................... 16

*Coastal States Gas Corp. v. Department of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ............................................................................. 18

*Dellinger v. Bessent*,
No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ............................................. 8

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) ............................................................................................ 18

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) ............................................................................... 25

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ........................................................................ 10, 13, 14

*Ex parte Levitt*,
302 U.S. 633 (1937) ........................................................................................ 10

*FEC v. Akins*,
524 U.S. 11 (1998) .......................................................................................... 14

*Feng Wang v. Pompeo*,
354 F. Supp. 3d 13 (D.D.C. 2018). .................................................................. 9

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ........................................................................................ 9

*Hi-Tech Pharmacal Co. v. FDA*,
587 F. Supp. 2d 1 (D.D.C. 2008) ..................................................................... 22

*Immigration & Naturalization Serv. v. Chadha*,
462 U.S. 919 (1983) ........................................................................................ 15, 16

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ......................................................................... 17, 18

*Judicial Watch, Inc. v. United States Dep't of Justice*,
20 F.4th 49 (D.C. Cir. 2021) ........................................................................... 17

*Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*,
265 F. Supp. 3d 54 (D.D.C. 2017) ................................................................... 12

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ............................................................................ 22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................................ 10, 11

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ........................................................................................ 8

*Mistretta v. United States*,
488 U.S. 361 (1989) ........................................................................................ 15

*Mylan Pharms., Inc. v. Shalala,*
81 F. Supp. 2d 30 (D.D.C. 2000) ................................................................. 9

*NAACP v. U.S. Department of Educ.,*
No. 25-CV-1120 (DLF), 2025 WL 1196212 (D.D.C. Apr. 24, 2025) ........................... 25

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.,*
861 F.2d 1114 (9th Cir. 1988) ................................................................. 18

*Navajo Nation v. Azar,*
292 F. Supp. 3d 508 (D.D.C. 2018) ............................................................ 22

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982) ........................................................................... 16

*Nken v. Holder,*
556 U.S. 418 (2009) ....................................................................... 8, 25

*NLRB v. Sears, Roebuck & Co.,*
421 U.S. 132 (1975) ........................................................................... 18

*Open Tech. Fund v. Pack,*
470 F. Supp. 3d 8 (D.D.C. 2020) .............................................................. 25

*Prisology, Inc. v. Federal Bureau of Prisons,*
852 F.3d 1114 (D.C. Cir. 2017) ............................................................... 13

*Sackett v. E.P.A.,*
566 U.S. 120 (2012) ........................................................................... 19

*Safari Club Int'l v. Jewell,*
47 F. Supp. 3d 29 (D.D.C. 2014) .............................................................. 23

*State v. Musk.,*
---F. Supp. 3d ---, 2025 WL 520583 (D.D.C. 2025) ........................................... 22

*Sterling Com. Credit-Michigan, LLC v. Phoenix Indus. I, LLC,*
762 F. Supp. 2d 8 (D.D.C. 2011) ............................................................... 8

*Strait Shipbrokers Pte. Ltd. v. Blinken,*
560 F. Supp. 3d 81 (D.D.C. 2021) .............................................................. 9

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs,*
60 F.3d 867 (1st Cir. 1995) ................................................................................. 18

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ........................................................................................... 11

*Trump v. U.S.,*
603 U.S. 593 (2024) ........................................................................................... 16

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.,*
592 U.S. 261 (2021) ........................................................................................... 18

*United States v. American Tel. & Tel. Co.,*
567 F.2d 121 (D.C. Cir. 1977) ........................................................................... 21

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ................................................................................................. 8

*Wis. Gas Co. v. FERC,*
758 F.2d 669 (D.C. Cir. 1985) ..................................................................... 22, 23

**STATUTES**

31 U.S.C. § 1512 ...................................................................................... 3, 17, 20

31 U.S.C. § 1513 ............................................................................................ 3, 15

5 U.S.C. § 552 ............................................................................................... 13, 21

Pub. L. 117–103, div. E, title II, § 204(a), 136 Stat. 257 (Mar. 15, 2022) ................................... 2

Pub. L. 117–328, div. E, title II, § 204, 136 Stat. 4667 (Dec. 29, 2022) ........................................ 3

**OTHER AUTHORITIES**

1 Op. O.L.C. 16 (1977) ....................................................................................... 21

28 Op. O.L.C. 79, 81 (2004) ............................................................................... 21

6 Op. O.L.C. 632 (1982) ..................................................................................... 21

Fed. R. Civ. P. 65 ................................................................................................ 25

Federalist No. 72 (A. Hamilton) (Clinton Rossiter ed. 1961) ............................ 16

Financial Services and General Government Appropriations for 2023: Hearings Before the Subcomm. on Fin. Servs. & Gen. Gov't of the H. Comm. on Appropriations, 117th Cong., pt. 5 (2022) ................................................................................................................................... 14

OMB Circular No. A-11 ............................................................................................................ 18

The Federalist No. 70 (A. Hamilton) (Clinton Rossiter ed. 1961) ............................................. 16

U.S. Const. art. III, § 2, cl. 1 ...................................................................................................... 9

## **INDEX OF EXHIBITS**

1. Declaration of Kelly Kinneen

2. Defendants' Counter-Statement of Material Facts as to Which There is No Genuine Issue

3. Proposed Order

## INTRODUCTION

Plaintiff Protect Democracy Project ("Protect Democracy"), a non-profit organization, attempts to enforce a statute that purports to require the Office of Management and Budget ("OMB") to publicly post documents apportioning appropriated funds.  Protect Democracy seeks a preliminary injunction, and has moved for partial summary judgment, arguing that OMB's decision to discontinue apportionment postings is contrary to law.  The Court should deny both motions.

