**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

PROTECT DEMOCRACY PROJECT,

               Plaintiff,

     v.

U.S. OFFICE OF MANAGEMENT & BUDGET
et al.,

               Defendants.

Case No. 1:25-cv-01111

---

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY
INJUNCTION OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

    I.     Protect Democracy Is Likely to Succeed on the Merits ........................................ 3

      A.    Protect Democracy Has Article III Standing ................................................. 3

         1.    Protect Democracy Is Incurring Informational Injury ............................... 3

         2.    Protect Democracy Is Suffering Economic Harm ...................................... 7

      B.    The 2022 and 2023 Appropriations Acts Are Constitutional ....................... 9

         1.    The Disclosure Requirements Do Not Intrude on any Inherent Presidential Power .. 9

         2.    Approved Apportionments Are Not Predecisional or Deliberative ......................... 13

    II.    Protect Democracy Is Suffering Irreparable Harm ....................................... 16

    III.   The Balance of Equities and Public Interest Favor Preliminary Relief ....................... 20

    IV.   The Court Should Alternatively Enter Partial Summary Judgment ............................ 20

    V.    The Court Should Not Order Bond ................................................................. 21

CONCLUSION ................................................................................................................ 22

# TABLE OF AUTHORITIES

## Cases

*A.B.C. Home Furnishings, Inc. v. Town of E. Hampton*, 947 F. Supp. 635 (E.D.N.Y. 1996)........ 8

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
   2025 WL 752378 (D.D.C. Mar. 10, 2025) ................................................................. 16

*Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd.*,
   365 F. Supp. 3d 118 (D.D.C. 2019). .......................................................................... 4

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615 (D.C. Cir. 2020).................. 3, 8

*Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34 (2d Cir. 2015) ............................ 8

*Bowsher v. Synar*, 478 U.S. 478 (1986)................................................................................... 11-12

*Cellco P'ship v. Bd. of Sup'rs of Fairfax Cnty., Va.*, 140 F. Supp. 3d 548 (E.D. Va. 2015).......... 8

*Citizens for Resp. & Ethics in Washington v. United States Postal Serv.*,
   557 F. Supp. 3d 145 (D.D.C. 2021) .......................................................................... 13

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) .................................. 10

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980). ........................... 13

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679 (D.C. Cir. 2023)............ 6

*Ctr. for Public Integrity v. U.S. Dep't of Def.*,
   No. 1:19-cv-03265, ECF No. 23-2 (D.D.C. Feb. 14, 2020) ........................................... 19

*Elec. Priv. Info. Ctr.* (*EPIC*) *v. Presidential Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) .................................................................................. 4

*Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d 30, 42 (D.D.C. 2006*)* .................................................... 20

*Epoch Props., Inc. v. City of Palmetto,* 2025 WL 693370 (M.D. Fla. Mar. 4, 2025).................... 8

*Ethyl Corp. v. E.P.A.*, 306 F.3d 1144 (D.C. Cir. 2002) .......................................................... 4, 6

*Fed. Election Comm'n v. Akins,* 524 U.S. 11 (1998)........................................................... 3, 6, 7

*Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016) .................................................. 4, 5

*Hawaii v. Trump*, 871 F.3d 646 (9th Cir. 2017) ...................................................................... 8

*Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4 (D.C. Cir. 2015)................................................ 7

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)........................... 8

*INS v. Chadha*, 462 U.S. 919 (1983) .................................................................................... 11

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52 (D.C .Cir.1977)................................................ 19

*Jud. Watch, Inc. v. U.S. Dep't of Com.*, 583 F.3d 871 (D.C. Cir. 2009) ...................................... 15

*Lawyers' Comm. for C.R. Under L. v. Presidential Advisory Comm'n on Election Integrity*,
   265 F. Supp. 3d 54 (D.D.C. 2017).......................................................................... 15

*Miller v. Carlson*, 768 F. Supp. 1331 (N.D. Cal. 1991) .......................................................... 8

*N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ................................................ 14

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) .................................... 21

*Nat'l Ass'n of Consumer Advocs. v. Gemini Tr. Co., LLC*, 757 F. Supp. 3d 59 (D.D.C. 2024)..... 3

*Nat'l Lifeline Ass'n v. Fed. Comm'ns Comm'n*,
    2018 WL 4154794 (D.C. Cir. Aug. 10, 2018) .................................................. 17

*Nixon v. Fitzgerald*, 457 U.S. 731(1982) .................................................. 12

*Noel Canning v. N.L.R.B.*, 705 F.3d 490 (D.C. Cir. 2013) ........................................ 10

*Payne Enters., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988) ............................ 16

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168 (1975)............................. 14

*Sackett v. EPA*, 566 U.S. 120 (2012). ................................................ 14

*Shays v. Fed. Election Comm'n*, 528 F.3d 914 (D.C. Cir. 2008) .................................. 6

*South Carolina v. United States*, 329 F. Supp. 3d 214 (D.S.C. 2018).................................. 21, 22

*Spaulding v. Douglas Aircraft Co.*, 60 F. Supp. 985 (S.D. Cal. 1945)........................... 11