As a threshold matter, Protect Democracy lacks standing to bring this case.  Article III does not permit litigation premised on generalized grievances that are common to all members of the public and where the plaintiff has not suffered a particularized injury, as is the case here.  Nor has Protect Democracy suffered the type of harm Congress sought to prevent by requiring disclosure of apportionment documents.  Disclosure was aimed at providing the public with insights into government spending and enabling Congress to oversee the Executive Branch's apportionment of appropriated funds, not to support a private organization's investment in a website it created to make the OMB website of apportionment documents searchable and its other activities as a middleman between the OMB website and the public.

Protect Democracy's claim also fails on the merits.  The President has delegated to OMB authority to allocate budgetary resources consistent with policy goals.  OMB initiates the budget allocation process through its apportionment of appropriated funds.  Apportionments are inherently deliberative in nature: they are OMB's interim funding deliberations, are routinely subject to change based on evolving conditions, and merely reflect OMB's best judgment in the moment about how an agency should use its funds.  The statutes at issue—which would require

OMB's disclosure of deliberative information— violate the separation of powers and Article II, and thus are unconstitutional and unenforceable.

Protect Democracy has also failed to show that it is suffering, or will suffer, irreparable harm in the absence of preliminary relief. Protect Democracy has failed to show that it needs access to the apportionment documents on a preliminary basis and that information regarding the Executive Branch's spending is not otherwise available. The balance of equities and the public interest also cut against Protect Democracy's request. The Court should deny Protect Democracy's request for a preliminary injunction and partial summary judgment.

## **BACKGROUND**

### I.    **Statutory Background**

Protect Democracy claims that Defendants have violated the Consolidated Appropriations Act of 2022 ("2022 Act") and the Consolidated Appropriations Act of 2023 ("2023 Act").

The 2022 Act states that the Office of Management and Budget ("OMB") is to "provide to the Committees on Appropriations and the Budget of the House of Representatives and the Senate each document apportioning an appropriation . . . including any associated footnotes, not later than 2 business days after the date of approval of such apportionment by the Office of Management and Budget." Pub. L. 117–103, div. E, title II, § 204(a), 136 Stat. 257 (Mar. 15, 2022). The 2022 Act further provides that OMB is to implement "an automated system to post each document apportioning an appropriation . . . , including any associated footnotes, in a format that qualifies each such document as an Open Government Data Asset . . . not later than 2 business days after the date of approval of such apportionment, and shall place on such website each document apportioning an appropriation . . . , including any associated footnotes, already

2

approved the current fiscal year . . . ." *Id*. § 204(b).  The statute also states that "[e]ach document apportioning an appropriation . . . that is posted on a publicly accessible website . . . shall also include a written explanation by the official approving each such apportionment stating the rationale for any footnotes for apportioned amounts."  *Id*. § 204(c).  Finally, the statute provides that OMB or the applicable agency "shall make available classified documentation referenced in any apportionment at the request of the chair or ranking member of any appropriate congressional committee or subcommittee."  *Id*.

The 2023 Act provides that OMB "shall continue to post [to its website] each document apportioning an appropriation . . . including any associated footnotes."  Pub. L. 117–328, div. E, title II, § 204, 136 Stat. 4667 (Dec. 29, 2022) (codified at 31 U.S.C. § 1513 note).

## II.    Factual Background

### A.  The Apportionment Process

At the start of each fiscal year, after appropriations bills are passed, the President must "apportion" the budget authority to the relevant federal agencies before each agency may obligate its funds.  31 U.S.C. §§ 1512–13; Declaration of Kelly Kinneen ("Kinneen Decl.") ¶ 4.  The President has delegated this apportionment authority to the OMB Director.  E.O. 6166, as amended by E.O. 12,608; Kinneen Decl. ¶ 4.

An apportionment is an OMB-approved plan to use budgetary resources.  31 U.S.C. § 1513(b)); Kinneen Decl. ¶ 5.  OMB apportions funds to agencies by time period, specific activity or project, or both.  31 U.S.C. § 1513(b)(1); Kinneen Decl. ¶ 5.  Funds are apportioned "as the [apportioning] official considers appropriate."  31 U.S.C. § 1512(b)(2); Kinneen Decl. ¶ 6.  Apportionments involve "significant discretion and judgment regarding the budgetary resources a program requires, including when those resources will be needed and for what purpose."

3

Kinneen Decl. ¶ 6.  Apportionments are legally binding on agencies, but not on OMB which remains free to alter its apportionment decisions "whenever it so chooses."  Kinneen Decl. ¶ 6. OMB Circular No. A-11 "confirms that agencies must follow instructions from the President, acting through OMB."  Kinneen Decl. ¶ 6.

Apportionments reflect OMB's forward-looking judgment about how an agency should use its funds during the period when those funds are legally available for obligation.  *Id*. ¶ 10. Apportionments "are estimates of the amounts of budgetary resources that OMB anticipates that programs will likely require in the future."  *Id*. ¶ 16.  OMB is statutorily required to periodically review and potentially modify apportionment decisions based on changes in circumstances or policy goals.  31 U.S.C. 1512(a); Kinneen Decl. ¶ 10.  As such, apportionments are "an internal Executive branch fiscal control mechanism designed to ensure that funds are being spent in accordance with the law and policy."  Kinneen Decl. ¶ 16. They involve "ongoing conversations and instructions to the agencies to ensure that apportionments are updated to reflect current realities and future estimates."  *Id*. ¶ 16.  "Apportionments are an interim step in the spending cycle that is only finalized "when the agency, not OMB, takes actions to obligate or expend the funds."  *Id*.