*T-Mobile Ne. LLC v. Loudoun Cnty. Bd. of Sup'rs*, 748 F.3d 185 (4th Cir. 2014) ...................... 8

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). ................................................ 4

*United States v. Bland*, 472 F.2d 1329 (D.C. Cir. 1972) (en banc) .............................. 9

*United States v. Richardson*, 418 U.S. 166 (1974) ............................................ 7

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...................................... 2, 10, 11

**Statutes, Rules, and Constitutional Provisions**

Pub. L. No. 117-103, 136 Stat. 49 (2022)................................................ 1, 5, 16

Pub. L. No. 117-328, 136 Stat. 4459 (2022)................................................ 1

28 U.S.C. § 530D(a)(1)(B) ................................................ 9

31 U.S.C. § 1513................................................ 11, 13

31 U.S.C. § 1513 note ................................................ 11

31 U.S.C. §§ 1517-19. ................................................ 12

44 U.S.C. § 3502(20). ................................................ 5

Fed. R. Civ. P. 65(c) ................................................ 21

U.S. Const. art. I, § 9, cl. 7................................................ 11

**Other Authorities**

E.O. 14217 (Feb. 19, 2025)................................................ 16

H.R. 1770, 115th Cong. (2017)................................................ 6

L. Brandeis, *What Publicity Can Do*, Harper's Weekly (Dec. 20, 1913). ...................... 15

## INTRODUCTION

Defendants' opposition confirms that this case is both straightforward on the law and of enormous import to our constitutional structure. Defendants do not dispute that they are violating two statutes enacted by Congress to cast sunlight on Defendants' implementation of Congress's spending directives through the apportionment process. Defendants instead rest principally on two defenses: that Protect Democracy lacks standing and that the statutes are unconstitutional. Neither defense holds water.

On standing, Protect Democracy is suffering textbook informational and economic injuries. The Supreme Court and the D.C. Circuit have long recognized that a party suffers injury where it cannot obtain information that an agency must disclose by law and that the party would use to fulfill Congress's purposes in mandating disclosure. The statutes here[1] require Defendants to disclose apportionment information to all members of the public, including Protect Democracy. Without the disclosures, Protect Democracy cannot scrutinize apportionments to learn and inform others of any misuse of apportionments to improperly restrict or prevent use of appropriations. Protect Democracy also cannot add the apportionments to its custom website, OpenOMB.org ("OpenOMB"), which Protect Democracy created to provide a user-friendly platform through which Protect Democracy can educate and share information with the public and Congress. All of these uses are the precise purposes for which Congress required disclosure.

Protect Democracy's economic injuries are also straightforward. Protect Democracy invested substantial time, money, and resources to create OpenOMB, in reliance on Defendants' compliance with the law. Those investments are now of little value because of Defendants'

---

[1] *See* Pub. L. No. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 256-57 (2022); Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022) (together, the "2022 and 2023 Appropriations Acts").

actions. The Supreme Court has held that a nonprofit suffers cognizable injury where, as here, its monetary investments are wasted due to a defendant's actions.

On the merits, Defendants erroneously argue that the 2022 and 2023 Appropriations Act intrude upon some inherent Presidential power to supervise apportionments. Because Defendants are violating the express will of Congress, the President's power is at its "lowest ebb," and Defendants cannot show that the President has "conclusive and preclusive" authority to determine the manner of apportioning funds. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring). Far from it—the Constitution gives the exclusive power of the purse to Congress, not the President. The apportionment process exists only because Congress created it, and Congress may regulate the conditions on which the Executive Branch carries out this system to implement Congress's spending directives. And unlike the cases cited by Defendants, this is not a case where Congress has involved itself in the execution of the law. Congress has entrusted the execution of the disclosure requirements to OMB alone.

As for Defendants' argument that apportionments are predecisional and deliberative, Defendants refute their own argument by conceding that apportionments are legally binding on agencies. The Court's analysis can begin and end with that concession, because it is black-letter law that legally operative actions are not predecisional or deliberative. Defendants cite no case holding otherwise, and no such case could exist because it is illogical that an action that has immediate legal effect, and even exposes officials to criminal liability, can be "predecisional." Defendants' complaints that complying with the law is burdensome or causes them not to include information they do not wish to become public are not legal bases for violating the law.

Protect Democracy is suffering irreparable harm in light of its immediate informational and economic injuries, and thus a preliminary injunction is warranted. However, because

2

Defendants do not dispute that this case raises purely issues of law and there are no material disputed facts, the Court may alternatively enter summary judgment.

## ARGUMENT

**I.    Protect Democracy Is Likely to Succeed on the Merits**

### A.  Protect Democracy Has Article III Standing

"Organizations can establish their own standing by making the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (alteration and quotations omitted). "[T]he essential question underpinning every standing inquiry is whether the suing party has a personal stake in the controversy," *Nat'l Ass'n of Consumer Advocs. v. Gemini Tr. Co., LLC*, 757 F. Supp. 3d 59, 62 (D.D.C. 2024) (quotations omitted).

Protect Democracy clearly has a "personal stake" in this controversy given the acute informational and economic injuries it is suffering due to Defendants' unlawful actions. Protect Democracy does not assert generalized interests common to all members of the public—it has suffered unique, direct harms to its right to receive information to carry out the purposes that Congress intended in mandating disclosure, and to the financial investments it made in reliance on Defendants' prior compliance with the law.