OMB's apportionment judgment can, and frequently does, change based on changes in economic, foreign policy, or domestic policy changes and events.  As long as the agency has not expended the funds for a program, OMB can reapportion the funds for other purposes, within the scope of the appropriation, throughout the fiscal year.  *Id*. ¶ 12.  Apportionments are part of an iterative, internal Executive Branch decision-making process that involves ongoing discussions between OMB and agencies to ensure that apportionments reflect current realities and future estimates.  *Id*. ¶ 12, 15.  Following the issuance of an apportionment, "OMB continues to

monitor agency funding, and works with agencies to determine the best use of appropriated funds. It may advise agencies regarding the President's priorities for the use of the funds or on sensitive matters touching on national security or foreign policy." *Id.* ¶ 16.

Two steps generally follow an OMB apportionment—obligation and expenditure. An OMB apportionment is typically required before an agency obligates funds, that is before an agency enters into a legally binding commitment that requires payment for goods or services. *Id.* ¶ 7. An expenditure occurs when an agency makes a payment on an obligation. *Id.* ¶ 8. Although obligations and expenditures cannot exceed the amount apportioned by OMB, an agency is not required to obligate or expend the full amount apportioned. *Id.* ¶ 9.

### B. The Apportionment Documents and their Contents.

OMB communicates apportionment decisions to agencies through Excel sheets that include designated funds for times, periods, projects, or activities. *Id.* ¶ 10. Designated funds are often accompanied by footnotes that give an agency additional information or instructions beyond the dollar amounts. *Id.* ¶ 11. Footnotes often provide additional restrictions on the use of funds, or condition the availability of funds on further action by the agency, or on other future circumstances. *Id.* Footnotes may disclose ongoing negotiations between an agency and OMB. *Id.* Footnotes may also reflect OMB's current policy deliberations, assumptions about program needs, and even future economic assumptions, all of which are subject to change and may precipitate re-apportionment. *Id.*

For example, a recently published apportionment to the Department of Interior included a footnote that conditioned fund allocation on the agency's provision of a spend plan that aligned with OMB's spending goals. Kinneen Decl., Exhibit B. An apportionment to the Department of Homeland Security required the agency to submit written reports justifying its programmatic

spending decisions. *Id*. These documents "demonstrate the iterative nature of OMB's apportionment decisions because additional engagement was necessary with the agencies before the funding could be provided for the purposes in question." Kinnen Decl. ¶ 17

In sum, apportionment documents "contain deliberative information that, while not classified, could nevertheless reveal sensitive information about national security, foreign affairs, the industrial base, critical infrastructure, and the like." *Id*. ¶ 17. An apportionment may also "indicate predecisional details regarding the timing for an infrastructure project, or may indicate the recipient of foreign aid." *Id*. Since the 2022 Act's enactment, OMB has been forced to omit "key information that would assist OMB and agencies in guiding allocations of resources throughout the funding process." *Id.* ¶ 13.

### C. The Apportionment Reporting Requirements

From July 2022 through March 24, 2025, OMB operated a publicly available apportionment reporting system in accordance with the 2022 Act. *See id.* ¶ 13. On March 24, 2025, the apportionment database was removed from OMB's website. On March 29, 2025, OMB explained, in correspondence to members of Congress, that it would no longer operate and maintain the publicly available automated system to which apportionments are posted. Kinneen Decl., Exhibit C. OMB determined that the system improperly requires "disclosure of sensitive, predecisional, and deliberative information. By their nature, apportionments and footnotes contain predecisional and deliberative information because they are interim decisions based on current circumstances and needs, and may be (and are) frequently changed as those circumstances change." *Id.* OMB further explained that such disclosures have a "chilling effect on deliberations within the Executive Branch," and have "adversely impacted the candor contained in OMB's communications with agencies and have undermined OMB's effectiveness

in supervising agency spending." *Id*.

### III.    Procedural History

On April 14, 2025, Protect Democracy filed its complaint under the Administrative

Procedure Act ("APA") against OMB and its director, in his official capacity, alleging that OMB

unlawfully removed its automated system for posting apportionment documents to a publicly

accessible website, and the information in that system.  ECF No. 1.  The Complaint asserts six

counts. Count I alleges that Defendants' failure to maintain a publicly available apportionment

database violates the requirements of the 2022 and 2023 Acts, violates a constitutional right or

power, and exceeds statutory authority.  *Id*. at 16–17.  Count II alleges that Defendants' failure to

publicly post apportionments within two days of approval constitutes unreasonable withholding

or delay.  *Id*. at 17–18.  Count III alleges that Defendants' removal of the apportionment

database was arbitrary and capricious.  *Id*. at 18–19.  Count IV alleges that Defendant Vought's

removal of the apportionment database is *ultra vires* because it violates the 2022 Act, the 2023

Act, and the Constitution.  *Id*. at 19–20.  Count V seeks a declaration under the Declaratory

Judgment Act that Defendants have violated the 2022 and 2023 Acts.  *Id*. at 20.  Count VI seeks

a writ of mandamus compelling Defendants to comply with the 2022 and 2023 Acts.  *Id*. at 21.

The Complaint seeks declaratory and injunctive, including restoration of the database and an

injunction preventing Defendants from removing it again.  *Id*. at 22.