### 1.  Protect Democracy Is Incurring Informational Injury

Decades ago, the Supreme Court held that "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Fed. Election Comm'n v. Akins,* 524 U.S. 11, 21 (1998). The D.C. Circuit has repeatedly held since *Akins* that a plaintiff suffers informational injury where "a statute . . . requires that the

information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Ethyl Corp. v. E.P.A.*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (quotations omitted). Stated differently, a plaintiff need only show that: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Elec. Priv. Info. Ctr.* (*EPIC*) *v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). Stated yet another way, "the existence and scope of an injury for informational standing purposes is defined by Congress: a plaintiff seeking to demonstrate that it has informational standing generally need not allege any *additional* harm beyond the one Congress has identified." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (quotations omitted).

Regardless of the precise formulation, Protect Democracy easily meets the requirements for informational injury here. Indeed, the result here is "straightforward." *See Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118, 124 (D.D.C. 2019).

First, as Defendants acknowledge, the 2022 and 2023 Appropriations Acts require OMB to disclose apportionments information to the public online. Defs.' Opp. to Pls.' Mot. ("Opp.") 14-15. This is exactly the type of "public-disclosure law" that confers an informational right for standing purposes. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 441 (2021). That the law requires disclosure to the public at large is of no moment: the Supreme Court has recognized standing based on the "denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information." *Id.*; *see also Air All. Houston*, 365 F. Supp. 3d at 124 (finding informational injury where plaintiff could not "access information that the statute mandates the agency collect and then make available"); *Friends of Animals*, 824 F.3d at 1041

(statute requiring the Secretary of Interior to make public all information on a permit application created "a right to information upon which . . . informational standing may be predicated").

Second, Protect Democracy is suffering the harm that "Congress has identified" in requiring the disclosure of apportionments. *Friends of Animals*, 828 F.3d at 992 (quotations omitted). Defendants assert that "[t]he 2022 and 2023 Acts are intended to provide the public with insights into government spending and to enable Congress to oversee the Executive Branch's apportionment of appropriated funds." Opp. 14. Protect Democracy agrees. Without the required disclosures, Protect Democracy is suffering harm to its *own* ability to obtain "insights into government spending." *Id.* As William Ford attests in his first declaration: "Without public access to the up-to-date apportionment documents and information previously made available on the OMB website, Protect Democracy can no longer . . . use the site to monitor the apportionments, footnotes, and the written explanations accompanying footnotes for potential violations of the law." Pl.'s Mot. for Prelim. Injun. or Summ J. ("Mot.") Ex. 1, Ford Decl. ¶ 19. That more than suffices to show informational injury.

Protect Democracy is incurring even more harms that reflect the purposes for which Congress mandated disclosure. In addition to precluding Protect Democracy's own scrutiny of apportionment data, "Protect Democracy can no longer provide updated information about apportionments to Congress, the press, and the public through OpenOMB." Ford Decl. ¶ 19. Defendants argue that Congress did not seek to provide information to the public through a "middleman." Opp. 15. But that cramped view of Congress's purposes has no textual support. To the contrary, Congress specifically required that OMB disclose apportionments in a format that qualifies as an "Open Government Data Asset," 136 Stat. at 257—in other words, a format that is "machine-readable," available "in an open format," and "not encumbered by restrictions . . . that

would impede" its use. 44 U.S.C. § 3502(20). These requirements are specifically intended to enable use by "the general public, businesses, journalists, academics, and advocates" alike. H.R. 1770, 115th Cong. § 2(a)(1) (2017), https://perma.cc/W222-D65A. It is only because the apportionment information is in this usable format that Protect Democracy was able to create the OpenOMB platform that automatically updates as new apportionments are disclosed. Protect Democracy has used this platform to advance Congress's actual purposes: to facilitate greater public and congressional insight into apportionments. Ford Decl. ¶¶ 2, 8, 11.

In short, Protect Democracy's inability to understand, scrutinize, and educate others on OMB's use of apportionments is exactly the scenario that Congress sought to prevent in enacting the disclosure requirements in the 2022 and 2023 Appropriations Acts.

Defendants' remaining grounds for resisting Protect Democracy's informational injury are quickly dispensed. Defendants suggest that an informational injury arises only if a plaintiff requests and is denied information that the government is required to provide by statute. *See* Opp. 12-13 (citing Freedom of Information Act (FOIA) and Federal Advisory Committee Act (FACA) cases). But the D.C. Circuit has rejected this argument, holding that a plaintiff "need not receive a specific denial" of a request for information "to sustain an informational injury." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023). Rather, "a plaintiff suffers an informational injury when an agency . . . places a legally unsupported limit on its statutory reporting requirements," "so long as the plaintiff has a statutory right to seek the information that the agency withheld." *Id.*; *see also Ethyl Corp.*, 306 F.3d at 1146-48 (finding standing without any specific request for or denial of information); *Shays v. Fed. Election Comm'n*, 528 F.3d 914, 923 (D.C. Cir. 2008) (same). As the Supreme Court put it in *Akins*, an

injury in fact exists where the plaintiff is unable "to obtain information . . . that, on [its] view of the law, the statute requires that [the government] make public." *Akins*, 524 U.S. at 21.