On April 27, 2025, Protect Democracy filed a Motion for a Preliminary Injunction, or in

the alternative Partial Summary Judgment, seeking a declaration that Defendants have violated

the 2022 and 2023 Acts and ordering Defendants to restore the publicly available apportionment

database.  ECF No. 18.  The sole basis of the motion is that Defendants' conduct is contrary to

the 2022 and 2023 Acts.

**LEGAL STANDARD**

**A. Preliminary Injunction Standard**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quotation omitted).  To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Any movant seeking a preliminary injunction, must demonstrate that they will suffer irreparable harm in the absence of the requested relief.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Irrespective of a party's showing as to the other three factors necessary to obtain preliminary equitable relief, "'[a] . . . failure to show any irreparable harm' constitutes grounds for denying the motion." *Sterling Com. Credit-Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 13 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).  Moreover, relief that "deeply intrudes into the core concerns of the executive branch" may be awarded only upon "an extraordinarily strong showing" as to each element.  *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14 (D.C. Cir. Feb. 15, 2025) (quoting *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978)).

The particular form of injunction Protect Democracy seeks here—an affirmative injunction ordering the Government to change the status quo—comprises a highly disfavored

form of relief.  Mandatory preliminary injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government."  *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000).  Plaintiffs seeking such relief "face a significantly heightened burden" of showing an entitlement to relief.  *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they deny such relief unless "the facts and law clearly favor the moving party."  *Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted).

## B.  Summary Judgment Standard

In an APA case, the Federal Rule of Civil Procedure 56(a) summary judgment standard, requiring the court to determine if there is a genuine dispute of material fact, does not apply.  Rather, the district court sits as an appellate tribunal, reviewing the administrative record.  "[S]ummary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  See *Advoc. Christ Med. Ctr. v. Becerra*, No. 17-cv-1519, 2022 WL 2064830 (D.D.C. June 8, 2022), *aff'd*, 80 F.4th 346 (D.C. Cir. 2023) (internal quotation omitted).

## ARGUMENT

## I.  Protect Democracy Cannot Establish Likelihood of Success on the Merits.

## A.  Protect Democracy Lacks Standing Under Article III.

Article III extends only to cases and controversies.  U.S. Const. art. III, § 2, cl. 1; *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024); *Coalition*

*for Mercury Free Drugs v. Sebelius*, 671 F.3d 1275, 1278–79 (D.C. Cir. 2012).  The party

seeking to invoke a federal court's jurisdiction bears the burden of establishing that it has

standing to sue.  *Alliance*, 602 U.S. 367 at 378.  To establish standing, a plaintiff must show that:

(i) it has or likely will suffer an injury in fact, (ii) defendant has or likely will cause plaintiff's

injury, and (iii) the requested judicial relief will likely redress plaintiff's injury.  *Alliance*, 602

U.S. at 380.  A plaintiff's failure to meet just one of the three prongs results in its failure to

establish standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (noting that each

standing element "must be supported").  In the preliminary injunction context, a plaintiff must

show a "substantial likelihood of standing."  *Elec. Privacy Info. Ctr. v. Presidential Advisory

Comm'n on Election Integrity* ("*EPIC*"), 878 F.3d 371, 377 (D.C. Cir. 2017) (citing *Lujan*, 504

U.S. at 561).  "Standing is not dispensed in gross," but rather must be established for each claim

in a complaint.  *Id*.

With respect to the first requirement, injury in fact, a plaintiff must show "that he has

sustained or is immediately in danger of sustaining a direct injury as the result of that action and

it is not sufficient that he has merely a general interest common to all members of the public.'"

*United States v. Richardson*, 418 U.S. 166, 177–78 (1974) (quoting *Ex parte Levitt*, 302 U.S.

633, 636 (1937)).  In *Richardson*, the plaintiff claimed that "without detailed information on

[agency] expenditures—and hence its activities—he [could not] follow the actions of Congress

or the Executive" or "properly fulfill his obligations as a member of the electorate in voting for

candidates seeking national office."  *Id*. at 176.  Even fifty years ago, the Supreme Court

recognized that "[a]s our society has become more complex, our numbers more vast, our lives

more varied, and our resources more strained, citizens increasingly request the intervention of

the courts on a greater variety of issues than at any period of our national development."  *Id*.  The

Supreme Court, however, concluded that the plaintiff's "generalized grievance" was insufficient

to establish standing because plaintiff did not have a "personal stake in the outcome," a

"particular, concrete injury," or "a direct injury." *Id*. at 176, 179–80; *Lujan*, 504 U.S. at 576

(concluding "the public interest in proper administration of the laws (specifically, in agencies'

observance of a particular, statutorily prescribed procedure) can[not] be converted into an

individual right by a statute that denominates it as such"); *TransUnion LLC v. Ramirez*, 594 U.S.

413, 442 (2021) (In order to establish a concrete, information injury, the plaintiff must show

"'downstream consequences' from failing to receive the required information.").

Despite it being Protect Democracy's burden to establish its standing, neither its

complaint nor its motion even mention standing.  Protect Democracy does not allege harm to any

members that it may have; indeed, it does not claim to have members at all.  *See* Mot. at 7

(explaining that Protect Democracy is a "nonpartisan, nonprofit organization dedicated to

preventing American democracy from declining into a more authoritarian form of government"

that carries out its work by "educating the public about democratic norms and conducting

research, analysis, and technology developments to promote fact-based debate").  Protect

Democracy's standing as an organization, therefore, can only be based on organizational

standing, as opposed to associational standing, which requires that at least one of an

organization's members have standing.  *See, e.g., Doctors for America v. OPM*, -- F. Supp. 3d --,

2025 WL 452707, at *3 (D.D.C. Feb. 11, 2025).  Nor can Protect Democracy base its standing

on harm to third parties not before the Court, such as members of the public or Congress.