Finally, Defendants erroneously compare this case to one of taxpayer standing. *See* Opp. 11 (discussing *United States v. Richardson*, 418 U.S. 166 (1974)). Unlike the *Richardson* plaintiff who asserted a general interest under the Appropriations Clause in obtaining detailed agency expenditures to allow him to monitor the actions of Congress or the Executive, *see* 418 U.S. at 176, Protect Democracy has a concrete and particularized interest in receiving apportionment information that Congress mandated be made publicly available at a specific time, in a specific format, and for the very purposes Protect Democracy is using the information.

## 2.  Protect Democracy Is Suffering Economic Harm

Protect Democracy is also suffering economic injuries that satisfy Article III's injury-in-fact requirement. "[E]conomic loss" is "a classic form of concrete and particularized harm." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 9 (D.C. Cir. 2015). Protect Democracy is suffering economic injury due to the lost value of the significant investments Protect Democracy made in creating and maintaining its website.

As Protect Democracy's William Ford detailed in his opening declaration, in furtherance of its organizational mission, Protect Democracy invested substantial time, money, and resources into building OpenOMB.org, its website making OMB's apportionments more accessible to and usable by the public. Mot. Ex. 1, Ford Decl. ¶¶ 7-9. Building the website was a ten-month endeavor, and that, coupled with post-launch work to develop new capabilities such as the notification feature, demanded hundreds of hours of time from organization staff. *Id.* But with OMB no longer posting its apportionments as legally required, "OpenOMB is now of considerably less value because it cannot serve its core function of making it easier to track

OMB's apportionments." Ex. A, Supp. Decl. of William P. Ford ("Ford Supp. Decl.) ¶ 2(a)

"OpenOMB is now only an archive of apportionments from a fixed period of time" in the past,

*id.*, rather than serving the purpose for which Protect Democracy invested substantial money and

resources in it—to "make oversight of OMB's apportionments easier for Congress, the press, and

the public" on an ongoing basis. *See AboutOpenOMB*, OpenOMB.org/about (last visited May 4,

20250. Moreover, Protect Democracy now cannot finish and launch a new "notification" feature

that it had spent months developing for OpenOMB and was about to go live before OMB took

down its apportionment website. Ford Decl. ¶¶ 7-9.

Defendants' actions resulting in the severe diminution of value of Protect Democracy's

investments is cognizable economic injury. The Supreme Court has explicitly held so, and in the

context of nonprofit organization. In *Village of Arlington Heights v. Metropolitan Housing

Development Corp.*, 429 U.S. 252 (1977), the Court found that a nonprofit suffered cognizable

"economic injury" where it had "expended thousands of dollars" on plans and studies in support

of a rezoning request that the defendant denied. *Id.* at 262. The Court found the nonprofit had

standing because the "plans and studies" on which it had spent money would be "worthless"

unless the request were granted. *Id.* Numerous other cases have found injury-in-fact where the

plaintiff invested time, money, or resources on a project that was rendered of little value because

of the defendant's subsequent action. *See, e.g.*, *Hawaii v. Trump*, 871 F.3d 646, 661 (9th Cir.

2017); *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015); *T-

Mobile Ne. LLC v. Loudoun Cnty. Bd. of Sup'rs*, 748 F.3d 185, 197 (4th Cir. 2014); *Epoch

Props., Inc. v. City of Palmetto,* 2025 WL 693370, at *4 (M.D. Fla. Mar. 4, 2025); *Cellco P'ship

v. Bd. of Sup'rs of Fairfax Cnty., Va.*, 140 F. Supp. 3d 548, 562 (E.D. Va. 2015); *A.B.C. Home

*Furnishings, Inc. v. Town of E. Hampton*, 947 F. Supp. 635, 642 (E.D.N.Y. 1996); *Miller v. Carlson*, 768 F. Supp. 1331, 1339 (N.D. Cal. 1991).

Defendants appear to refer to these harms as relating to Protect Democracy's "proprietary interests," Opp. 12, but that only confirms that Protect Democracy's injuries are not generalized ones. The standing injury for a nonprofit organization is the same as for anyone else. *Anti-Vivisection Soc'y*, 946 F.3d at 618. Protect Democracy has injury-in-fact where it suffers an injury to its bottom line, just as would any individual or for-profit corporation.

### B. The 2022 and 2023 Appropriations Acts Are Constitutional

On the merits, Defendants do not deny that their taking down the OMB apportionment website violates the 2022 and 2023 Appropriations Acts. Defendants' sole defense on the merits is that those Acts are unconstitutional. Defendants appear to assert two grounds on which the Acts are purportedly unconstitutional: (1) the disclosure requirements intrude upon some inherent Executive Branch power to manage its affairs (Opp. 15-17); and (2) the Acts require Defendants to disclose information subject to the deliberative process privilege (*id.* at 18-21).