*Alliance*, 602 U.S. at 392–93.

Protect Democracy's theory of how *it* is harmed by the removal of OMB's public

apportionment database is harm to its interest in operating a website that it developed based on

OMB's website.  Protect Democracy explains that in October 2024, more than two years after OMB launched its public apportionment database website, it launched its own website called OpenOMB to make it easier for Congress, the press, and the public to use OMB's apportionment information.  Ford Decl. (ECF No. 18-4) at ¶¶ 4, Mot. at 7–8.  The website pulls the primary source data from OMB's site and stores the files in a database in a manner that allows them to be searched, filtered, and indexed.  *Id*. ¶ 10.  Protect Democracy claims that OpenOMB is used by Congress, litigants, the press, public policy organizations, academics, libraries, budget experts, and the Wikipedia community, and touts the number of views it has gotten.  *Id*. at ¶ 11-12.  It claims to have invested "hundreds of hours" building, designing, operating, and improving Open OMB.  *Id*. at ¶ 9.  Protect Democracy also provides training to organizations and journalists on how to use OpenOMB.  *Id*. Since OMB took down its apportionment website, Protect Democracy claims the number of views OpenOMB has received has dropped, that it cannot launch a new notification feature that it spent resources developing, and that it can no longer provide updated information about apportionments through OpenOMB.  *Id*. at ¶¶ 15-17, 19-20.

Protect Democracy attempts to characterize this alleged harm as an informational injury, arguing that it is being deprived of the ability to make OMB's apportionment documents more accessible to the public.  But it is really complaining about an injury to its own proprietary interests in OpenOMB, citing the fewer visitors to its website since OMB took down its website, and having to halt the new notification feature that it had been developing.  Mot. at 19.  In any event, the cases Protect Democracy relies on for its alleged irreparable informational injury are inapposite.  *Id*. *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, 265 F. Supp. 3d 54 (D.D.C. 2017), was a suit seeking disclosure of records of an alleged advisory committee, brought under the Federal Advisory

Committee Act ("FACA"), and *EPIC v. DOJ*, 416 F. Supp. 2d 30 (D.D.C. 2006), was a suit

seeking records under the Freedom of Information Act ("FOIA").  In FOIA cases, including ones

brought to enforce FOIA's affirmative disclosure obligations under 5 U.S.C. § 552(a)(2), anyone

who has requested specific records from an agency and had their request denied has standing to

bring an action; "the requester has suffered a particularized injury because he has requested and

been denied information Congress gave him a right to receive." *Prisology, Inc. v. Federal

Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017).  The same is true when someone

requests, and is denied, information under FACA.  *Public Citizen v. DOJ*, 491 U.S. 440, 449–50

(1989); *see also Lawyers' Committee*, 265 F. Supp. 3d at 64 (citing *Public Citizen* in discussing

standing).  In contrast, here, there are no allegations of a request for, and denial of,

apportionment documents to support a particularized injury for purposes of standing.  *See* ECF

No. 1.

Nor does Protect Democracy's asserted informational injury satisfy the test set forth by

the D.C. Circuit in *EPIC v. Presidential Advisory Comm'n on Election Integrity* for a denial of

access to information to constitute an injury-in-fact for standing purposes.  In that *EPIC* case, the

plaintiff was a nonprofit organization whose mission was to focus public attention on emerging

privacy and civil liberties issues.  878 F.3d at 374.  It sued a presidential commission on election

integrity, which had requested voter roll data from the states, for failing to complete a privacy

impact assessment before collecting that information, as allegedly required by the E-Government

Act.  *Id*.  The court held that EPIC lacked standing based on either informational or

organizational injury.  *Id*. at 378.  The court explained that to demonstrate a "'sufficiently

concrete and particularized informational injury'" for purposes of standing, a plaintiff must show

that "'(1) it has been deprived of information that, on its interpretation, a statute requires the

government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *Id.* (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)); *see also FEC v. Akins*, 524 U.S. 11, 22 (1998) (noting the presence of a statute that "does seek to protect individuals such as respondents from the kind of harm they say they have suffered, i.e., failing to receive particular information about campaign-related activities."). The court held that EPIC had not suffered the type of harm that the E-Government Act sought to prevent in requiring agencies to conduct privacy impact assessments, and therefore faltered at the second step. *EPIC*, 878 F.3d at 378. That requirement was meant to protect individuals' privacy—in EPIC's challenge, voters' privacy—not help EPIC further its mission of "ensuring public oversight of record systems" or focusing public attention on privacy issues. *Id.*

Protect Democracy fails at both steps. Neither the 2022 nor the 2023 Acts require disclosure of information to Protect Democracy, but rather require the government's disclosure of information to the public at large. Protect Democracy also has not suffered the type of harm Congress sought to prevent by requiring disclosure under the 2022 and 2023 Acts. The 2022 and 2023 Acts are intended to provide the public with insights into government spending and to enable Congress to oversee the Executive Branch's apportionment of appropriated funds. *See* Financial Services and General Government Appropriations for 2023: Hearings Before the Subcomm. on Fin. Servs. & Gen. Gov't of the H. Comm. on Appropriations, 117th Cong., pt. 5, at 125 (2022) (The 2023 Act "will provide the public with insight into billions of dollars of federal spending, while ensuring this committee, and Congress, can perform its oversight work and ensure the executive branch is faithfully implementing appropriations law."); Pl. Ex. 7 (In a division-by-division summary of the 2022 Act, then-Chairwoman of the House Appropriations

Committee stated that the 2022 Act would make "apportionments of appropriations publicly available in a timely manner"). As discussed above, the injury Protect Democracy seeks to vindicate is the injury to its own proprietary interests in OpenOMB. That is an interest that is distinct from providing the public with the apportionment materials directly, without any middleman, as Congress did in the 2023 Act, and of course it is also distinct from Congress's own interest in oversight.