"[T]he burden of establishing the unconstitutionality of a statute rests on him who assails it." *United States v. Bland*, 472 F.2d 1329, 1334 (D.C. Cir. 1972) (en banc). Defendants do not come close to meeting their burden to establish that the Acts here are unconstitutional.[2]

### 1. The Disclosure Requirements Do Not Intrude on any Inherent Presidential Power

Justice Jackson's tripartite framework for evaluating presidential authority governs Defendants' contention that the Acts intrude upon the President's purported inherent "power of

---

[2] The Attorney General does not appear to have complied with 28 U.S.C. § 530D(a)(1)(B)'s requirement to notify Congress when the Department of Justice "contest[s] affirmatively, in any judicial . . . the constitutionality of any provision of any Federal statute."

administering [appropriated] funds." Opp. 17. This framework rests on the principle that the President's authority "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Under the third category of Justice Jackson's framework, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* at 637-38 (Jackson, J., concurring). "Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject." *Id.* "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id.*

Defendants' refusal to post apportionments violates the express will of Congress in the 2022 and 2023 Appropriations Acts, and therefore the President's power falls into the third category of Justice Jackson's framework and is at "its lowest ebb." *Id.* Defendants cannot show the President's power over apportionments is "conclusive and preclusive," as the "Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "The Framers placed the power of the purse in the Congress in large part because the British experience taught that the appropriations power was a tool with which the legislature could resist 'the overgrown prerogatives of the other branches of government.'" *Noel Canning v. N.L.R.B.*, 705 F.3d 490, 510 (D.C. Cir. 2013) (quoting The Federalist No. 58). Because "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I, § 9, cl. 7, the President has no inherent authority at all to authorize or restrict the spending of federal funds. The apportionment system itself exists only because Congress created (and has now revised) it in the Antideficiency

Act. 31 U.S.C. § 1513. And OMB would have no money to apportion if Congress did not appropriate it.

Defendants oddly suggest that the disclosure requirements mandated by Congress interfere with OMB "using its apportionment authority as Congress intended." Opp. 20; *see also id.* at 17 (citing 31 U.S.C. § 1512). Congress codified the disclosure requirements *within* the Antideficiency Act, at 31 U.S.C. § 1513 note, and those requirements are now part and parcel of the congressionally prescribed apportionment system. The disclosure requirements, in other words, are a direct exercise of Congress's power of the purse in conditioning the use of appropriations. Just as Congress conditioned the use of appropriations on the funds being apportioned, Congress has now conditioned the apportionment process on apportionments being made public. *See Spaulding v. Douglas Aircraft Co.*, 60 F. Supp. 985, 988 (S.D. Cal. 1945), *aff'd*, 154 F.2d 419 (9th Cir. 1946) ("Congress in making appropriations has the power and authority not only to designate the purpose of the appropriation, but also the terms and conditions under which the executive department of the government may expend such appropriations.").

None of the cases cited by Defendants suggest that the President has "conclusive and preclusive authority" over the manner in which funds are apportioned, including whether they must be made public. *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring). None have anything to do with whether the Executive Branch may refuse to carry out congressional directives.

Both *INS v. Chadha,* 462 U.S. 919 (1983) and *Bowsher v. Synar*, 478 U.S. 478 (1986) concerned actual or effective congressional vetoes of execution action. *Chadha* involved a statute that allowed either chamber of Congress, by passing a resolution, to veto the Attorney General's decision to deport a particular noncitizen. 462 U.S. at 923. The Court held that this

procedure did not comply with the Constitution's bicameralism and presentment requirements for legislation. *Id.* at 951-59. In *Bowsher*, the Court struck down a statute that placed "execution of the law" in the hands of the Comptroller General, an official subject to removal by Congress. 478 U.S. at 726, 732. The Court held that "[t]o permit an officer controlled by Congress to execute the laws would be, in essence, to permit a congressional veto." *Id.* at 726. The fact that the Comptroller General was removable by Congress is what impermissibly gave Congress "an active role . . . in the supervision of officers charged with the execution of the laws." *Id.* at 722. *Cf.* Opp. 15 (quoting this language without context). Here, by contrast, the 2022 and 2023 Appropriations Acts give Congress no role in carrying out or vetoing the Executive Branch's "execution of" the apportionment disclosure requirements set forth in the Acts. 478 U.S. at 726, 732. The Acts place responsibility for carrying out these statutory requirements in OMB alone.

 *Nixon v. Fitzgerald*, 457 U.S. 731 (1982) is further afield. *Nixon* concerned the President's immunity from civil damages suits for actions connected to his official responsibilities. The Court's analysis focused on whether lawsuits brought by private citizens seeking damages would interfere with the President's constitutional duties. The case did not involve any act of Congress, and thus has nothing to do with whether the Executive Branch may defy an act of Congress. Indeed, the Court noted that Congress had not "taken express legislative action to subject the President to civil liability for his official acts." *Id.* at 748.

 In short, Defendants cite no authority—and there is none—to support the contention that the Executive Branch has inherent authority to ignore express statutory directives relating to the expenditure of congressional appropriations.