### B. Protect Democracy's Claim That Defendants' Conduct Violated the 2022 and 2023 Acts is Unlikely to Succeed Because the Statute Unconstitutionally Infringes Upon Executive Power.

Protect Democracy is unlikely to succeed on its claim that OMB's failure to operate and maintain a system to publicly post apportionments is unlawful. Under the 2022 and 2023 Acts, Congress imposed various requirements relating to OMB's apportionment approvals, including that OMB maintain a publicly available, automated system wherein approved apportionments are posted within two business days of the date of approval and written explanations for any footnotes accompanying approved apportionments are provided. *See* 31 U.S.C. § 1513 note. Because these provisions constitute impermissible Congressional intrusion into Executive functions, Protect Democracy's enforcement attempt fails.

The Constitution divides power "into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983). Each Branch is required to act "within its assigned sphere" consistent with Constitutional mandates. *Id*. at 952–53. Although the three Branches are not "entirely separate and distinct," each Branch must be "free from the control or coercive influence, direct or indirect, of either of the others." *Mistretta v. United States*, 488 U.S. 361, 380 (1989) (cleaned

up).  "Even when a branch does not arrogate power to itself[,] the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Clinton v. Jones*, 520 U.S. 681, 701 (1997) (cleaned up); *see also Trump v. United States*, 603 U.S. 593, 614 (2024).

Indeed, "[t]he Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986).  Once Congress enacts legislation, "its participation ends" and "can thereafter control the execution of its enactment only indirectly—by passing new legislation." *Id*. at 733–34 (citation omitted); *Chadha,* 462 U.S. at 958 (holding that a legislative veto violated separation of powers because it permitted Congressional override of a function delegated to the Executive Branch).  The Constitution, therefore, prohibits Congressional intrusion into the President's "supervisory and policy responsibilities," which include[s] the enforcement of federal law." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

More specifically, the "application and disbursement of the public moneys in conformity to the general appropriations of the legislature" is executive in nature, and those carrying out such functions "ought to be considered as the assistants or deputies of the chief magistrate." The Federalist No. 72, at 435–36 (A. Hamilton) (Clinton Rossiter ed. 1961).  Apportionment allows the President to act with "energy" and "unity" in the implementation of programs enacted by Congress. The Federalist No. 70, at 472 (A. Hamilton) (Clinton Rossiter ed. 1961).  And "the Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts." *Bowsher*, 478 U.S. at 722.  Accordingly, Congress's power of appropriation has long been understood to not carry with it a power to

infringe upon the constitutional prerogatives of other entities.  Thus, once Congress appropriates funds, the power of administering the funds falls on the President.

Here, Congress afforded the President authority to apportion funds as he "considers appropriate." *See* 15 U.S.C. § 1512(b)(2).  And as the statutory scheme recognizes, the Executive Branch's apportionment decisions are subject to change.  *See* 31 U.S.C. § 1512(a) ("An apportionment may be reapportioned under this section."); *id*. § 1512(d) ("An apportionment or a reapportionment shall be reviewed at least 4 times a year by the official designated in section 1513 of this title to make apportionments.").  In practice, OMB and agencies engage in an iterative process before appropriated funds are obligated and expended.  Kinneen Decl. ¶ 16.  Following issuance of an apportionment, "OMB continues to monitor agency funding, and works with agencies to determine the best use of appropriated funds." *Id*.  Apportionment are not fixed; OMB frequently re-visits and amends apportionment decisions based on changing circumstances, including ongoing discussions with agencies.  *Id*. ¶ 11, 16.  OMB's guidance is not finalized until an agency obligates apportioned funds.  *Id*.  OMB's interim apportionment decisions are, therefore, privileged because they are "crucial to fulfillment of the unique role and responsibilities of the executive branch." *In re Sealed Case*, 121 F.3d 729, 736 (D.C. Cir. 1997) (citations omitted).

The deliberative process privilege—the most common executive privilege—is a privilege grounded in the separation of powers aimed at ensuring "that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism" and preventing "disclosure of proposed policies before they have been finally formulated or adopted." *Judicial Watch, Inc. v. United States Dep't of Justice*, 20 F.4th 49, 54 (D.C. Cir. 2021) (quoting *Coastal States Gas*

*Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)); *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) ("The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." (quotation marks omitted)).

The deliberative process privilege, therefore, shields "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotation marks omitted); *United States Fish & Wildlife Serv. v. Sierra Club, Inc*., 592 U.S. 261, 263 (2021) (The privilege "protects from disclosure documents generated during an agency's deliberations about a policy."). The privilege applies to documents that are predecisional and deliberative. *In re Sealed Case*, 121 F.3d at 737 (citing *Army Times Publ'g Co. v. Department of the Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993)); *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995). "The privilege applies when a document is "(1) predecisional, that is, 'antecedent to the adoption of agency policy,' and (2) deliberative, that is, actually 'related to the process by which policies are formulated.'") (quoting *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988)).