### 2.   Approved Apportionments Are Not Predecisional or Deliberative

Defendants likewise present no credible arguments that apportionments are predecisional and deliberative and thus subject to the deliberative process privilege. Defendants concede that approved apportionments are "legally binding on agencies." Opp. 4 (citing Kinneen Decl. ¶ 6). Defendants must concede that, because apportionments, by law, provide legal authorization for agencies to spend the apportioned amounts, legally prohibit agencies from spending more than those amounts, and subject officials to administrative discipline and criminal liability if they authorize spending more than the apportioned amounts. 31 U.S.C. §§ 1513, 1517-19.

Defendants' concession that apportionments are legally binding conclusively refutes their privilege claim. It is settled law that "[a] document with 'operative and controlling effect,'" including one that "leads to 'direct and appreciative legal consequences,'" "is not subject to the [deliberative process] privilege." *Citizens for Resp. & Ethics in Washington v. United States Postal Serv.*, 557 F. Supp. 3d 145, 157 (D.D.C. 2021) (quoting *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 270 (2021), and *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867-69 (D.C. Cir. 1980)). That must be the case, for it is simply not possible for a "predecisional" document to be legally binding, let alone to expose individuals to prison time if they violate the document's directives. Defendants cite no case in which a court has ever found a legally binding document to be predecisional and deliberative. Defendants also do not cite any instance before now where *OMB itself* has claimed apportionments are privileged. Defendants do not dispute that in prior FOIA litigation they have released final apportionments without asserting the deliberative process privilege. Mot. 16-17.

Defendants nonetheless insist that approved apportionments are predecisional and deliberative because, while "legally binding on agencies," "OMB . . . remains free to alter its

apportionment decisions." Opp. 4. That is not what "predecisional" and "deliberative" mean. OMB's apportionments are final because they have real operative legal effect *on agencies* the moment they are issued. The "possibility" that OMB "might reconsider . . . does not suffice to make [its] otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

Consider, for example, if this Court were to grant the instant request for a preliminary injunction. If the Court issued a preliminary injunction that compelled Defendants to restore the apportionments website, that injunction would not be "predecisional" or "deliberative" merely because the Court, as the decisionmaker, could later reach a different decision as the case unfolds. Likewise, as the Supreme Court has repeatedly recognized, a U.S. District Court judgment is "final" because it has "real operative effect," even if it may be later "overturned" or revised by the Court of Appeals. *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 159 n.25 (1975); *accord Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 183 (1975).

Given their immediate legal effect, apportionments would be final decisions even if OMB always changed them as time passed, but that is not even the case. The declaration submitted by Defendants asserts that apportionments "may," "might," or "can be" changed "if" new circumstances or policies warrant it. Kinneen Decl. ¶¶ 10, 12. But as the declaration impliedly admits, there are many instances where OMB never revises an apportionment. *See id.* ¶ 10 (stating that apportionments are "often" updated). The fact that apportionments frequently are left without revision merely reinforces that apportionments are not "deliberative" but rather are final decisions permitting agencies to spend a specific amount of money at a given point in time.

Defendants' remaining arguments are just policy disagreements with Congress that have no bearing on whether Defendants may ignore Congress's directives. Defendants lament that publicly disclosing apportionments in a tight timeframe "burdens" them and forces them to

"omit" information from apportionments that they would prefer to keep "confidential[]" rather than being known by the public. Opp. 20. None of these reasons make apportionments predecisional or deliberative. And again, apportionments exist only because Congress created the apportionment process through the Antideficiency Act and because it appropriates funds each year to be apportioned. Congress is free to alter or condition the apportionments process it created, even if those changes make the process somewhat more burdensome to implement. Defendants do not claim that the disclosure requirements make it prohibitively burdensome to carry out apportionments, nor could they given that OMB complied with the disclosure requirement for three years.

Defendants' argument would call into question virtually every statute Congress has passed imposing information disclosure requirements on the Executive Branch. Take FOIA, for example. As any attorney who has worked in the Executive Branch knows, FOIA imposes an enormous "burden" on agencies, and it certainly has a "chilling effect" on communications, as officials frequently "omit" information from their emails over worry that they could be disclosed in FOIA. *Cf.* Opp. 6, 20. That does not make FOIA unconstitutional. FACA imposes an even greater burden. Unlike FOIA and the 2022 and 2023 Appropriations Acts here, FACA requires the disclosure of "materials manifesting an agency's deliberative processes." *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 583 F.3d 871, 874 (D.C. Cir. 2009). And yet FACA, too, is constitutionally sound. Imposing a burden on the Executive Branch to disclose information that it does not wish to disclose does not render a statute unconstitutional. Such statutes have virtue precisely because they require the disclosure of information that the Executive Branch may prefer the public does not know. *See* L. Brandeis, *What Publicity Can Do*, Harper's Weekly (Dec. 20, 1913).

## II.    Protect Democracy Is Suffering Irreparable Harm

Defendants' conduct is irreparably harming Protect Democracy in several ways. First, Defendants' actions deprive Protect Democracy of information it needs to assess and inform others on how the Executive Branch is, or is not, spending appropriated funds—"information that is highly relevant to an ongoing public debate." *Lawyers' Comm. for C.R. Under L. v. Presidential Advisory Comm'n on Election Integrity*, 265 F. Supp. 3d 54, 70 (D.D.C. 2017). OMB's apportionment decisions are a matter of immense, immediate concern to Protect Democracy, particularly where the President and Defendant Vought have openly declared their intent to impound appropriated funds, Mot. 10, and where the Executive Branch is actively refusing to spend appropriations for agencies that the President is seeking to dismantle, *see, e.g.*, *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *14-18 (D.D.C. Mar. 10, 2025) (refusal to spend appropriations for USAID); E.O. 14217 § 2 (Feb. 19, 2025) (ordering that four agencies "shall be eliminated").