OMB's apportionment of funds involves a complex, deliberative process laden with policy considerations. Kineenn Decl. ¶¶ 11–12. Defendants do not dispute that apportionments are legally binding OMB-approved plans, in that agencies are required to act consistent with OMB's guidance on spending. *See* OMB Circular No. A-11 § 120.1; Pl.'s Mot. at 13 (quoting

same).  The apportionment, however, does not bind OMB, which remains free to change the allocations, as OMB Circular No. A-11 notes.  *See* OMB Circular No. A-11 § 120.48.   An apportionment is the initial step in the Executive's spending determination.  *Id.* ¶ 11, 16.  It is OMB's initial distribution of funds to accomplish policy goals.  *Id.* ¶¶ 10–11.  Apportionments are routinely subject to change based on OMB's continued monitoring of agencies' actions and re-evaluation of policy goals.  *Id.* ¶¶ 10–11.  Specifically, "if a significant economic, foreign, or other policy shift occurs, the funds apportioned for those programs may need to change.  One program might then have its apportionment reduced, while another program's apportionment would be increased."  *Id.* ¶ 12.  Thus, there is more than a "mere possibility" that OMB will reconsider budgetary allocations, *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012)—that is in fact the nature of the process.

Requiring OMB to reveal its apportionments results in disclosure of predecisional, deliberative information has a chilling effect on OMB's decision making, including through OMB's omission of key details regarding the agency action it seeks prior to making funds available for disbursement.  For example, in the past, OMB apportionments for projects or activities (category B apportionments) included "identifying references for the individual loan borrowers" along with "provisional financial commitments subject to ongoing review and potential re-apportionment."  *Id.* ¶ 14.  Following enactment of the publication requirement, OMB removed sensitive information from apportionment documents, "which has impeded OMB's ability to most efficiently provide direction to and receive information from agencies."  *Id.* ¶ 15.  While apportionment documents still contain deliberative information, *id.* ¶ 16, OMB has been forced to omit important context that "could reveal information about the Executive

Branch's internal planning and strategy," *id*. ¶ 15.  Therefore, these statutes requiring revealing the apportionment information "impair" the performance of the Executive's duties.

Apportionment documents reflect interim deliberations that are part of the Executive's broader spending policy.  The Constitution confers on the President the duty to take care that the laws are faithfully executed.  When it comes to apportionment authority in particular, it is up to the President to apportion funds as he "considers appropriate."  31 U.S.C. § 1512(b)(2).  As the Supreme Court emphasized in *Bowsher*, "exercise[ing] judgment concerning facts that affect the application" of a statute and "interpret[ing] the provisions of the [statute] to determine what budgetary calculations are required," is "the very essence of execution of the law." 478 U.S. at 733.

Specifically, the 2023 Act's requirement that OMB publish information automatically within two days impermissibly burdens the administration of the apportionment process and creates a heightened risk of disclosure of deliberative information.  Requiring OMB to disclose approved apportionments hinders the prudent obligation of an appropriation and the execution of an agency program, project, or activity at the risk of divulging deliberative communications.  For example, following the issuance of an apportionment, OMB works with agencies to determine the best use of appropriated funds and may advise agencies regarding the President's priorities for funds or on sensitive matters touching on national security or foreign policy.  Kinneen Decl. ¶ 17.  Due to the expedited timeline for public disclosure, OMB is often forced to omit key policy information from apportionments, thereby forcing it "to choose between compromising confidentiality and using its apportionment authority as Congress intended."  *Id*. ¶ 18.

By comparison, FOIA provides at least twenty business days, plus an additional ten days in unusual circumstances, for agencies to collect, review, and produce records in response to

specific requests.  5 U.S.C. § 552(a)(6)(A).  That process includes determining whether predecisional, deliberative information is exempt from disclosure.  *Id*. § 552(b)(5).  Similarly, when Congress requests information or even subpoenas records from the Executive Branch, agencies engage in the accommodation process, which invariably takes longer than two days. *See United States v. American Tel. & Tel. Co*., 567 F.2d 121 (D.C. Cir. 1977).  Yet the 2022 and 2023 Acts require the automatic publication of information in a mere two days.  Without the two-day requirement, Protect Democracy's "contrary to law" claim is reduced to an "unreasonable delay" claim under the APA, which is a separate claim Protect Democracy asserts in its Complaint but does not assert in the instant motion.

In sum, the 2022 and 2023 Acts' disclosure requirements amount to excessive and impermissible micromanagement, interfering with the President's constitutional authority over the implementation of appropriations and his discretion in executing the laws.  *See* 28 Op. O.L.C. 79, 81 (2004) (Department of Justice's Office of Legal Counsel letter noting that "the 'right of disclosure' statutes prohibit Executive Branch supervision of employee disclosures unconstitutionally limits the ability of the President and his appointees to supervise and control the dissemination of privileged government information."); 6 Op. O.L.C. 632, 638 (1982) ("[T]he President's relationship with his subordinates must be free from certain types of interference from the coordinate branches of government in order to permit the President effectively to carry out his constitutionally assigned responsibilities."); 1 Op. O.L.C. 16, 17 (1977) (similar analysis of Inspector General reporting requirements).  Accordingly, the mandatory and automatic reporting requirements are foreclosed by the deliberative process privilege and prohibited by the Constitution.

II.    **Protect Democracy Has Failed to Demonstrate that It Will Suffer Irreparable Harm Unless the Court Grants the Requested Relief.**

Protect Democracy has also failed to demonstrate that it will suffer irreparable harm if the Court does not enter the requested preliminary injunction.  To demonstrate irreparable harm, Protect Democracy must meet a "high standard" of showing that it faces injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that are "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (Harm must be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm" (citation and alteration omitted)).  Making that showing requires proof that the harm it identifies "is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). "[T]he failure to show a likelihood of irreparable harms remains, standing alone, sufficient to defeat [a preliminary injunction] motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018).