The injuries being incurred by Protect Democracy from lack of access to the required information are irreparable. Every day that goes by without disclosure of apportionments is a day that Protect Democracy cannot carry out its mission of scrutinizing and informing others on whether and how the President is using apportionments to "defer" spending funds in violation of the Impoundment Control Act, 2 U.S.C. §§ 682, 684, or to wholly prevent funds from being spent before they expire in less than five months, without the Executive Branch having obtained congressional rescission of the funds as legally required, *id.* § 683. The apportionment data will become "stale" and of considerably less "value" if disclosed after any unlawful deferrals are occurring, and certainly when it is too late in the fiscal year for Protect Democracy to sound the

alarm about funding that is likely to expire because it has not been apportioned with sufficient time before it expires. *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).

But the parties need not debate how quickly apportionments must be disclosed to serve Congress's statutory purposes, because Congress has resolved that question by mandating that OMB automatically post them publicly *within two business days* of making the final apportionment decision. 136 Stat. at 257. "[M]ak[ing] apportionments publicly available *in a timely manner*," according to Representative Rosa DeLauro (Chairwoman of the House Appropriations Committee when the 2022 Appropriations Act was enacted), is an "Important Policy Change" that Congress adopted to "[s]trengthen[] our democracy." Mot. Ex. 7, at 18 (emphasis added). Congress created the disclosure requirements, and Congress deserves great deference in its determination of the timing by which apportionments must be disclosed to serve the law's purposes.

Second, the direct economic injuries suffered by Protect Democracy constitute irreparable harm. Although the D.C. Circuit has held that "*recoverable* monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business," the D.C. Circuit has "judged allegations of *unrecoverable* monetary losses by a less stringent standard." *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 2018 WL 4154794, at *1 (D.C. Cir. Aug. 10, 2018) (citing *Robertson v. Cartinhour*, 429 Fed. Appx. 1, 3 (D.C. Cir. 2011)). The economic harms to Protect Democracy are not recoverable from a future judgment. Any future period of time where Protect Democracy's investments in OpenOMB are being wasted and of little value cannot be remedied through a future injunction. The money that Protect Democracy is paying each month to Amazon Web Services to keep OpenOMB online, in the hopes that Defendants will start disclosing apportionments again after a final judgment, are

17

certainly not recoverable, since there is no path to Protect Democracy obtaining damages for these expenses. *See* Ford Supp. Decl. ¶ 2(b).

Defendants' informational and economic harms are especially acute because they cut to the core of Protect Democracy's mission. In carrying out its mission of preventing American democracy from declining into a more authoritarian form of government, Protect Democracy places special focus on safeguarding Congress's power of the purse, which is a critical check against abuse of executive authority. Ford Decl. ¶¶ 2-3. That is why Protect Democracy invested so much in building OpenOMB, why it spends time reviewing apportionments when they are made public, and why it cares so deeply that OpenOMB can serve as a resource to Congress, the press, and the public. Protect Democracy's injuries are anything but "generalized grievances that are common to all members of the public." Opp. 1. The information and economic injuries that Protect Democracy is suffering are actively and irreparably interfering with Protect Democracy's fulfillment of its unique mission.

None of Defendants' objections counter Protect Democracy's multiple forms of irreparable harm. Defendants attempt to recharacterize Protect Democracy's injuries as a third-party harm. Opp. 21-22. That argument misses the point. As explained *supra*, Defendants' actions have directly interfered with Protect Democracy's own scrutiny of the information that the law requires to be disclosed, and Protect Democracy's own mission-critical activities of timely educating the public and Congress on whether the Executive Branch is spending appropriations as legally required. And Defendants' actions are harming Protect Democracy's own investments in creating OpenOMB. All of those harms are incurred by Protect Democracy, not third parties.

Defendants also note that OpenOMB still exists, Opp. 23, but they do not dispute that the website is not serving its core purpose of providing the public with *timely* information about ongoing OMB's apportionments. Instead, OpenOMB is simply providing apportionment information as a historical artifact. *See* Ford Supp. Decl. ¶ 2(a) ("OpenOMB is now only an archive of apportionments from a fixed period of time."). That the archived apportionment information is substantially less valuable to the public's understanding of the Executive Branch's ongoing conduct in the midst of an ongoing public debate is reflected in the sharp drop in page views after Defendants ceased complying with the law. *Id.* ¶¶ 14-15.