First, Protect Democracy's generalized claim that it has been unable to monitor and report "on the Executive Branch's compliance with Congress's directives" is insufficient to establish irreparable harm.  *See* Mot. at 19; *id*. at 11 ("Having data on apportionments is [] crucial to ensuring transparency in how taxpayer dollars are allocated and spent.").  Protect Democracy does not represent the public here, and "injuries to third parties are not a basis to find irreparable harm," just as they are not a basis to find standing.  *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018); *State v. Musk*., ---F. Supp. 3d ---, 2025 WL 520583, at *4 (D.D.C. 2025) ("[H]arm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must

instead be connected specifically to the parties before the Court." (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)).  Assuming the public has an overarching desire for apportionment information, such desire does not support a finding of irreparable harm *to* Protect Democracy.

Second, Protect Democracy's claim that it is suffering irreparable harm by the diminished utility of its OpenOMB website similarly fails.  Mot. at 19.  Protect Democracy has not had to fold OpenOMB as a result of the challenged action; rather, it complains of decreased views to its cite.  Ford Decl. ¶¶ 15–17.  Protect Democracy acknowledges that it recently submitted a FOIA request to OMB seeking the apportionment documents that have been taken down from the OMB website.  *Id*. ¶ 22.  Significantly, Protect Democracy does not claim an inability to obtain the documents through that request, but merely speculates that the documents will be produced in a format that would prevent Protect Democracy from "feed[ing] the information into OpenOMB . . . without significant manual effort."  *Id*.  Therefore, by its own admission, Protect Democracy's claimed harm is not irreparable.

Third, Protect Democracy claims that it has invested significant resources into the development of its website and a new notification feature it intended to make available.  However, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough."  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  Rather, it is black-letter law that economic harm is generally not irreparable.  *Wis.Gas Co.*, 758 F.2d at 674.  The only exceptions are "where the loss threatens the very existence of the movant's business," *id*. (citation omitted), or "where the claimed economic loss is unrecoverable."  *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014).  Protect Democracy's investment in its website is, therefore, not cognizable as irreparable harm for purposes of a preliminary injunction.

23

Finally, Protect Democracy has failed to show that injunctive relief is necessary pending the resolution of this case. In *Citizens for Responsibility & Ethics in Washington v. U.S. DOGE Serv.*, the District Court determined that the plaintiff failed to establish irreparable harm as a result of the defendant's failure to "to expeditiously process" a FOIA request. No. 25-CV-511 (CRC), 2025 WL 752367, at *5, 9 (D.D.C. Mar. 10, 2025), *reconsideration denied*, No. 25-CV-511 (CRC), 2025 WL 863947 (D.D.C. Mar. 19, 2025). The plaintiff claimed that an injunction was necessary prior to the date the government's continuing resolution was set to expire because the plaintiff was required "to inform public debate over appropriations legislation." *Id*. at *5. The court concluded that injunctive relief was not warranted because the requested information would "not go 'stale' for [plaintiff]'s own asserted purpose." *Id*. at *9–10. The court explained that because the plaintiff's request was not tied to a singular event with a certain end date (*i.e.*, "a census, congressional election, or impeachment process"), "after which the requested records would no longer have anything but 'historical value,'" the records would "remain valuable and relevant" to Congress and the public. *Id*. (citing *Brennan Ctr. for Justice at NYU Sch. of Law v. Dep't of Commerce*, 498 F. Supp. 3d 87, 101 (D.D.C. 2020)).

Here, too, Protect Democracy has failed to show that it will be irreparably harmed in the absence of a mandatory injunction ordering Defendants to post all apportionment documents and footnotes. Protect Democracy does not claim that the documents will be "stale" or otherwise merely "historical" to the extent this case is ultimately resolved in its favor. At bottom, there is no need for preliminary injunctive relief now because there is no date certain by which Protect Democracy needs to review and analyze spending documents for the government writ large. To the extent Protect Democracy prevails in this case, it will be afforded access to the apportionment documents and may resume review in accordance with its mission.

24

### III.    The Balance of the Equities and the Public Interest Support Rejection of Protect Democracy's Motion.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). "[T]hwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020). In this setting, granting the preliminary injunction that Protect Democracy seeks would require unconstitutional infringement upon Executive power. *See NAACP v. U.S. Department of Educ.*, No. 25-CV-1120 (DLF), 2025 WL 1196212, at *7 (D.D.C. Apr. 24, 2025) ("[E]nforcement of an unconstitutional law is always contrary to the public interest." (citation omitted)).

### IV.    Protect Democracy Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief

The Court should order security with any preliminary injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Protect Democracy to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

### V.    Protect Democracy's Partial Motion for Summary Judgment Fails

Protect Democracy moves for partial summary judgment on its claim that OMB's failure to maintain a publicly available apportionment database is contrary to the 2022 and 2023 Acts.

Because Protect Democracy has not established a likelihood of success on the merits of that

claim, as explained above, it is not entitled to summary judgment.

## **CONCLUSION**

For all the foregoing reasons, the Court should deny Protect Democracy's motion for a

preliminary injunction and for partial summary judgment.


Dated: May 2, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director


*/s/ Heidy L. Gonzalez*
HEIDY L. GONZALEZ
(FL Bar #1025003)
CARMEN M. BANERJEE
(D.C. Bar #497678)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov

*Attorneys for Defendants*