Finally, Defendants say that Protect Democracy merely "speculates" that it will be unable to receive apportionment documents through a FOIA request that satisfy the Open Government Data Asset requirement on which Protect Democracy relies to update its website. Opp. 23. For one, Defendants have made clear through this lawsuit that they consider apportionments to be covered by the deliberative process privilege, and thus if Defendants remain consistent in that position, FOIA is not a viable alternative. Indeed, even if Defendants do disclose some information through FOIA, they are likely to withhold the very information that Congress felt it most important be disclosed in the 2022 and 2023 Appropriations Acts, such as apportionment footnotes that restrict how agencies may use the apportioned funds. Moreover, if Defendants did produce apportionments via FOIA, that law contains no requirement that the government produce documents in the format requirement by the 2022 and 2023 Appropriations Act. As shown by OMB's prior FOIA responses producing apportionment decisions, *see Ctr. for Public Integrity v. U.S. Dep't of Def.*, No. 1:19-cv-03265, ECF No. 23-2 (D.D.C. Feb. 14, 2020), OMB typically produces documents in PDF format, which Protect Democracy could not use to feed into OpenOMB absent significant manual labor. Ford Decl. ¶ 22.

### III.    The Balance of Equities and Public Interest Favor Preliminary Relief

"[T]here is an overriding public interest in the general importance of an agency's faithful adherence to its statutory mandate." *Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d 30, 42 (D.D.C. 2006) (quoting *Jacksonville Port Auth. v. Adams.*, 556 F.2d 52, 59 (D.C. Cir.1977)). That public interest is especially acute here, where the law exists to shed light on government actions that may present a real and present threat to the constitutional order, and to individuals and entities who may be affected by the unlawful impoundment of congressional appropriations. *See* Mot. 20-21; *see also, e.g.*, *Nat'l Endowment for Democracy v. United States*, No. 1:25-cv-648, ECF No. 16 (D.D.C Mar. 31, 2025) (in a JSR filed after OMB took down its apportionment website, discussing lack of information over whether the government's "unusual" obligation practice indicated that the Executive Branch was planning to obstruct the plaintiff's "ability to receive its directly appropriated funds through limited apportionment or otherwise").

Defendants' sole response is that a preliminary injunction would unconstitutionally infringe upon Executive power. Opp. 25. But as explained above, Defendants fail to show that the 2022 and 2023 Appropriations Acts' apportionment transparency provisions are unconstitutional. *Supra.* Any contention of acute harm to the government is also belied by the *nearly three years* in which OMB complied with the statutory disclosure requirements without incident. The sudden claim that Defendants are harmed by following the law pending the final disposition of this case contradicts years of prior practice and lacks any legal basis.

### IV.    The Court Should Alternatively Enter Partial Summary Judgment

In responding to Protect Democracy's request for summary judgment, Defendants solely reiterate their contention that Protect Democracy is unlikely to succeed on the merits. Defendants do *not* contend that there are any material disputed facts that would preclude the entry of

summary judgment. Any such argument therefore is forfeited or waived. This Court therefore

may resolve this case and the constitutionality of the 2022 and 2023 Appropriations Acts as a

matter of law. The resolution of that question is clear: the statutes are not unconstitutional, and

Defendants' actions plainly violate the statutes' mandates.

In light of Defendants' failure to raise any disputed questions of material fact, Protect

Democracy respectfully submits that entry of partial summary judgment may be appropriate.

## V.    The Court Should Not Order Bond

The Court should reject Defendants' unsupported request that Protect Democracy post an

unspecified amount of security if the Court enters a preliminary injunction. Federal Rule of Civil

Procedure 65(c) authorizes courts to require a movant to post security "in an amount that the

court considers proper to pay the costs and damages sustained by" the opposing party if they are

later "found to have been wrongfully enjoined." "It is well settled that Rule 65(c) gives the Court

wide discretion in the matter of requiring security." *Nat. Res. Def. Council, Inc. v. Morton*, 337

F. Supp. 167, 168 (D.D.C. 1971). Courts have exercised their discretion to waive security when

it "would have the effect of denying the plaintiffs their right to judicial review of administrative

action." *Id.* Courts have also set only "nominal bond amounts in public interest litigation." *South

Carolina v. United States*, 329 F. Supp. 3d 214, 238 n.35 (D.S.C. 2018), *vacated and remanded*,

912 F.3d 720 (4th Cir. 2019) (citing 11A Charles Alan Wright, Arthur R. Miller, & Edward H.

Cooper, Federal Practice and Procedure § 2954 (3rd ed. 2018)).

Here, the Court should waive security. Defendants do not contend that they will suffer

"costs and damages" if the Court issues a preliminary injunction that is later lifted. Nor could

they. Protect Democracy seeks injunctive relief requiring the government to *provide information*,

not to take any action affecting its pecuniary interests. In these circumstances, security would be

improper and would only serve to allow the government to "skirt[] judicial oversight," *South Carolina*, 329 F. Supp. 3d at 238, while depriving Protect Democracy—a nonprofit organization—of a right to judicial review of administrative action.

## CONCLUSION

For the foregoing reasons, the Court should grant Protect Democracy's Motion for a Preliminary Injunction or in the Alternative Summary Judgment.

Dated: May 5, 2025

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar # 1016621)
Kyla M. Snow*
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington DC, 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

* Not admitted in the District of Columbia. Practice limited to matters before U.S. courts. (admitted *pro hac vice*)

*Counsel for Plaintiff*